**ORIGINAL**

1   MANATT, PHELPS & PHILLIPS, LLP
    ROBERT H. PLATT (Bar No. CA 108533)
2   rplatt@manatt.com
    MARK S. LEE (Bar No. CA 094103)
3   mlee@manatt.com
    DONALD R. BROWN (Bar No. CA 156548)
4   dbrown@manatt.com
    11355 West Olympic Boulevard
5   Los Angeles, CA 90064-1614
    Telephone: (310) 312-4000
6   Facsimile: (310) 312-4224

7   Attorneys for *Plaintiff*
    TICKETMASTER L.L.C.

8

9

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13  TICKETMASTER L.L.C., a Virginia          Case No. CV 07-2534 ABC(JWJx)
    limited liability company,
14                                           [PROPOSED] FINDINGS OF FACT,
              Plaintiff,                      CONCLUSIONS OF LAW, AND
15                                            PRELIMINARY INJUNCTION
         vs.
16
    RMG TECHNOLOGIES, INC., a
17  Delaware corporation, and DOES 1
    through 10, inclusive,
18
              Defendants.
19

20          Having entered an order granting Plaintiff Ticketmaster L.L.C.'s Motion for

21  Preliminary Injunction ("Motion") on October 16, 2007, the Court makes the

22  following findings of fact and conclusions of law, and enters the following

23  preliminary injunction against RMG Technologies, Inc. ("RMG") and others

24  described below, pursuant to Fed.R.Civ.Proc. 65.

25  **I.    FINDINGS OF FACT**

26          **A.    Facts Relevant to Contract Claim**

27                  1.    Ticketmaster sells tickets for entertainment and sport events on

28  behalf of its clients to the general public through a variety of means, including its

    copyrighted website ticketmaster.com ("website"). Ticketmaster attempts to ensure

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41166571.1

1    a fair and equitable ticket buying process on the website by contract and through

2    technological means.  (Declaration of Kevin McLain ["McLain Decl."] ¶ 28.)

3          2.    Visitors to ticketmaster.com are required to accept contractual

4    provisions set forth in the website's "Terms of Use."  The Terms of Use governing

5    ticketmaster.com include the following terms:

6        "You [the viewer] agree that you are only authorized to visit, view and
         to retain a copy of pages of this site for your own personal use, and
7        that you shall not duplicate, download, [or] modify . . . the material on
         this Site for any purpose other than to review event and promotions
8        information, for personal use . . ."  (Pl.'s Ex. 8 at 70).

9        "No . . . areas of this Site may be used by our visitors for any
         commercial purposes . . . " (Id. at 71.)
10

11       "You agree that you will not use any robot, spider or other automated
         device, process, or means to access the Site . . . You agree that you
12       will not use any device, software or routine that interferes with the
         proper working of the Site nor shall you attempt to interfere with the
13       proper working of the Site." (Id. at 71.)

14       "You agree that you will not take any action that imposes an
         unreasonable or disproportionately large load on our infrastructure."
15       (Id. at 71-72.)

16       "You agree that you will not access, reload or 'refresh' transactional
         event or ticketing pages, or make any other request to transactional
17       servers, more than once during any three second interval." (Id. at 72.)

18       "You do not have permission to access this Site in any way that
         violates . . . these terms of use." (Id. at 72.)

19       "You understand and agree that . . . Ticketmaster may terminate your
20       access to this Site, cancel your ticket order or tickets acquired through
         your ticket order . . . if Ticketmaster believes that your conduct or the
21       conduct of any person with whom Ticketmaster believes you act in
         concert . . . violates or is inconsistent with these Terms or the law, or
22       violates the rights of Ticketmaster, a client of Ticketmaster or another
         user of the Site." (Id. at 72.)

23          3.    Any person viewing Ticketmaster's website is put on notice of

24    the Terms of Use.  The ticketmaster.com homepage displays the following warning:

25    "Use of this website is subject to express Terms of Use which prohibit commercial

26    use of this site.  By continuing past this page, you agree to abide by these terms."

27    (McLain Decl. ¶ 10; Pl.'s Exh. 4.)  The underlined phrase "Terms of Use" is a

28    hyperlink to the full Terms of Use; the same phrase appears on almost every page

1   of ticketmaster.com. (*Id.* ¶¶ 10-11; Exhs. 4-5.) In addition, since 2003, users of

2   ticketmaster.com have had to affirmatively agree to the Terms of Use as part of the

3   procedure to set up an account, and since mid-2006, users have had to affirmatively

4   agree to the Terms of Use for every ticket purchase.(*Id.* ¶¶ 12, 13; Exhs. 6, 7.)

5           4.      RMG Technologies, Inc. ("RMG") is a company that offers

6   software services. RMG has marketed and sold applications that enable RMG's

7   clients to use automated devices to enter and navigate through its website to

8   purchase tickets faster than Ticketmaster's human customers can, in violation of the

9   Terms of Use governing the website. (McLain Decl. ¶ 25, Pl.'s Exh. 1; Kovach

10  Decl. ¶ 3; Lieb Decl. ¶ 8, Pl. Exhs. 13-16.)

11          5.      RMG received notice of Ticketmaster's Terms of Use and

12  assented to them when it used ticketmaster.com to create its products and services.

13  (*Id.*)

14          6.      RMG describes its products and services in a non-public portion

15  of a website it maintains as follows:

16  **"Purchasemaster:  Tickets - Lots of tickets**

17          "Faster than any browser, *Purchasemaster* lets you do the work
    of a dozen people at once. You'll be looking through dozens of tickets
18  while the competition is still clicking on the refresh button waiting for
    the on sale to start.
19
            "*Purchasemaster's* **stealth** technology lets you hide your IP
20  address, so **you never get blocked by Ticketmaster.**" (Emphasis in
    original.)
21

22  (Pl.'s Exh. 1.)

23          7.      Ticketmaster's Senior Director of Applications Support, Kevin

24  McLain, traced ticket requests and purchases made on ticketmaster.com back to

25  individual users and, ultimately, to RMG. Based on his methodology, McLain

26  discovered, for example, that Chris Kovach, a ticket broker and one of RMG's

27  clients, purchased over 9,500 ticket orders - or 24,000 tickets - over the last several

28  years. (McLain Decl. ¶ 24.)

8.    McLain also identified Gary Charles Bonner and Thomas J. Prior as RMG's clients.  Using IP addresses registered to RMG, Bonner made almost 13,000 ticket purchases over several years, and made more than 425,000 ticket requests in a single day.  (*Id.*)  Using IP addresses registered to RMG, Prior made almost 22,000 ticket orders over several years, and made more than 600,000 ticket requests in a single day.  (*Id.*)  Requests so numerous cannot be made other than with automated devices.  (Lieb Reply Decl. ¶4.)

9.    Besides providing its products and services, RMG assists its clients in purchasing tickets from ticketmaster.com.  If a customer encounters any difficulty in securing tickets, it may immediately consult with an RMG representative.  (Kovach Decl. ¶ 10.)  RMG also offers consulting services to enable its clients to set up hardware, telecommunications equipment and other tools to purchase tickets from Ticketmaster.  (Kovach Decl. ¶¶ 10-11.)

10.    RMG conceals its actions from Ticketmaster.  Its technology spreads automated requests for tickets over multiple IP addresses to conceal the source of the requests.  (Lieb Decl. ¶ 8.e.)  RMG helps customers obtain new IP addresses from their internet service providers.  (Kovach Decl. ¶ 11.)  RMG screens potential customers to insure that they have no affiliation with or loyalty to Ticketmaster.  (Kovach Decl. ¶¶ 3, 12.)  RMG warns its customers not to publicize the existence of RMG's ticket buying services.  (Kovach Decl. ¶ 12, Pl.'s Exh. 18.)

**B.    Facts Relevant to Copyright Claim**

11.    Ticketmaster owns registered copyrights in the website ticketmaster.com, and, separately, in portions of the website.  (Lee Decl. ¶ 2; McLain Decl. ¶ 5, Pl.'s Exh. 2.)

12.    Each time someone views a page from ticketmaster.com, a copy of that page is necessarily downloaded or "cached" from Ticketmaster's computers onto the RMG's computer's random access memory ("RAM").  (Lieb Decl. ¶ 9.)

13.    RMG has viewed Ticketmaster's website, thereby copying the

1  website's webpages. Although Ticketmaster does not present direct evidence of

2  such viewing, the logic from which such an inference may be drawn is compelling.

3  Ticketmaster presents expert testimony that RMG necessarily had to view

4  ticketmaster.com in order to create the applications that enable RMG's customers to

5  enter and navigate through the website. (Lieb Decl. ¶ 9.) Indeed, it order to test the

6  applications to determine whether they worked as intended, RMG would have had

7  to actually use the applications to purchase tickets from the website. (*Id.*) By

8  RMG's own description, TBAT is "a browser geared for the purchase of tickets

9  from a variety of websites including . . . ticketmaster.com." (Garibay Decl. ¶ 5.) It

10 also follows that RMG's clients would have had to visit the website, and thus copy

11 pages, in order to make ticket purchases.

12      14.     Viewers are authorized to view -- and thereby copy -- pages of

13 the website when they do so in accordance with the Terms of Use. (Pl.'s Exh. 8.)

14 In addition, Ticketmaster reserves the right to terminate any person's access to the

15 website if it believes that person violated the Terms of Use. (*Id.*) Inasmuch as

16 RMG used the website, RMG assented to the terms.

17      15.     Kovach testified how he used RMG's applications to make

18 automated ticket requests, and that RMG made representatives available to help

19 him use its applications, circumvent Ticketmaster's security measures, and set up

20 his hardware for optimal use. (Kovach Decl. ¶¶ 6-11.)

21      **C.     Facts Relevant to DMCA Claim**

22      16.     Ticketmaster employs a number of technological means to

23 ensure that ticket buying over the website is fair and equitable. One of these

24 measures is a computer security program known as CAPTCHA that is designed to

25 distinguish between human users and computer programs, and thereby prevent

26 purchasers from using automated devices to purchase tickets. (McLain Decl. ¶ 9,

27 Pl.'s Exh. 3.)

28      17.     When the user makes a ticket request on ticketmaster.com,

1    CAPTCHA presents "a box with stylized random characters partially obscured

2    behind hash marks." (McLain Decl. ¶ 9.) The user is required to type the

3    characters into a box on the screen in order to proceed with the request. (*Id.*) Most

4    automated devices cannot decipher and type the random characters and thus cannot

5    proceed to the copyrighted ticket purchase pages.

6           18.    CAPTCHA both controls access to a protected work because a

7    user cannot proceed to copyright protected webpages without solving CAPTCHA,

8    and protects rights of a copyright owner because, by preventing automated access to

9    the ticket purchase webpage, CAPTCHA prevents users from copying those pages.

10    **D.**    **Facts Relevant to Irreparable Harm**

11           19.    Ticketmaster is suffering a loss of goodwill with the ticket

12    buying public in that there is a growing public perception that Ticketmaster does

13    not provide the public with a fair opportunity to buy tickets due to automated

14    purchases. (Obara Decl. ¶¶ 4-5.) Ticketmaster has received numerous complaints

15    from consumers about the unavailability of tickets, some of which demonstrate

16    extreme dissatisfaction with Ticketmaster and indicate suspicions that Ticketmaster

17    is colluding with ticket brokers to deny consumers tickets. (*Id.*; Pl.'s Exh. 19.)

18           20.    Ticketmaster's brief quotes several of the complaints compiled

19    in Exhibit 19. (*See* Mot. 10, fn. 8.) One such complaint states:

20      "I would like to know how within 20 seconds of a show going on sale I
        could not find ANY seats together at ANY price at this event.

21      However, there are gobs of them for sale on many different scalper
        sites. How is this possible and why is this tolerated. The only

22      explanation for this is that people inside TM are in cahoots with these
        criminals. I would just like to know if there are any plans whatsoever

23      to address this situation."

24           21.    Ticketmaster has also submitted copies of consumer comments

25    posted on blogs expressing similar extreme dissatisfaction. (Pl.'s Exh. 20). For

26    example, the following is a comment posted by someone who could not obtain

27    tickets to a performance of the rock group "Rush":

28

"I am absolutely irate about TicketBxxxxxd and its practices. As has been mentioned on this site already, the whole process of getting tickets to concerts has gotten completely out of control with scalpers, brokers, and God-knows-who-else trying to make a buck at the expense of fans." (Mot. 11. fn. 9.)

22. Ticketmaster has presented evidence of numerous news stories discussing the unavailability of tickets. (*See* Pl's. Exh. 24.) Many of the news stories concern the unavailability of tickets to concerts in Hannah Montana's "Best of Both Worlds" tour. Based on the reports, many parents expressed disappointed and outrage at Ticketmaster because tickets to many Hannah Montana concerts throughout the nation (Bossier City, Louisiana; Miami, Florida; Atlanta, Georgia; and Kansas City, Missouri, for example) were snapped up within several hours -- and sometimes within minutes -- of their release for sale. It also appears that the public's difficulty obtaining tickets to the Hannah Montana concerts was so severe and created such an outcry that the Attorneys General of Missouri and Arkansas initiated investigations into Ticketmaster's ticket selling practices. (*See* Pl.'s Exhs. 26, 27.)

### E.    Facts Relevant to Balance of Harms and Public Interest

23. Although the extent of RMG's culpability for this harm to Ticketmaster's goodwill cannot yet be determined, it is likely that some of RMG's customers were able to obtain tickets to such concerts by using RMG's applications. (*See* Suppl. Decl. McLain ¶¶ 4-5; Suppl. Lee Decl. ¶¶ 1-3; Exh. 23.)

24. Given the extent of RMG's participation in the hundreds of thousands of automated ticket requests wrongfully made of Ticketmaster's website, it is likely that RMG's conduct has caused, and will continue to cause, some portion of Ticketmaster's loss of goodwill unless RMG's conduct is enjoined.

25. As a consequence of Ticketmaster's loss of consumer goodwill, it also faces the possibility of loss of goodwill and loss of business from its clients. (McLain Reply Decl. ¶ 7.)

26. Based on the consumer complaints and news reports referenced

1  above (*see* Pl.'s Exhs. 19, 20, 24), it is evident that RMG's conduct not only harms

2  Ticketmaster, but also harms the public because it denies consumers the

3  opportunity to purchase tickets to events at the face price.

4         27.    Insofar as RMG's misconduct allows its ticket broker clients to

5  unfairly purchase numerous tickets for resale resulting in immediately sold-out

6  events, ordinary consumers must either forego the event or pay ticket brokers

7  inflated prices for resold tickets.

8         28.    The Court finds that a bond of $300,000 is reasonable under the

9  facts of this case.

10  ## II.  CONCLUSIONS OF LAW

11      **A.**    **Standards For Preliminary Injunction**

12         1.    To obtain a preliminary injunction, a plaintiff must show

13  "either:  (a) a likelihood of success on the merits and the possibility of irreparable

14  injury; or (b) that serious questions going to the merits were raised and the balance

15  of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725,

16  731 (9th Cir. 1999).  "These two alternatives represent extremes of a single

17  continuum, rather than two separate tests." *Id.* (internal quotation: omitted).  "Thus,

18  the greater the relative hardship to [a plaintiff], the less probability of success must

19  be shown." *Id.; see also International Jensen, Inc. v. Metrosound U.S.A., Inc.*,

20  4 F.3d 819, 82' (9th Cir. 1993).  "The district court must also consider whether the

21  public interest favors issuance of the injunction." *Southwest Voter Registration*

22  *Educ. Protect v. Shelley*, 344 F.3d 914, 917 (9th Cir. 2003).  A preliminary

23  injunction is an "extraordinary remedy" for which the need must be "clear and

24  unequivocal." *Shelton v. National Collegiate Athletic Ass'n*, 539 F.2d 1197, 1199

25  (9th Cir. 1976).  Ticketmaster is entitled to a preliminary injunction under these

26  standards for the reasons described below.

27      **B.**    **Likelihood of Success on Copyright Claim**

28         2.    To prevail on its claim for copyright infringement, Ticketmaster

1    must (a) "show ownership of the allegedly infringed material and (b) [it] must

2    demonstrate that the alleged infringers violate at least one exclusive right granted to

3    copyright holders under 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239

4    F.3d 1004, 1013 (9th Cir. 2001).

5         3.    Ticketmaster owns its website, which qualifies as a work of

6    authorship under the Copyright Act. "A website may constitute a work of

7    authorship fixed in a tangible medium of expression . . . Copyright protection for a

8    website may extend to both the screen displays and the computer code for the

9    website." *Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F. Supp.

10   2d 291, 296 (S.D.N.Y. 2007). Ticketmaster has presented ten copyright

11   registrations for its website and specific portions of it (Pl.'s Exh. 2), and RMG does

12   not dispute Ticketmaster's claim that its website is copyrighted. Ticketmaster has

13   thus satisfied the first element of its copyright claim.

14        4.    Ticketmaster also satisfies the second element, because RMG is

15   liable for directly copying Ticketmaster's website. That liability is based on the

16   automatically-created "cached" or "RAM" copies of ticketmaster.com webpages

17   that are stored on RMG's computers each time RMG accesses ticketmaster.com.

18   (Lieb Decl. ¶ 9.)

19        5.    Such "cached" or "RAM" copies are "copies" under the

20   Copyright Act. Section 101 of the Copyright Act defines "copies" as "material

21   objects, other than phonorecords, in which a work is fixed by any method now

22   known or later developed, and from which the work can be perceived, reproduced,

23   or otherwise communicated, either directly or with the aid of a machine or device."

24   17 U.S.C. § 101. The Copyright Act also provides that "[a] work is 'fixed' in a

25   tangible medium of expression when its embodiment in a copy or phonorecord, by

26   or under the authority of the author, is sufficiently permanent or stable to permit it

27   to be perceived, reproduced, or otherwise communicated for a period of more than

28   transitory duration." *Id.*

1    6.    The copies of webpages stored automatically in a computer's

2    cache or random access memory ("RAM") upon a viewing of the webpage fall

3    within the Copyright Act's definition of "copy." *See, e.g., MAI Systems Corp. v.*

4    *Peak Computer, Inc.,* 991 F.2d 511, 519 (9th Cir. 1993) ("We recognize that these

5    authorities are somewhat troubling since they do not specify that a copy is created

6    regardless of whether the software is loaded into the RAM, the hard disk or the read

7    only memory ('ROM'). However, since we find that the copy created in the RAM

8    can be 'perceived, reproduced, or otherwise communicated,' we hold, that the

9    loading of software into the RAM creates a copy under the Copyright Act.") *See*

10   *also Twentieth Century Fox Film Corp. v. Cablevision Systems Corp.,* 478 F. Supp.

11   2d 607, 621 (S.D.N.Y. 2007) (agreeing with the "numerous courts [that] have held

12   that the transmission of information through a computer's random access memory

13   or RAM . . . creates a 'copy' for purposes of the Copyright Act," and citing cases.)

14   7.    The Terms of Use presented on ticketmaster.com create a non-

15   exclusive license to copy the website. "The word 'license,' means permission, or

16   authority; and a license to do any particular thing, is a permission or authority to do

17   that thing." *Federal Land Bank of Wichita v. Board of County Com'rs,* 368 U.S.

18   146, 154 (1961). "No magic words must be included in a document" to create a

19   copyright license. *Radio Television Espanola S.A. v. New World Entertainment,*

20   *Ltd.,* 183 F.3d 922, 927 (9th Cir. 1999). Furthermore, nonexclusive licenses can be

21   implied from conduct. *See Effects Associates, Inc. v. Cohen,* 908 F.2d 555, 558-

22   559 (9th Cir. 1990) (holding that by creating a work at defendant's request and

23   handing it over to defendant to copy and distribute, plaintiff granted defendant an

24   implied nonexclusive license to the work.) Use of a work in excess of a license

25   gives rise to liability for copyright infringement. *LGS Architects, Inc. v. Concordia*

26   *Homes of Nevada,* 434 F.3d 1150, 1156 (9th Cir. 2006) ("When a licensee exceeds

27   the scope of the license granted by the copyright holder, the licensee is liable for

28   infringement.")

1    8.    RMG agreed to the Terms of Use when it viewed and navigated

2    through ticketmaster.com. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 126 F. Supp.

3    2d 238, 248 (S.D.N.Y. 2000) (where website's terms of use stated "by submitting

4    this query, you agree to abide by these terms," court held "there can be no question

5    that [the user of website] manifested its assent to be bound" by the terms of use

6    when it electronically submitted queries to the database); *Hotmail Corp. v. Van$*

7    *Money Pie Inc.*, 1998 WL 388389, 2, 6 (N.D. Cal. 1998) (granting preliminary

8    injunction based in part on breach of "Terms of Service" agreement, to which

9    defendants had assented.)

10    9.    The Terms of Use are not so vague as to be unenforceable.

11    They permit access for personal use only, prohibit commercial use, prohibit the use

12    of bots and automated devices, limit the frequency with which users can make

13    requests of the website, and require the user to agree not to interfere with the proper

14    working of the website, as described above.

15    10.    The phrase "automated device" within the Terms of Use is not

16    confusing. It appears in the provision in which website viewers agree to "not use

17    any robot, spider or <u>other</u> automated device, process, or means to access the Site."

18    (emphasis added). Although the Terms of Use include no additional definition of

19    "automated device," they identify robots and spiders as examples of such devices,

20    which RMG's President Garibay states are "programs which by their very nature

21    run without interfacing with humans." (Garibay Decl. ¶ 4.)

22    11.    RMG's applications are "automated devices" pursuant to the

23    Terms of Use. Adam Lieb, a computer consultant who studied a directory RMG

24    placed on Kovach's computer, testified that "the term 'automated device' is easy to

25    understand in the context of computer programming" -- a field in which Garibay

26    claims 10 years of experience -- and that TBAT is an automated device. (Lieb

27    Reply Decl. ¶ 2; Garibay Decl. ¶ 1.) Lieb explains that even though TBAT may

28    require human initialization or set up, the application generates automated requests

thereafter.  Based on his examination of the "super proxy" log files on Kovach's computer, Lieb states that "several webpage requests per second were made to Ticketmaster, via the proxy, from the same source IP address.  Thousands of requests were made per day.  No human would be able to generate that many requests during manual, non-automated web browsing.  These were automated request[s] made by an 'automated device.' " (Lieb Reply Decl. ¶ 4.)

12.    Based on his personal experience, Kovach describes RMG's software as "including automated devices that RMG calls 'workers' that can automatically navigate the Ticketmaster website . . . . [M]y level of service enabled me to use multiple workers - sometimes over one hundred of them - simultaneously to search for and request tickets." (Kovach Decl. ¶ 5.)  Kovach further describes how he could command the workers to search for tickets according to parameters that he would set, and that the workers would search for tickets automatically and alert him when they found tickets matching his parameters.  (Kovach Decl. ¶¶ 6-7, 9.)  Indeed, RMG's own website advertises its products as "let[ting] you do the work of a dozen people at once.  Just enter the event information . . . and the moment the event goes on sale, *PurchaseMaster* goes into action." (Pl.'s Exh. 1.)  In view of all of the evidence, Ticketmaster is highly likely to succeed on its claim that RMG's applications are automated devices that violate the Terms of Use.

13.    RMG's products and services violate other provisions of the Terms of Use.  For example, using an application that enables a person to make several requests per second would violate the provision limiting the frequency of requests to no more than one every three seconds.  Furthermore, use of an application designed to thwart Ticketmaster's access control by, in RMG's own description, "stealth technology [that] lets you hide your IP address, so you **never get blocked by Ticketmaster**," (Pl.'s Exh. 1) (original emphasis) would breach the user's agreement to "not use any device, software or routine that interferes with the proper working of the Site nor shall you attempt to interfere with the proper

1    working of the Site." *See also* Kovach Decl. ¶ 8 (explaining his understanding that

2    the "workers are specifically designed to navigate or otherwise avoid various

3    security measures on Ticketmaster's website.")

4              14.    Automatically making cache copies of Ticketmaster's webpages

5    does not constitute fair use as a matter of law under *Perfect 10, Inc., v.*

6    *Amazon.com, Inc.*, 487 F.3d 701, 716 (9th Cir. 2007). "[B]ecause the defendant in

7    an infringement action has the burden of proving fair use, the defendant is

8    responsible for introducing evidence of fair use in responding to a motion for

9    preliminary relief." *Perfect 10*, 487 F.3d at 714. Here, RMG has come forward

10   with no evidence of fair use. Nor did RMG attempt to explain how its use satisfies

11   any of the four fair use factors set forth in 17 U.S.C. § 107. Accordingly, the fair

12   use defense fails to defeat Ticketmaster's motion on these grounds alone.

13             15.    Further, *Perfect 10* does not stand for such an absolute principle

14   of law. *Perfect 10* addressed, among other questions, whether users who link to

15   infringing websites and thus make automatic cache copies of those infringing

16   websites themselves commit copyright infringement. The Ninth Circuit agreed

17   with the district court that such conduct was "fair use **in this context**" because the

18   caching was "noncommercial, transformative . and has a minimal impact on the

19   potential market for the original work." (*Perfect 10*, 487 F.3d at 726 (emphasis

20   added) (quoting district court).) Significantly, the Court also noted that "a cache

21   copies no more than necessary to assist the user in Internet use," and, in the case

22   before it, the "background copying has no more than a minimal effect" on the

23   plaintiff's rights. *Id.*

24             16.    In this context, by contrast, RMG is not an "innocent" third-

25   party visitor to another person's infringing site. Instead, the purpose of RMG's

26   viewing ticketmaster.com and the copying that necessarily entails is to engage in

27   conduct that violates the Terms of Use in the ways described above. In addition,

28   RMG's use of the website is to further its own commercial objectives, that is, to

1  create and sell ticket purchasing applications that can gain unauthorized access to
2  ticketmaster.com. In addition, in this case, such copying has a significant, as
3  opposed to minimal, effect on Ticketmaster's rights because RMG's conduct
4  empowers its customers to also violate the Terms of Use, infringe on
5  Ticketmaster's rights, and collectively cause Ticketmaster the harm described
6  below.

7          17.    Because the Court rules that Ticketmaster has a strong
8  likelihood of proving that RMG violated ticketmaster.com's Terms of Use by using
9  automated devices, making excessive requests, and interfering with the proper
10  working of the website when it used and/or designed applications that access
11  ticketmaster.com, the Court concludes that Ticketmaster has a strong likelihood of
12  succeeding on the merits of its claim for direct copyright infringement.

13          18.    Ticketmaster also has a strong likelihood of success on its claim
14  for indirect copyright infringement. "One infringes contributorily by intentionally
15  inducing or encouraging direct infringement, and infringes vicariously by profiting
16  from direct infringement while declining to exercise a right to stop or limit it."
17  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930-931 (2005)
18  (citations omitted). Although "[t]he Copyright Act does not expressly render
19  anyone liable for infringement committed by another, these doctrines of secondary
20  liability emerged from common law principles and are well established in the law."
21  *Id.* In *Grokster*, the Supreme Court held that "one who distributes a device with the
22  object of promoting its use to infringe copyright, as shown by clear expression or
23  other affirmative steps taken to foster infringement, is liable for the resulting acts of
24  infringement by third parties." *Id.* at 936-937. Evidence to support an inducement
25  theory includes, for example "advertisement[s] or solicitation[s] that broadcast[] a
26  message designed to stimulate others to commit violations." *Id.* at 937. Here, as
27  described above, there is substantial evidence that RMG designed its application for
28  the purpose of giving its clients unauthorized access to ticketmaster.com.

19.    Designing and marketing a device whose purpose is to allow unauthorized access to, and thus to infringe on, a copyrighted website is sufficient to trigger contributory liability for infringement committed by the device's immediate users. *See, e.g., Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (stating that providing the site and facilities for known infringing activity is sufficient to establish contributory liability, and quoting with approval 2 William F. Patry, Copyright Law & Practice 1147, "Merely providing the means for infringement may be sufficient" to incur contributory copyright liability.)

20.    RMG's clients made hundreds of thousands of ticket requests in a single day, and requests so numerous cannot be made other than with automated devices. (*See* Lieb Reply Decl. ¶ 4.)  Such uses infringe on Ticketmaster's copyrights for the reasons stated above with regard to RMG's direct infringement.

21.    The Court rules that Ticketmaster is highly likely to prove that RMG induced or encouraged its clients' direct infringement by providing them with devices that gain them unauthorized access to and use of ticketmaster.com. Ticketmaster is therefore highly likely to succeed in its claim against RMG for contributory infringement.

**C.    <u>Likelihood of Success on DMCA Claim</u>**

22.    The Court rules that Ticketmaster is likely to prevail on its claims under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq.*

23.    Ticketmaster asserts a claim under Section 1201(a)(2) of the DMCA, which prohibits trafficking in devices designed to circumvent "technological measure[s] that effectively control[] access to a work protected under this title." 17 U.S.C. § 1201(a)(2). "A plaintiff alleging a violation of § 1201(a)(2) must prove: (a) ownership of a valid copyright on a work, (b) effectively controlled by a technological measure, which has been circumvented, (c) that third parties can now access, (d) without authorization, in a

1  manner that (e) infringes or facilitates infringing a right protected by the Copyright

2  Act, because of a product that (f) the defendant either (i) designed or produced

3  primarily for circumvention; (ii) made available despite only limited commercial

4  significance other than circumvention; or (iii) marketed for use in circumvention of

5  the controlling technological measure." *Chamberlain Group, Inc. v. Skylink*

6  *Technologies, Inc.*, 381 F.3d 1178, 1203 (Fed. Cir. 2004).

7        24.   Here, Ticketmaster is likely to prove that (a) Ticketmaster owns

8  copyrights to ticketmaster.com and specific portions thereof; (b) Ticketmaster

9  employs "technological measures" such as CAPTCHA to block automated access

10  to its copyrighted ticket purchase pages; (c) RMG's customers are third parties who

11  can now access those copyrighted pages; (d) these parties access those pages

12  without Ticketmaster's authorization; and (e) this access infringes Ticketmaster's

13  rights because it entails copying those pages in excess of the third parties' license to

14  do so; and (f) these third parties have such access because of RMG's products

15  designed primarily for circumvention, and marketed for use in circumvention of the

16  controlling technological measure.

17        25.   Ticketmaster's CAPTCHA qualifies as a "technological

18  measure" under the DMCA. Although the DMCA does not appear to include a

19  definition of the term, it states that "a technological measure 'effectively controls

20  access to a work' if the measure, in the ordinary course of its operation, requires the

21  application of information, or a process or a treatment, with the authority of the

22  copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). Thus,

23  because CAPTCHA "in the ordinary course of its operation, requires the

24  application of information .. to gain access to the work," it is a technological

25  measure that regulates access to a copyrighted work. Ticketmaster is therefore

26  likely to prevail on its DMCA § 1201(a)(2) claim.

27        26.   Section 1201(b)(1) of the DMCA similarly prohibits the

28  trafficking of devices primarily designed or produced for the purpose of

circumventing "protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof." *See Sony Computer Entertainment America, Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 964 (N.D. Cal. 2006). Sections 1201(a)(2) and 1201(b)(1) differ only in that 1201(a)(2), by its terms, makes it wrongful to traffic in devices that circumvent technological measures that <u>control access to protected works</u>, while 1201(b)(1) makes it wrongful to traffic in devices that circumvent technological measures that <u>protect rights of a copyright owner in a work</u>. For the foregoing reasons, the Court concludes that Ticketmaster is likely to prevail on its DMCA §§ 1201(a)(2) and 1201(b)(1) claims.

### D.    Likelihood of Success on Breach of Contract Claim

27.    For the reasons discussed above in connection with the copyright infringement claim, the Court concludes that Ticketmaster is highly likely to prove that use of ticketmaster.com is governed by the Terms of Use; that RMG was on notice of, and assented to, the Terms of Use; and that RMG violated the Terms of Use by using automated devices to access the website, using an application that makes several requests per second (in violation of the provision limiting the frequency of requests to no more than one every three seconds), and by using an application designed to thwart Ticketmaster's access controls (which breaches the user's agreement to "not use any device, software or routine that interferes with the proper working of the Site nor shall you attempt to interfere with the proper working of the Site.") The Court therefore rules that Ticketmaster is likely to prevail on its breach of contract claim.

### E.    Irreparable Injury

28.    For Ticketmaster's copyright claim, "a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm." *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1155 (9th Cir. 2006) (citing Johnson Controls, 886 F.2d at 1174). "A copyright holder seeking a

1   preliminary injunction is therefore not required to make an independent

2   demonstration of irreparable harm." *Id.* at 1155-56. Here, because Ticketmaster

3   has shown a strong likelihood of success on the merits of its copyright claim, the

4   Court presumes irreparable harm. RMG has done nothing to rebut that

5   presumption.

6           29.   The Court also rules that Ticketmaster has otherwise shown the

7   possibility of irreparable harm required to support the issuance of a preliminary

8   injunction on its DMCA and breach of contract claims.

9           30.   Ticketmaster's evidence demonstrating public dissatisfaction,

10   including customer complaints, publicly posted internet comments, and media

11   reports, is properly before the Court as non-hearsay evidence. *See, e.g., Academy of*

12   *Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d

13   1446, 1456 (9th Cir. 1991) (error for the district court not to consider newspapers

14   article and telephone calls as evidence of actual confusion). In addition, to the

15   extent some of the newspaper articles may be offered for a hearsay purpose, the

16   Court has wide latitude to consider such evidence in the preliminary injunction

17   context. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir.

18   1988) (stating that it "was within the discretion of the district court to accept this

19   hearsay for purposes of deciding whether to issue the preliminary injunction");

20   *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The

21   urgency of obtaining a preliminary injunction necessitates a prompt determina-

22   tion . . . The trial court may give even inadmissible evidence some weight, when to

23   do so serves the purpose of preventing irreparable harm before trial.")

24           31.   The Court finds RMG's other evidentiary objections meritless.

25   Ticketmaster declarants Kovach, McLain, Obara, and Lee supplied sufficient

26   foundation that their testimony is based on their personal knowledge and

27   experience. To the extent they offered opinion testimony, they did so in

28   conformance with the Rules of Evidence.

1        32.    RMG's objection to the Lieb Declaration is also meritless.  Lieb

2    laid a foundation sufficient to show that his testimony is based on personal

3    knowledge, and that the opinions he offers are not "speculative" because they are

4    based of his examination of Kovach's computer and his experience as a computer

5    consultant.

6        33.    In this Circuit, intangible injuries, such as damage to goodwill,

7    can constitute irreparable harm.  *See Rent-A-Center, Inc. v. Canyon Television and*

8    *Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see also, Stuhlbarg*

9    *Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir.

10   2001) ("Evidence of threatened loss of prospective customers or goodwill certainly

11   supports a finding of the possibility of irreparable harm."); *eBay, Inc. v. Bidder's*

12   *Edge, Inc.*, 100 F. Supp.2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost

13   profits and lost customer goodwill is irreparable because it is neither easily

14   calculable, nor easily compensable and is therefore an appropriate basis for

15   injunctive relief.")  Ticketmaster has also submitted evidence that it has attempted

16   to use technological countermeasures to prevent automated ticket requests, but that

17   these efforts have had only limited success.  (McLain Decl. ¶¶ 23-24, 26-27, 31-

18   33.)  In addition, the cost to Ticketmaster of developing and implementing such

19   countermeasures is not easily calculable.  (*Id.*)  For the foregoing reasons, the Court

20   finds that Ticketmaster has demonstrated the possibility of irreparable harm.

21       34.    In the copyright infringement context, once a plaintiff has

22   established a strong likelihood of success on the merits, any harm to the defendant

23   that results from being preliminarily enjoined from continuing to infringe is legally

24   irrelevant.  *See Triad Sys. Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1338 (9th

25   Cir. 1995) (defendant "cannot complain of the harm that will befall it when

26   properly forced to desist from its infringing activities."); *Cadence Design Sys., Inc.*

27   *v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) (holding that it was reversible

28   error for a district court to even consider "the fact that an injunction would be

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1  devastating to [defendant's] business," because "where the only hardship that the

2  defendant will suffer is lost profits from an activity which has been shown likely to

3  be infringing, such an argument in defense merits little equitable consideration.")

4  Thus, the possibility that RMG will lose possibly all of its profits from the sale of

5  infringing applications does not tip the hardships in RMG's favor.

6      35.    Moreover, because Ticketmaster has persuasively demonstrated

7  likelihood of success on the merits of several of its claims, the balance of hardships

8  becomes less significant to the Court's analysis. *See id.* at 830 ("The balance of

9  hardships factor may assume significance in cases where the plaintiff has not

10  established a strong likelihood of success on the merits, but here [the plaintiff]

11  established that it was likely to succeed on the merits of its copyright claim.")

12      36.    The Court determines that the public interest favors the issuance

13  of a preliminary injunction.  RMG's conduct not only harms Ticketmaster but also

14  harms the public because it denies consumers the opportunity to purchase tickets to

15  events at the "face" price.  It allows RMG's ticket broker clients to unfairly

16  purchase numerous tickets for resale, resulting in immediately sold-out events and

17  forcing ordinary consumers to either forego the event or pay ticket brokers' inflated

18  prices for resold tickets.

19      37.    The Court concludes that a bond of $300,000 is appropriate in

20  this action.

21  **III.    PRELIMINARY INJUNCTION**

22      For all the reasons set forth above,

23      1.    **IT IS HEREBY ORDERED** that Defendant RMG

24  Technologies, Inc. ("RMG") and its officers, directors, principals, agents, represen-

25  tatives, shareholders, partners, employees, successors and assigns, licensees,

26  contractual privies, and all others in active concert or participation them, are hereby

27  preliminarily enjoined while this action is pending from:

28      a.    Creating, trafficking in, facilitating the use of or using

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41166571.1                    20

1  computer programs or other automated devices, including but not limited to those

2  identified in RMG's website as shown in attached Exhibit 1, to circumvent the

3  technological access control and copy protection systems in Ticketmaster's website,

4  including but not limited to Ticketmaster's CAPTCHA;

5          b.      Using information gained from accessing Ticketmaster's

6  website to create computer programs to circumvent Ticketmaster's access control,

7  copy protection and website regulation systems or breach Ticketmaster's Terms of

8  Use;

9          c.      Copying or facilitating the copying of portions of

10  Ticketmaster's website in excess of any license Ticketmaster has granted;

11          d.      Creating, trafficking in, facilitating the use of or using

12  computer programs or other automated devices, including but not limited to those

13  described in attached Exhibit 1, to purchase or facilitate the purchase of tickets

14  from Ticketmaster's website faster than a human being who manually enters the

15  information needed to obtain information about and purchase tickets to an event, for

16  the commercial purpose of reselling such tickets;

17          e.      Otherwise accessing or using Ticketmaster's website in

18  excess of the license granted by the Terms of Use posted thereon; and

19          f.      Facilitating, assisting, aiding, abetting, contributing to,

20  inducing, or otherwise supporting or encouraging any actions that would permit any

21  other person to engage in any of the acts prohibited by subparagraphs a. through e.

22  above.

23          2.      **IT IS FURTHER ORDERED** that Ticketmaster shall post a

24  bond or cash in a form approved by the Clerk of the Court in the sum of $300,000

25  on or before October 25, 2007 as security for payment of such costs and damages as

26  / / /

27  / / /

28  / / /

1   may be incurred or otherwise suffered by any party who is subsequently found to be

2   wrongfully enjoined or restrained by this injunction.

3

4   Dated:  October 26, 2007             _____

5                                    Audrey B. Collins

6                                    United States District Judge

7   Respectfully submitted,

8   MANATT, PHELPS & PHILLIPS, LLP
     ROBERT H. PLATT

9   MARK S. LEE
     DONALD R. BROWN

10

11

12   By: _____
      Mark S. Lee

13     *Attorneys for Plaintiff*
      TICKETMASTER L.L.C.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES



**EXHIBIT**

tabbies'

/

## PROOF OF SERVICE

I, Victoria M. Tejeda, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 11355 West Olympic Boulevard, Los Angeles, California 90064-1614. On October 22, 2007, I served a copy of the within document(s): **[PROPOSED] FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY INJUNCTION**

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Golden State Overnight agent for delivery.

☐ by causing the document(s) listed above to be hand delivered to the person(s) at the address(es) set forth below by a certified messenger service.

☒ by sending an electronic message with attached PDF.

David N. Tarlow, Esq.
Law Offices of Coggan & Tarlow
1925 Century Park East, Suite 2320
Los Angeles, California 90067-2343
Tel. No. (310) 407-0922
Fax No. (310) 407-0923
Email: davidtarlow@verizon.net
Email: dnt@cogganlaw.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 22, 2007, at Los Angeles, California.

_Victoria M. Tejeda_
Victoria M. Tejeda

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41150580.1