JAY M. COGGAN (BAR NO. 86107)
DAVID N. TARLOW (BAR NO. 214050)
JOSHUA G. BLUM (BAR NO. 249082)
COGGAN & TARLOW
1925 Century Park East, Suite 2320
Los Angeles, CA 90067
Telephone (310) 407-0922
Facsimile (310) 407-0923

*No Fee Paid*

*Attorneys* for Defendant RMG TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

TICKETMASTER L.L.C. a Virginia
limited liability company,

         Plaintiff,

   vs.

RMG TECHNOLOGIES, INC. a
Delaware corporation, and DOES 1
through 10 inclusive,
       Defendants.

Case No.: ~~BC378067~~   CV 07-2534 ABC (JWJx)

**NOTICE OF APPEAL TO THE
UNITED STATES COURT OF
APPEALS FOR THE NINTH
CIRCUIT**

**PRELIMINARY INJUNCTION
APPEAL**

     RMG Technologies, Inc., a Defendant herein, appeals to the United States
Court of Appeals for the Ninth Circuit the Order granting a Preliminary Injunction
entered in this case on October 16, 2007.

Dated: November 6, 2007

                               Jay M. Coggan
                               Attorney for Defendant
                               RMG Technologies, Inc.

LAW OFFICES
COGGAN &
TARLOW
LOS ANGELES
NEW YORK

1

*NO*

CLERK, U S DISTRICT COURT
FILED
OCT 16 2007
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

**THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).**

*Priority Send*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TICKETMASTER L.L.C., a Virginia limited liability company,<br><br>            Plaintiff,<br><br>      v.<br><br>RMG TECHNOLOGIES, INC., a Delaware corporation, and DOES 1 through 10, inclusive,<br><br>            Defendants. | CV 07-2534 ABC (JWJx)<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |



ENTERED

DOCKETED ON CM

OCT 16 2007

BY ___ 152

Pending before the Court is Plaintiff Ticketmaster LLC's Motion

for Preliminary Injunction ("Motion"), filed on August 27, 2007.

Defendant RMG Technologies, Inc. ("Defendant" or "RMG") opposed on

September 17, 2007, and Plaintiff replied on September 24, 2007. On

October 5, 2007, Plaintiff submitted a Court-ordered supplemental

declaration of Kevin McLain, and on October 9, 2007, Defendant

submitted a supplemental declaration of Cipriano Garibay. The hearing

on this matter was held on October 15, 2007. Upon consideration of



1  the parties' submissions, arguments of counsel, and the case file, the

2  Court hereby GRANTS the Motion.

3

4  ## I.  FACTUAL AND PROCEDURAL BACKGROUND

5      In this action, Plaintiff Ticketmaster ("Plaintiff" or

6  "Ticketmaster") alleges that Defendant RMG ("Defendant" or "RMG") has

7  developed and marketed automated devices to access and navigate

8  through Ticketmaster's website, thereby infringing Ticketmaster's

9  copyrights and violating the website's Terms of Use and a number of

10  federal and state statutes.

11      Plaintiff Ticketmaster sells tickets for entertainment and sports

12  events on behalf of its clients to the general public through a

13  variety of means, including its copyrighted website ticketmaster.com

14  ("website").  (First Amended Complaint ("FAC") ¶ 3.)  Recognizing that

15  competition to purchase tickets can be intense, Plaintiff contends

16  that it attempts to ensure a fair and equitable ticket buying process

17  on the website by contract and through technological means.  (Id.)

18  First, visitors to ticketmaster.com are required to accept contractual

19  provisions set forth in the website's "Terms of Use."  (FAC ¶¶ 16-20.)

20  These terms permit viewers to use ticketmaster.com for personal use

21  only, prohibit commercial use, prohibit the use of automatic devices,

22  prohibit users from accessing ticketing pages more than once during

23  any three second interval, and prohibit consumers from purchasing more

24  than a specific number of tickets in a single transaction.  (FAC ¶¶

25  21-26; Pl.'s Exhs. 8, 9.)

26      Second, Plaintiff contends that it employs a number of

27  technological means to ensure that ticket buying over the website is

28  fair and equitable.  One of these measures is a computer security

2

feature known as CAPTCHA that is designed to distinguish between human users and computer programs, and thereby prevent purchasers from using automated devices to purchase tickets.  (FAC ¶ 14.)

Plaintiff contends that Defendant RMG markets and sells applications that enable Defendant's clients to use automated devices to enter and navigate through its website in violation of the Terms of Use governing the website, thereby causing injury to Plaintiff.  (FAC ¶¶ 3-5, 17-27.)  For example, Plaintiff contends that Defendant's applications are prohibited "automatic devices," that the applications circumvent Plaintiff's access control and copy protection systems, including CAPTCHA, inundate Plaintiff's computers with thousands of automatic requests thereby preventing ordinary consumers from accessing the website, and enable Defendant's clients to purchase large quantities of tickets.  (FAC ¶¶ 28-30, 34.) Based on these allegations, Plaintiff's FAC, filed on June 25, 2007, states eleven causes of action against Defendant.

Plaintiff now moves for a preliminary injunction based on five of its claims.  Plaintiff's evidence in support of the Motion includes declarations from its Senior Director of Applications Support, Kevin McLain, wherein McLain testifies how he was able to trace ticket requests and purchases made on ticketmaster.com back to individual users and, ultimately, to Defendant.  Based on his methodology, McLain discovered, for example, that Chris Kovach, a ticket broker and one of Defendant's clients, made over 9,500 ticket orders - or 24,000 tickets - over the last several years. (McLain Decl. ¶ 24.)  McLain also explains that he identified Gary Charles Bonner and Thomas J. Prior as Defendant's clients.  Using IP addresses registered to Defendant, Bonner made almost 13,000 ticket purchases over several years, and

made more than 425,000 ticket requests in a single day. (Id.) Using IP addresses registered to Defendant, Prior made almost 22,000 ticket orders over several years, and made more than 600,000 ticket requests in a single day. (Id.)[1] Plaintiff also submitted declarations from Kovach, one of Defendant's former clients; Adam Lieb, a computer and internet consultant; Steven Obara, Plaintiff's Director of Customer Service Operations; Mark Lee, an attorney representing Plaintiff in this matter; and a number of exhibits.[2]

Defendant challenges the Motion on both legal and factual grounds. Defendant states that the computer application Plaintiff seeks to enjoin Defendant from using and selling is its Ticket Broker Acquisition Tool ("TBAT"), and that this application is not an "automated device" but, rather, is simply a type of internet browser,

---

[1] McLain's Court-ordered Supplemental Declaration, filed on October 5, 2007, explains in detail, to the Court's satisfaction, the steps MacLain took to trace ticket purchases to Defendant, using purchases made by Prior as an example.

[2] Defendant objects to these declarations and the exhibits attached thereto on numerous grounds. The Court finds Defendant's objections meritless. Kovach, McLain, Obara, and Lee supplied sufficient foundation that their testimony is based on their personal knowledge and experience. To the extent they offered opinion testimony, they did so in conformance with the Rules of Evidence. Nor are Defendant's hearsay objections well-taken. Defendant also objects to the Lieb Declaration. However, Lieb laid a foundation sufficient to show that his testimony is based on personal knowledge, and that the opinions he offers are not "speculative" because they are based on his examination of Kovach's computer and his experience as a computer consultant. Furthermore, in the preliminary injunction context, the Court is not strictly bound by all rules of evidence. See, e.g., Flynt Distributing Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination . . . The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.") Thus, the Court has discretion to consider the proffered evidence even if it might not be admissible if presented in other settings.

1 | akin to Internet Explorer, requiring human interaction. (Garibay
2 | Decl. ¶¶ 3, 4) Defendant also urges that it should not be bound by the
3 | Terms of Use and that, in any case, Plaintiff has presented no
4 | evidence upon which it - as opposed to the persons using TBAT - can be
5 | enjoined. Defendant also argues that Plaintiff's legal theories are
6 | flawed in various ways.[3]

7 |

8 |          II.  LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

9 |      To obtain a preliminary injunction, a plaintiff must show
10 | "either: (1) a likelihood of success on the merits and the possibility
11 | of irreparable injury; or (2) that serious questions going to the
12 | merits were raised and the balance of hardships tips sharply in its
13 | favor." Walczak v. EPL Prolong, Inc., 198 F.3d 725, 731 (9th Cir.
14 | 1999). "These two alternatives represent extremes of a single
15 | continuum, rather than two separate tests." Id. (internal quotations
16 | omitted). "Thus, the greater the relative hardship to [a plaintiff],
17 | the less probability of success must be shown." Id.; see also
18 | International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822
19 | (9th Cir. 1993). "The district court must also consider whether the
20 | public interest favors issuance of the injunction." Southwest Voter
21 | Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th Cir.

22 |

23 |      [3] The Court rejects Defendant's argument that the Motion should
24 | be denied as premature because it was brought prior to the Court's
     | ruling on Defendant's Motion to Dismiss. Defendant also appears to
25 | argue, rather inconsistently, that the Motion is untimely because it
     | was filed approximately three months after Plaintiff obtained the
26 | Kovach Declaration. None of the cases Defendant cites is persuasive.
     | In view of the facts and posture of this case, the Court finds that
27 | the Motion is neither premature nor untimely. In any event, the Court
     | did consider the motion to dismiss together with the present Motion,
28 | and issued an order on October 12, 2007 denying the motion to dismiss.

1  2003).  A preliminary injunction is an "extraordinary remedy" for

2  which the need must be "clear and unequivocal."  <u>Shelton v. National</u>

3  <u>Collegiate Athletic Ass'n</u>, 539 F.2d 1197, 1199 (9th Cir. 1976).

4

5                        **III.  ANALYSIS**

6       The five claims on which Plaintiff seeks a preliminary injunction

7  are its claims for violation of the United States Copyright Act, 17

8  U.S.C. § 501 <u>et seq.</u>, the Digital Millenium Copyright Act ("DMCA") 17

9  U.S.C. § 1201, California Penal Code § 502, and the Computer Fraud and

10  Abuse Act ("CFAA") 18 U.S.C. § 1030(g), and on its breach of contract

11  claim.

12       **A. Likelihood of Success on the Merits.**

13            1.   **Plaintiff's Copyright Claim**

14       To prevail on its claim for copyright infringement, Plaintiff

15  must (1) "show ownership of the allegedly infringed material and (2)

16  [it] must demonstrate that the alleged infringers violate[d] at least

17  one exclusive right granted to copyright holders under 17 U.S.C. §

18  106."  <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1013 (9th

19  Cir. 2001).  Plaintiff alleges that Defendant is violating its

20  copyright in the ticketmaster.com website.

21       Plaintiff has submitted evidence that it owns registered

22  copyrights in the website ticketmaster.com, and, separately, in

23  portions of the website.  (Lee Decl. ¶ 2; McLain Decl. ¶ 5, Pl.'s Exh.

24  2.)  "A website may constitute a work of authorship fixed in a

25  tangible medium of expression . . . Copyright protection for a website

26  may extend to both the screen displays and the computer code for the

27  website."  <u>Integrative Nutrition, Inc. v. Academy of Healing</u>

28  <u>Nutrition</u>,  476 F.Supp. 2d 291, 296 (S.D.N.Y. 2007).  Defendant does

1 not dispute Plaintiff's claim that its website is copyrighted.

2 Plaintiff has thus satisfied the first element of its copyright claim.

3     Plaintiff alleges that Defendant infringes its copyrights in

4 ticketmaster.com both directly and indirectly. First, Plaintiff

5 states that each time Defendant views a page from ticketmaster.com, a

6 copy of that page is necessarily downloaded or "cached" from

7 Plaintiff's computers onto the Defendant's computer's random access

8 memory ("RAM"), thus rendering Defendant <u>directly liable</u> for such

9 copying. (Mot. 13:9-12; McLain Decl. ¶ 4.) Plaintiff also argues

10 that Defendant directly participates in its clients' unauthorized

11 access of the website because its clients do not acquire physical

12 possession of the software. Rather, Defendant's devices are kept on

13 Defendant's own computer systems; in order to gain access to

14 Defendant's devices, its clients must log onto Defendant's website

15 ticketbrokertools.com, and use the devices hosted on

16 ticketbrokertools.com to improperly access ticketmaster.com. (Mot.

17 6:18-24; Kovach Decl. 2:18-25.) Thus, Defendant allows and, indeed,

18 requires its clients to go through its own infrastructure in order to

19 use the devices that access ticketmaster.com. Defendant denies this

20 factual allegation and states that "TBAT [has never been] operated

21 from RMG's computer system on behalf of any client, as it is not, nor

22 has it ever, been centrally run on behalf of any client." (Garibay

23 Decl. ¶ 5.)

24     Second, Plaintiff states that Defendant is <u>indirectly liable</u> for

25 contributory infringement, vicarious infringement, and inducing

26 copyright infringement because it provides its clients with bots and

27 other automated devices to infringe Plaintiff's copyright in its

28 website. (Mot. 15:9-14.) Both direct and indirect infringement occur

1  insofar as the person viewing the website does so in excess of the

2  authorization Plaintiff grants through the website's Terms of Use.

3        a.   **Defendant's Direct Liability for Copyright**

4             **Infringement**

5     Defendant's <u>direct</u> liability for copyright infringement is based

6  on the automatically-created copies of ticketmaster.com webpages that

7  are stored on Defendant's computer each time Defendant accesses

8  ticketmaster.com.  (Lieb Decl. ¶ 9.)  Defendant does not contest that,

9  as a technological question, whenever a webpage is viewed on a

10  computer, a copy of the viewed page is made and stored on the viewer's

11  computer.  However, Defendant contends that such "cached" copies are

12  not "copies" within the meaning of the Copyright Act, that such copies

13  could not give rise to copyright liability because their creation

14  constitutes fair use, and that Plaintiff has not shown that any pages

15  from ticketmaster.com were ever downloaded or stored on Defendant's

16  computer.

17     Section 101 of the Copyright Act defines "copies" as "material

18  objects, other than phonorecords, in which a work is fixed by any

19  method now known or later developed, and from which the work can be

20  perceived, reproduced, or otherwise communicated, either directly or

21  with the aid of a machine or device."  17 U.S.C. § 101.  The Copyright

22  Act also provides that "[a] work is 'fixed' in a tangible medium of

23  expression when its embodiment in a copy or phonorecord, by or under

24  the authority of the author, is sufficiently permanent or stable to

25  permit it to be perceived, reproduced, or otherwise communicated for a

26  period of more than transitory duration."  <u>Id.</u>

27     The copies of webpages stored automatically in a computer's cache

28  or random access memory ("RAM") upon a viewing of the webpage fall

1  within the Copyright Act's definition of "copy."  See, e.g., MAI

2  Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 519 (9th Cir.

3  1993) ("We recognize that these authorities are somewhat troubling

4  since they do not specify that a copy is created regardless of whether

5  the software is loaded into the RAM, the hard disk or the read only

6  memory ('ROM'). However, since we find that the copy created in the

7  RAM can be 'perceived, reproduced, or otherwise communicated,' we hold

8  that the loading of software into the RAM creates a copy under the

9  Copyright Act.")  See also Twentieth Century Fox Film Corp. v.

10 Cablevision Systems Corp., 478 F.Supp. 2d 607, 621 (S.D.N.Y. 2007)

11 (agreeing with the "numerous courts [that] have held that the

12 transmission of information through a computer's random access memory

13 or RAM . . . creates a 'copy' for purposes of the Copyright Act," and

14 citing cases.)  Thus, copies of ticketmaster.com webpages

15 automatically stored on a viewer's computer are "copies" within the

16 meaning of the Copyright Act.

17     The Court must next determine whether Plaintiff has shown by a

18 preponderance of the evidence that Defendant did in fact view the

19 website, thereby copying its webpages.  Although Plaintiff does not

20 present direct evidence of such viewing, the logic from which such an

21 inference may be drawn is compelling.  Plaintiff presents expert

22 testimony that Defendant necessarily had to view ticketmaster.com in

23 order to create the applications that enable Defendant's clients to

24 enter and navigate through the website.  (Lieb Decl. ¶ 9.)  Indeed, in

25 order to test the applications to determine whether they worked as

26 intended, Defendant would have had to actually use the applications to

27 purchase tickets from the website.  (Id.)  By Defendant's own

28 description, TBAT is "a browser geared for the purchase of tickets

1  from a variety of websites including . . . ticketmaster.com."

2  (Garibay Decl. ¶ 5.)  It also follows that Defendant's clients would

3  have had to visit the website, and thus copy pages, in order to use

4  Defendant's applications to make ticket purchases through

5  ticketmaster.com.  The Court thus finds that Plaintiff is indeed

6  likely to prove that Defendant visited (and used) ticketmaster.com and

7  necessarily made copies of pages from the copyrighted website.

8      Plaintiff also argues that Defendant is directly liable for

9  infringement because Defendant requires and/or allows its clients to

10  work through its website and computer system in order to use its

11  ticket purchasing software to access ticketmaster.com.  Defendant

12  disputes this allegation.  However, the Court finds it unnecessary to

13  address Plaintiff's likelihood of showing that Defendant acts as an

14  intermediary for its clients' unauthorized use of ticketmaster.com.

15  As discussed above, Plaintiff will likely succeed in its claim for

16  direct liability by showing that Defendant itself viewed and/or used

17  the website.[4]

18      Next, the Court will consider whether Plaintiff is likely to

19  demonstrate that such copying constitutes copyright infringement.

20  Plaintiff contends that Defendant infringed its copyrights by

21  accessing and using the copyrighted website in excess of the

22  authorization granted in the website's Terms of Use, which Plaintiff

23  contends creates a non-exclusive license to view (and thus copy) pages

24  from the website.  Defendant presents a number of legal and factual

25  _____

26      [4]  In addition, even accepting Defendant's version of the facts –
    that its clients download TBAT onto their own computers and operate it
27  independent of Defendant – Defendant would still be liable for
    contributory infringement, discussed infra.
28

1  arguments against this theory, but none of them is meritorious.

2      First, the Court agrees that the Terms of Use presented on

3  ticketmaster.com create a non-exclusive license to copy the website.

4  "The word 'license,' means permission, or authority; and a license to

5  do any particular thing, is a permission or authority to do that

6  thing." Federal Land Bank of Wichita v. Board of County Com'rs, 368

7  U.S. 146, 154 (1961). "No magic words must be included in a document"

8  to create a copyright license. Radio Television Espanola S.A. v. New

9  World Entertainment, Ltd., 183 F.3d 922, 927 (9th Cir. 1999).

10  Furthermore, nonexclusive licenses can be implied from conduct. See

11  Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558-559 (9th Cir.

12  1990) (holding that by creating a work at defendant's request and

13  handing it over to defendant to copy and distribute, plaintiff granted

14  defendant an implied nonexclusive license to the work.) Use of a work

15  in excess of a license gives rise to liability for copyright

16  infringement. LGS Architects, Inc. v. Concordia Homes of Nevada, 434

17  F.3d 1150, 1156 (9th Cir. 2006) ("When a licensee exceeds the scope of

18  the license granted by the copyright holder, the licensee is liable

19  for infringement.")

20      Plaintiff has presented evidence showing that access to the

21  website is governed by specific Terms of Use, and that any person

22  viewing the website is put on notice of the Terms of Use. For

23  example, the ticketmaster.com homepage displays the following warning:

24  "Use of this website is subject to express Terms of Use which prohibit

25  commercial use of this site. By continuing past this page, you agree

26  to abide by these terms." (McLain Decl. ¶ 10; Pl.'s Exh. 4.) The

27  underlined phrase "Terms of Use" is a hyperlink to the full Terms of

28  Use; the same phrase appears on almost every page of ticketmaster.com.

1  (Id. ¶¶ 10-11; Pl.'s Exhs. 4-5.)  In addition, since 2003, users of

2  ticketmaster.com have had to affirmatively agree to the Terms of Use

3  as part of the procedure to set up an account, and since mid-2006,

4  users have had to affirmatively agree to the Terms of Use for every

5  ticket purchase.  (Id. ¶¶ 12, 13; Pl.'s Exhs. 6, 7.)

6      Having determined that Plaintiff is highly likely to succeed in

7  showing that Defendants viewed and navigated through ticketmaster.com,

8  the Court further concludes that Plaintiff is highly likely to succeed

9  in showing that Defendant received notice of the Terms of Use and

10  assented to them by actually using the website.  See, e.g.,

11  Register.com, Inc. v. Verio, Inc., 126 F.Supp. 2d 238, 248 (S.D.N.Y.

12  2000) (where website's terms of use stated "by submitting this query,

13  you agree to abide by these terms," court held "there can be no

14  question that [the user of website] manifested its assent to be bound"

15  by the terms of use when it electronically submitted queries to the

16  database); Hotmail Corp. v. Van$ Money Pie Inc., 1998 WL 388389, 2, 6

17  (N.D. Cal. 1998) (granting preliminary injunction based in part on

18  breach of "Terms of Service" agreement, to which defendants had

19  assented.)  Indeed, Defendant does not seriously contest that it was

20  on notice of the Terms of Use; rather, Defendant argues that the Terms

21  of Use do not amount to an agreement or a license, and that the Terms

22  are too uncertain to be enforced.  The Court finds no merit in these

23  arguments.

24      The Terms of Use governing ticketmaster.com include the following

25  terms:

26      "You [the viewer] agree that you are only authorized to
       visit, view and to retain a copy of pages of this Site for
27     your own personal use, and that you shall not duplicate,
       download, [or] modify . . . the material on this Site for
28     any purpose other than to review event and promotions

1    information, for personal use . . ." (Pl.'s Exh. 8 at 70.)

2    "No . . . areas of this Site may be used by our visitors for
     any commercial purposes . . ." (Id. at 71.)

3

4    "You agree that you will not use any robot, spider or other
     automated device, process, or means to access the Site . . .
     You agree that you will not use any device, software or

5    routine that interferes with the proper working of the Site
     nor shall you attempt to interfere with the proper working

6    of the Site." (Id. at 71.)

7    "You agree that you will not take any action that imposes an
     unreasonable or disproportionately large load on our

8    infrastructure." (Id. at 71-72.)

9    "You agree that you will not access, reload or 'refresh'
     transactional event or ticketing pages, or make any other

10   request to transactional servers, more than once during any
     three second interval." (Id. at 72.)

11

12   "You do not have permission to access this Site in any way
     that violates . . . these terms of use." (Id. at 72.)

13   "You understand and agree that . . . Ticketmaster may
     terminate your access to this Site, cancel your ticket order

14   or tickets acquired through your ticket order . . . if
     Ticketmaster believes that your conduct or the conduct of

15   any person with whom Ticketmaster believes you act in
     concert . . . violates or is inconsistent with these Terms

16   or the law, or violates the rights of Ticketmaster, a client
     of Ticketmaster or another user of the Site." (Id. at 72.)

17

18   Viewers are thus authorized to view - and thereby copy – pages of

19   the website when they do so in accordance with the Terms of Use.  In

20   addition, Plaintiff reserves the right to terminate any person's

21   access to the website if it believes that person violated the Terms of

22   Use.  Thus, by the Terms of Use, Plaintiff grants a nonexclusive

23   license to visitors to copy pages from the website in compliance with

24   those Terms.  Inasmuch as Defendant used the website, Defendant

25   assented to the terms.

26       Nor are the terms so vague as to be unenforceable.  The above

27   terms permit access for personal use only, prohibit commercial use,

28   prohibit the use of bots and automated devices, limit the frequency

1  with which users can make requests through the website, and require

2  the user to agree not to interfere with the proper working of the

3  website. Defendant argues, however, that the term "automated device"

4  is confusing. Specifically, Defendant's President, Cipriano Garibay,

5  a software designer, testifies in his declaration that TBAT – which he

6  appears to claim is the only product in issue in this case – is just a

7  web browser and is not an "automated device" because it requires human

8  interaction to function. (Garibay Decl. ¶ 4.) Garibay further claims

9  that he does not know what Plaintiff is referring to by the term

10 "automated device" because "every computer in the world, as well as

11 all computer programs and web browsers, have [sic] a large degree of

12 automation built in since they are not run manually. Clearly,

13 Ticketmaster is not seeking to prohibit all computers and browsers

14 from accessing its website, otherwise the website would be useless.

15 However, as Ticketmaster has not defined 'automated device' in its

16 'Terms of Use,' I can only speculate as to what it means by same."

17 (Id.)

18      This claim is specious. First, the term "automated device"

19 appears in the provision in which website viewers agree to "not use

20 any robot, spider or other automated device, process, or means to

21 access the Site." (emphasis added). Although the terms of use include

22 no additional definition of "automated device," they identify robots

23 and spiders as examples of such devices, which Garibay states are

24 "programs which by their very nature run without interfacing with

25 humans." (Garibay Decl. ¶ 4.) Plaintiff has submitted credible

26 testimony showing that Defendant's applications are, in fact,

27 automated devices. For example, Adam Lieb, a computer consultant who

28 studied a directory Defendant placed on Kovach's computer, testifies

14

that "the term 'automated device' is easy to understand in the context

of computer programming" - a field in which Garibay claims 10 years of

experience - and that Defendant's programs are automated devices.

(Lieb Reply Decl. ¶ 2; Garibay Decl. ¶ 1.)   Lieb distinguishes

Defendant's programs from conventional internet browsers - which he

agrees are not automated devices - and explains that even though

Defendant's programs may require human initialization or set up, they

generate automated requests thereafter.   Based on his examination of

the "super proxy" log files on Kovach's computer, Lieb states that

"several webpage requests per second were made to Ticketmaster, via

the proxy, from the same source IP address.   Thousands of requests

were made per day.   No human would be able to generate that many

requests during manual, non-automated web browsing.   These were

automated request[s] made by an 'automated device.'"   (Lieb Reply

Decl. ¶ 4.)

Based on his personal experience, Kovach describes Defendant's

software as "including automated devices that RMG calls 'workers' that

can automatically navigate the Ticketmaster website . . . [M]y level

of service enabled me to use multiple workers - sometimes over one

hundred of them - simultaneously to search for and request tickets."

(Kovach Decl. ¶ 5.)   Kovach further describes how he could command the

workers to search for tickets according to parameters that he would

set, and that the workers would search for tickets automatically and

alert him when they found tickets matching his parameters.   (Kovach

Decl. ¶¶ 6-7, 9.)   Indeed, Defendant's own website advertises its

products as "let[ting] you do the work of a dozen people at once.

Just enter the event information . . . and the moment the event goes

on sale, *PurchaseMaster* goes into action."   (Pl.'s Exh. 1.)   In view

1  of all of the evidence, Plaintiff is highly likely to succeed on its

2  claim that Defendant's applications are automated devices that violate

3  the Terms of Use.

4      However, even setting aside Plaintiff's prohibition of automated

5  devices, the application as described would violate other provisions

6  of the Terms of Use.  For example, using an application that enables a

7  person to make several requests per second would violate the provision

8  limiting the frequency of requests to no more than one every three

9  seconds.  Furthermore, use of an application designed to thwart

10  Plaintiff's access control by, in Defendant's own description,

11  "stealth technology [that] lets you hide your IP address, so you **never**

12  **get blocked by Ticketmaster**," (Pl.'s Exh. 1) (original emphasis) would

13  breach the user's agreement to "not use any device, software or

14  routine that interferes with the proper working of the Site nor shall

15  you attempt to interfere with the proper working of the Site."  See

16  also Kovach Decl. ¶ 8 (explaining his understanding that the "workers

17  are specifically designed to navigate or otherwise avoid various

18  security measures on Ticketmaster's website.").

19      Finally, Defendant argues in summary fashion that to the extent

20  Plaintiff's claim is predicated on automatically-made cache copies of

21  Plaintiff's webpages, such cache copies constitute fair use as a

22  matter of law under Perfect 10, Inc., v. Amazon.com, Inc., 487 F.3d

23  701, 716 (9th Cir. 2007).  This argument is unavailing for several

24  reasons.  First, "[b]ecause the defendant in an infringement action

25  has the burden of proving fair use, the defendant is responsible for

26  introducing evidence of fair use in responding to a motion for

27  preliminary relief."  Perfect 10, 487 F.3d at 714.  Here, Defendant

28  has come forward with no evidence of fair use.  Nor did Defendant

1  attempt to explain how its use satisfies any of the four fair use

2  factors set forth in 17 U.S.C. § 107.  Accordingly, the fair use

3  defense fails to defeat Plaintiff's Motion on these grounds alone.

4      Second, Perfect 10 does not stand for the absolute principle of

5  law that Defendant attributes to it.  Rather, Perfect 10 addressed,

6  among other questions, whether users who link to infringing websites

7  and thus make automatic cache copies of those infringing websites

8  themselves commit copyright infringement.  The Ninth Circuit agreed

9  with the district court that such conduct was "fair use **in this**

10 **context**" because the caching was "noncommercial, transformative . . .

11 and has a minimal impact on the potential market for the original

12 work."  Perfect 10, 487 F.3d at 726 (emphasis added) (quoting district

13 court).  Significantly, the Court also noted that "a cache copies no

14 more than necessary to assist the user in Internet use," and, in the

15 case before it, the "background copying has no more than a minimal

16 effect" on the plaintiff's rights.  Id.  In this context, by contrast,

17 Defendant is not an "innocent" third-party visitor to another person's

18 infringing site.  Instead, the purpose of Defendant's viewing

19 ticketmaster.com and the copying that necessarily entails is to engage

20 in conduct that violates the Terms of Use in the ways described above.

21 In addition, Defendant's use of the website is to further its own

22 commercial objectives, that is, to create and sell ticket purchasing

23 applications that can gain unauthorized access to ticketmaster.com.

24 Furthermore, in this case, such copying has a significant, as opposed

25 to minimal, effect on Plaintiff's rights because Defendant's conduct

26 empowers its clients to also violate the Terms of Use, infringe on

27 Plaintiff's rights, and collectively cause Plaintiff the harm

28 described below.  For all of these reasons, Defendant's fair use

1 defense fails.

2      Because the Court finds that Plaintiff has a strong likelihood of

3 proving that Defendant violated ticketmaster.com's Terms of Use by

4 using automated devices, making excessive requests, and interfering

5 with the proper working of the website when it used and/or designed

6 applications that access ticketmaster.com, the Court finds that

7 Plaintiff has a strong likelihood of succeeding on the merits of its

8 claim for direct copyright infringement.

9              b.    **Defendant's Indirect Liability for Copyright**

10                   **Infringement**

11      Plaintiff also argues that it has a strong likelihood of success

12 on its claim for <u>indirect</u> copyright infringement.  The Court agrees.

13      "One infringes contributorily by intentionally inducing or

14 encouraging direct infringement, and infringes vicariously by

15 profiting from direct infringement while declining to exercise a right

16 to stop or limit it." <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster</u>,

17 <u>Ltd.</u>, 545 U.S. 913, 930-931 (2005) (citations omitted).  Although

18 "[t]he Copyright Act does not expressly render anyone liable for

19 infringement committed by another, these doctrines of secondary

20 liability emerged from common law principles and are well-established

21 in the law."  <u>Id.</u>  In <u>Grokster</u>, the Supreme Court held that "one who

22 distributes a device with the object of promoting its use to infringe

23 copyright, as shown by clear expression or other affirmative steps

24 taken to foster infringement, is liable for the resulting acts of

25 infringement by third parties." <u>Id.</u> at 936-937.  Evidence to support

26 an inducement theory includes, for example "advertisement[s] or

27 solicitation[s] that broadcast[] a message designed to stimulate

28 others to commit violations."  <u>Id.</u> at 937.  Here, as described above,

1  there is substantial evidence that Defendant designed its application

2  for the purpose of giving its clients unauthorized access to

3  ticketmaster.com; Defendant even advertises its product as "stealth

4  technology [that] lets you hide your IP address, so you **never get**

5  **blocked by Ticketmaster**" (Pl.'s Exh. 1.) (original emphasis.)

6  Designing and marketing a device whose purpose is to allow

7  unauthorized access to, and thus to infringe on, a copyrighted website

8  is sufficient to trigger contributory liability for infringement

9  committed by the device's immediate users.  <u>See, e.g.</u>, <u>Fonovisa, Inc.</u>

10  <u>v. Cherry Auction, Inc.</u>, 76 F.3d 259, 264 (9th Cir. 1996) (stating

11  that providing the site and facilities for known infringing activity

12  is sufficient to establish contributory liability, and quoting with

13  approval 2 William F. Patry, <u>Copyright Law & Practice</u> 1147, "[m]erely

14  providing the means for infringement may be sufficient" to incur

15  contributory copyright liability.).

16      As discussed in the Background section, Plaintiff has presented

17  examples of Defendant's clients making numerous ticket purchases and

18  ticket requests using Defendant's applications and resources,

19  including the examples of Bonner making more than 425,000 requests in

20  a single day, and Prior making more than 600,000 requests in a single

21  day, both through IP addresses registered to Defendant. (McLain Decl.

22  ¶ 24.)   Requests so numerous cannot be made other than with automated

23  devices.   (<u>See</u> Lieb Reply Decl. ¶ 4.)   Kovach testified how he used

24  Defendant's applications to make automated ticket requests, and that

25  Defendant made representatives available to help him use its

26  applications, circumvent Plaintiff's security measures, and set up his

27  hardware for optimal use.   (Kovach Decl. ¶¶ 6-11.)   Such uses infringe

28  on Plaintiff's copyrights for the reasons stated above with regard to

Case 2:07-cv-02534-ABC-JC    Document 57    Filed 10/16/2007    Page 20 of 32

1  Defendant's direct infringement.

2     Based on this evidence, the Court finds that Plaintiff is highly

3  likely to prove that Defendant induced or encouraged its clients'

4  direct infringement by providing them with devices that gain them

5  unauthorized access to and use of ticketmaster.com.  Plaintiff is

6  therefore highly likely to succeed in its claim against Defendant for

7  contributory infringement.

8        **2.    Plaintiff's Claim Under the Digital Millenium**

9             **Copyright Act**

10     Plaintiff alleges that Defendant has violated the Digital

11  Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201 et seq., by

12  trafficking in technological products, services, devices, or

13  components that are primarily designed to circumvent Plaintiff's

14  access control and copy protection systems.  (FAC ¶¶ 51-55.)

15  Plaintiff's Motion relies on two provisions of the DMCA.

16     First, Plaintiff claims that Defendant is liable under section

17  1201(a)(2), which prohibits trafficking in devices designed to

18  circumvent "technological measure[s] that effectively control[] access

19  to a work protected under this title."  17 U.S.C. § 1201(a)(2).  "A

20  plaintiff alleging a violation of § 1201(a)(2) must prove:  (1)

21  ownership of a valid copyright on a work, (2) effectively controlled

22  by a technological measure, which has been circumvented, (3) that

23  third parties can now access (4) without authorization, in a manner

24  that (5) infringes or facilitates infringing a right protected by the

25  Copyright Act, because of a product that (6) the defendant either (i)

26  designed or produced primarily for circumvention; (ii) made available

27  despite only limited commercial significance other than circumvention;

28  or (iii) marketed for use in circumvention of the controlling

1 | technological measure." <u>Chamberlain Group, Inc. v. Skylink</u>

2 | <u>Technologies, Inc.</u>, 381 F.3d 1178, 1203 (Fed. Cir. 2004).

3 |     The Court finds that Plaintiff is likely to prevail on its

4 | section 1201(a)(2) claim.  Specifically, as stated above, Plaintiff is

5 | likely to prove that (1) Plaintiff owns copyrights to ticketmaster.com

6 | and specific portions thereof; (2) Plaintiff employs "technological

7 | measures" such as CAPTCHA to block automated access to its copyrighted

8 | ticket purchase pages; (3) Defendant's clients are third parties who

9 | can now access those copyrighted pages; (4) these parties access those

10 | pages without Plaintiff's authorization;(5) that this access infringes

11 | Plaintiff's rights because it entails copying those pages in excess of

12 | the third parties' license to do so; and (6)(i),(iii) these third

13 | parties have such access because of Defendant's products designed

14 | primarily for circumvention, and marketed for use in circumvention, of

15 | the controlling technological measure.

16 |     The majority of Defendant's challenges to Plaintiff's Motion on

17 | the DMCA claim are repetitive of its arguments with regard to the

18 | copyright claim, and are unavailing for the same reasons.  Defendant's

19 | only unique arguments as to the DMCA claim are that CAPTCHA is not a

20 | system or a program, but is simply an image (Def.'s Opp'n 17:7-8;

21 | Garibay Decl. ¶ 6), and that CAPTCHA is designed to regulate ticket

22 | sales, not to regulate access to a copyrighted work.  (Def.'s Opp'n

23 | 17:9-20.)

24 |     First, the Court notes that the DMCA does not equate its use of

25 | the term "technological measure" with Defendant's terms "system" or

26 | "program."  In any case, Plaintiff has submitted evidence that CAPTCHA

27 | is a technological measure that regulates access to a copyrighted

28 | work.  Although the DMCA does not appear to include a definition of

1  the term, it states that "a technological measure 'effectively

2  controls access to a work' if the measure, in the ordinary course of

3  its operation, requires the application of information, or a process

4  or a treatment, with the authority of the copyright owner, to gain

5  access to the work." 17 U.S.C.A. § 1201(a)(3)(B). When the user makes

6  a ticket request on ticketmaster.com, CAPTCHA presents "a box with

7  stylized random characters partially obscured behind hash marks."

8  (McLain Decl. ¶ 9.) The user is required to type the characters into

9  an entry on the screen in order to proceed with the request. (Id.)

10 Most automated devices cannot decipher and type the random characters

11 and thus cannot proceed to the copyrighted ticket purchase pages.

12 Thus, because CAPTCHA "in the ordinary course of its operation,

13 requires the application of information . . . to gain access to the

14 work," it is a technological measure that regulates access to a

15 copyrighted work. Plaintiff is therefore likely to prevail on its

16 DMCA § 1201(a)(2) claim.

17      Section 1201(b)(1) similarly prohibits trafficking in devices

18 primarily designed or produced for the purpose of circumventing

19 "protection afforded by a technological measure that effectively

20 protects a right of a copyright owner under this title in a work or a

21 portion thereof." See Sony Computer Entertainment America, Inc. v.

22 Divineo, Inc., 457 F.Supp. 2d 957, 964 (N.D. Cal. 2006). Sections

23 1201(a)(2) and 1201(b)(1) differ only in that 1201(a)(2) makes it

24 wrongful to traffic in devices that circumvent technological measures

25 that control access to protected works, while 1201(b)(1) makes it

26 wrongful to traffic in devices that circumvent technological measures

27 that protect rights of a copyright owner in a work. Here, CAPTCHA

28 both controls access to a protected work because a user cannot proceed

1  to copyright-protected webpages without solving CAPTCHA, and protects

2  rights of a copyright owner because, by preventing automated access to

3  the ticket purchase webpage, CAPTCHA prevents users from copying those

4  pages.  For the foregoing reasons, the Court finds that Plaintiff is

5  likely to prevail on its DMCA §§ 1201(a)(2) and 1201(b)(1) claims.

6         **3.   Plaintiff's Breach of Contract Claim**

7         Plaintiff argues that Defendant is breaching the ticketmaster.com

8  Terms of Use in numerous ways, and is therefore liable for breach of

9  contract.  (FAC ¶¶ 84-93.)  The facts and issues that this claim

10 raises are the same as those raised by Plaintiff's contention, in

11 connection with its copyright claims, that Defendant breached the

12 Terms of Use.  The Court addressed the merits of that claim in its

13 discussion of Plaintiff's claim for copyright infringement, and

14 concluded that Plaintiff is highly likely to prove that use of

15 ticketmaster.com is governed by the Terms of Use; that Defendant was

16 on notice of, and assented to, the Terms of Use; and that Defendant

17 violated the Terms of Use by using automated devices to access the

18 website, using an application that makes several requests per second

19 (in violation of the provision limiting the frequency of requests to

20 no more than one every three seconds), and by using an application

21 designed to thwart Plaintiff's access controls (which breaches the

22 user's agreement to "not use any device, software or routine that

23 interferes with the proper working of the Site nor shall you attempt

24 to interfere with the proper working of the Site.").  The Court

25 therefore finds that Plaintiff is likely to prevail on its breach of

26 contract claim.

27 //

28 //

1    **4.    Plaintiff's Computer Fraud and Abuse Act Claim**

2        Plaintiff also argues that it is likely to prevail on its claim

3    under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

4    Although the CFAA is a criminal statute, it permits "any person who

5    suffers damage or loss" through a violation of its provisions "to

6    maintain a civil action . . . to obtain compensatory damages and

7    injunctive relief or other equitable relief."   18 U.S.C. § 1030(g).

8    To prevail on its CFAA claim, Plaintiff must demonstrate that

9    Defendant "intentionally accesse[d] a computer without authorization

10    or exceed[ed] authorized access, and thereby obtain[ed] information

11    from any protected computer," 18 U.S.C. § 1030(a)(2)(C), or that

12    Defendant "knowingly cause[d] the transmission of a program . . . and

13    . . . cause[d] damage without authorization to a protected computer."

14    18 U.S.C. § 1030(a)(5)(A)(i).   Plaintiff must also demonstrate that

15    Defendant's unauthorized access caused $5,000 in loss or damage during

16    a one year period.   18 U.S.C. § 1030(a)(5)(B)(i).

17        It appears likely that Plaintiff will be able to prove that

18    Defendant gained unauthorized access to, and/or exceeded authorized

19    access to, Plaintiff's protected computers, and caused damage thereby.

20    Based on the statute and the cases Plaintiff cites, the Court also

21    agrees that the required $5,000 of harm may consist of harm to a

22    computer system, and need not be suffered by just one computer during

23    one particular intrusion.   See, e.g., Creative Computing v.

24    Getloaded.com LLC, 386 F.3d 930, 934-935 (9th Cir. 2004) (interpreting

25    the CFAA).   However, because Plaintiff has not quantified its harm as

26    required by the statute or even attempted to show what portion of the

27    harm is attributable to Defendant, the Court cannot find that

28    Plaintiff has affirmatively shown that its harm caused by Defendant

1  exceeds the $5,000 minimum.  Thus, the CFAA claim does not provide a

2  basis for a preliminary injunction.

3      In light of the Court's rulings on Plaintiff's copyright, DMCA,

4  and breach of contract claims, the Court need not address whether

5  Plaintiff is likely to succeed on its claims under California Penal

6  Code § 502, the fifth basis asserted for the preliminary injunction.

7      **B.    Irreparable Harm**

8      Having determined that Plaintiff has a strong likelihood of

9  success on the merits of its copyright, DMCA, and breach of contract

10 claims, the Court now addresses whether Plaintiff has shown "the

11 possibility of irreparable injury."  <u>Walczak</u>, 148 F.3d at 731.

12     For Plaintiff's copyright claim, "a showing of a reasonable

13 likelihood of success on the merits raises a presumption of

14 irreparable harm."  <u>LGS Architects, Inc. v. Concordia Homes of Nevada</u>,

15 434 F.3d 1150, 1155 (9th Cir. 2006) (citing <u>Johnson Controls, Inc. v.</u>

16 <u>Phoenix Control Sys., Inc.</u>, 886 F.2d 1173, 1174 (9th Cir. 1989).  "A

17 copyright holder seeking a preliminary injunction is therefore not

18 required to make an independent demonstration of irreparable harm."

19 <u>LGS Architects</u>, 434 F.3d at 1155-56.  Here, because Plaintiff has

20 shown a strong likelihood of success on the merits of its copyright

21 claim, the Court presumes irreparable harm.  Defendant has done

22 nothing to rebut that presumption.

23     The Court also finds that Plaintiff has otherwise shown the

24 possibility of irreparable harm required to support the issuance of a

25 preliminary injunction on its DMCA and breach of contract claims.

26 Specifically, Plaintiff has submitted extensive evidence demonstrating

27 that it is suffering a loss of goodwill with the buying public in that

28 there is a growing public perception that Plaintiff does not provide

1  the public with a fair opportunity to buy tickets due to automated

2  purchases.  (Obara Decl. ¶¶ 4-5.)  Such evidence includes numerous

3  complaints from consumers about the unavailability of tickets, some of

4  which manifest extreme dissatisfaction with Plaintiff and voice

5  suspicions that Plaintiff is colluding with ticket brokers to deny

6  consumers tickets.  (Id.; Pl.'s Exh. 19.)[5]  Plaintiff has also

7  submitted consumer comments posted on blogs expressing similar

8  sentiments (Pl.'s Exh. 20)[6] and numerous news stories discussing the

9  unavailability of tickets. (See Pl's. Exh. 24.)  For example, many of

10  the news stories concern the unavailability of tickets to concerts in

11  Hannah Montana's "Best of Both Worlds" tour.  Based on the reports,

12  many parents expressed disappointment and outrage at Plaintiff because

13  tickets to many Hannah Montana concerts throughout the nation (Bossier

14  City, Louisiana; Miami, Florida; Atlanta, Georgia; and Kansas City,

15  Missouri, for example) were snapped up within several hours – and

16  sometimes within minutes – of their release for sale.  It also appears

17  that the public's difficulty obtaining tickets to the Hannah Montana

18  concerts was so severe and created such an outcry that the Attorneys

19  ────────────────

20  [5]  Plaintiff's brief quotes several of the complaints compiled in
Exhibit 19.  (See Mot. 10, fn. 8.)  One such complaint states: "I

21  would like to know how within 20 seconds of a show going on sale I
could not find ANY seats together at ANY price at this event.

22  However, there are gobs of them for sale on many different scalper
sites.  How is this possible and why is this tolerated.  The only

23  explanation for this is that people inside TM are in cahoots with
these criminals.  I would just like to know if there are any plans

24  whatsoever to address this situation."

25  [6]  For example, the following is a comment posted by someone who
could not obtain tickets to a performance of the rock group "Rush": "I

26  am absolutely irate about TicketBxxxxxd and its practices.  As has
been mentioned on this site already, the whole process of getting

27  tickets to concerts has gotten completely out of control with
scalpers, brokers, and God-knows-who-else trying to make a buck at the

28  expense of fans."  (Mot. 11, fn. 9.)

1  General of Missouri and Arkansas initiated investigations into

2  Plaintiff's ticket selling practices. (See Pl.'s Exhs. 26, 27.)

3      Such evidence demonstrating public dissatisfaction with Plaintiff

4  is properly before the Court as non-hearsay evidence.  See, e.g.,

5  Academy of Motion Picture Arts and Sciences v. Creative House

6  Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991) (error for the

7  district court not to consider newspaper articles and telephone calls

8  as evidence of actual confusion).  In addition, to the extent some of

9  the newspaper articles may be offered for a hearsay purpose, the Court

10 has wide latitude to consider such evidence in the preliminary

11 injunction context. Republic of the Phillipines v. Marcos, 862 F.2d

12 1355, 1363 (9th Cir. 1988) (stating that it "was within the discretion

13 of the district court to accept this hearsay for purposes of deciding

14 whether to issue the preliminary injunction.")

15     Although the extent of Defendant's culpability for such harm to

16 Plaintiff's goodwill cannot yet be ascertained, it is likely that some

17 of Defendant's clients were able to obtain tickets to such concerts by

18 using Defendant's applications. (See Suppl. Decl. McLain ¶¶ 4-5;

19 Suppl. Lee Decl. ¶¶ 1-3; Pl.'s Exh. 23.)  Given the alleged extent of

20 Defendant's participation in the hundreds of thousands of automated

21 ticket requests wrongfully made of Plaintiff's website, it is likely

22 that Defendant's conduct has caused, and will continue to cause, some

23 portion of Plaintiff's loss of goodwill unless Defendant's conduct is

24 enjoined.  As a consequence of Plaintiff's loss of consumer goodwill,

25 Plaintiff also faces the possibility of loss of goodwill and loss of

26 business from its clients. (McLain Reply Decl. ¶ 7.)

27     Defendant argues that Plaintiff is not harmed when its inventory

28 of tickets is bought up immediately upon release because Plaintiff is

1  paid full price for each ticket, and receives the same service fees

2  and profits, whether the tickets are purchased by Defendant's clients

3  or by other consumers.  (Def.'s Opp'n 11:11-21.)  However, that

4  argument ignores the harm to goodwill that Plaintiff is suffering.  In

5  this Circuit, intangible injuries, such as damage to goodwill, can

6  constitute irreparable harm.  See Rent-A-Center, Inc. v. Canyon

7  Television and Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir.

8  1991); see also, Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush

9  and Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of

10  threatened loss of prospective customers or goodwill certainly

11  supports a finding of the possibility of irreparable harm."); eBay,

12  Inc. v. Bidder's Edge, Inc., 100 F.Supp.2d 1058, 1066 (N.D. Cal. 2000)

13  ("Harm resulting from lost profits and lost customer goodwill is

14  irreparable because it is neither easily calculable, nor easily

15  compensable and is therefore an appropriate basis for injunctive

16  relief.")  Plaintiff has also submitted evidence that it has attempted

17  to use technological countermeasures to prevent automated ticket

18  requests, but that such efforts had only limited success and, in each

19  instance, were quickly thwarted.  (McLain Decl. ¶¶ 23-24, 26-27, 31-

20  33.)  Thus, the Court is not persuaded by Defendant's argument that

21  Plaintiff's self-help measures (such as "blacklisting" IP addresses)

22  are enough to prevent irreparable harm and thus obviate the need for

23  injunctive relief.  In addition to the countermeasures being

24  ultimately ineffective, the cost to Plaintiff of developing and

25  implementing them is not easily calculable.  (Id.)  For the foregoing

26  reasons, the Court finds that Plaintiff has demonstrated the

27  possibility of irreparable harm.

28  //

## C. Balance of Hardships

1

2     Defendant contends that the balance of hardships tips sharply in

3   its favor because it would go out of business if forced to stop

4   selling TBAT.   (Garibay Decl. ¶¶ 3-4.)   However, in the copyright

5   infringement context, once a plaintiff has established a strong

6   likelihood of success on the merits, any harm to the defendant that

7   results from being preliminarily enjoined from continuing to infringe

8   is legally irrelevant.   See Triad Sys. Corp. v. Southeastern Exp. Co.,

9   64 F.3d 1330, 1338 (9th Cir. 1995) (defendant "cannot complain of the

10  harm that will befall it when properly forced to desist from its

11  infringing activities."); Cadence Design Sys., Inc. v. Avant! Corp.,

12  125 F.3d 824, 830 (9th Cir. 1997) (holding that it was reversible

13  error for a district court to even consider "the fact that an

14  injunction would be devastating to [defendant's] business," because

15  "where the only hardship that the defendant will suffer is lost

16  profits from an activity which has been shown likely to be infringing,

17  such an argument in defense merits little equitable consideration.")

18  Thus, the possibility that Defendant will lose all of its profits from

19  the sale of infringing applications does not tip the balance of

20  hardships in Defendant's favor.   Moreover, because Plaintiff has

21  persuasively demonstrated likelihood of success on the merits of

22  several of its claims, the balance of hardships becomes less

23  significant to the Court's analysis.   See id. at 830 ("The balance of

24  hardships factor may assume significance in cases where the plaintiff

25  has not established a strong likelihood of success on the merits, but

26  here [the plaintiff] established that it was likely to succeed on the

27  merits of its copyright claim.").   Therefore, to the extent to which

28  //

1  the balance of hardships is significant in the instant case, it tips

2  in Plaintiff's favor.

3  **D.   Public Interest**

4  The Court finds that the public interest favors the issuance of a

5  preliminary injunction.  Based on the consumer complaints and news

6  reports referenced above (see Pl.'s Exhs. 19, 20, 24), it is evident

7  that Defendant's conduct not only harms Plaintiff, but also harms the

8  public because it denies consumers the opportunity to purchase tickets

9  at their face price.  Thus, insofar as Defendant's misconduct allows

10  its ticket broker clients to unfairly purchase numerous tickets for

11  resale resulting in immediately sold-out events, ordinary consumers

12  must either forego the event or pay ticket brokers inflated prices for

13  resold tickets.  The public interest therefore weighs in favor of an

14  injunction.

15

16  **IV.   BOND**

17  Federal Rule of Civil Procedure 65(c) requires Plaintiff to post

18  a bond, in a sum that the Court deems appropriate, for the payment of

19  costs and damages that Defendant may suffer if it is later found to

20  have been wrongfully enjoined.  A bond may not be required, or may be

21  minimal, when the harm to the enjoined party is slight or where the

22  movant has demonstrated a likelihood of success. See, e.g., Jorgensen

23  v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003); Walczak, 198 F.3d at

24  733.  However, the Court retains discretion to require a bond when the

25  party seeking the injunction has not offered evidence of its own harm

26  in posting a bond, see Barahona-Gomez v. Reno, 167 F.3d 1228, 1237

27  (9th Cir. 1999).

28  Plaintiff asks the Court to require only a nominal bond of $1,000

1  because it has shown a likelihood of success. Defendant, by contrast,

2  argues that a substantial bond of at least $10 million should be

3  required because the injunction will put it out of business. Having

4  considered these arguments, the Court ORDERS Plaintiff to post a **bond**

5  **of $300,000**, an amount that is reasonable under the facts of this

6  case, **within ten (10) days of the date of this Order**. Plaintiff is

7  also ORDERED to prepare a proposed order consistent with this Order,

8  including findings of fact and conclusions of law, **within ten (10)**

9  **days of the date of this Order**.

10

11                          **V. CONCLUSION**

12      Plaintiff has persuasively demonstrated that it will likely

13  succeed on the merits of its claims that Defendant has infringed

14  Plaintiff's copyrights in the ticketmaster.com website, violated the

15  Digital Millenium Copyright Act, and breached a contract (the

16  website's Terms of Use). Plaintiff has also shown the likelihood of

17  irreparable harm. Furthermore, the balance of hardships tips in

18  Plaintiff's favor, not Defendant's. The public interest also favors

19  the issuance of a preliminary inunction. Therefore, the Court hereby

20  **GRANTS** Plaintiff's Motion for Preliminary Injunction and **ENJOINS**

21  Defendant RMG Technologies, Inc., and all persons acting for its

22  benefit or on its behalf, from:

23

24      1.   Creating, trafficking in, facilitating the use of or using

25           computer programs or other automatic devices to circumvent

26           the technological copy protection systems in Ticketmaster's

27           website;

28

2.  Using information gained from access of Ticketmaster's
website to create computer programs to circumvent
Ticketmaster's copy protection and website regulation
systems;

3.  Copying or facilitating the copying of portions of
Ticketmaster's website in excess of any license Ticketmaster
has granted;

4.  Purchasing or facilitating the purchase of tickets from
Ticketmaster's website for the commercial purpose of
reselling them; and

5.  Otherwise accessing and using Ticketmaster's website in
excess of the license granted by the Terms of Use posted
thereon.

DATED:     O ct 16, 2007

_____
AUDREY B. COLLINS
UNITED STATES DISTRICT JUDGE

## PROOF OF SERVICE

**STATE OF CALIFORNIA** )
                                  ) ss:
**COUNTY OF LOS ANGELES** )

       I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is: **1925 Century Park East, #2320, Los Angeles, California 90067.**

       On November 7, 2007, I served the foregoing document described as **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEAL FOR THE NINTH CIRCUIT: PRELIMINARY INJUNCTION APPEAL** on all interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, and addressed as follows:

Robert H. Platt, Esq.
Donald Brown Esq.
Mannatt, Phelps & Phillips, LLP
11355 West Olympic Blvd.
Los Angeles, CA 90064-1614

       **(X)**       **BY MAIL.**  I caused such envelopes to be deposited in the mail.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on the same day with postage thereon, fully prepaid, at Los Angeles, California in the ordinary course of business.

       I declare under penalty of penalty of perjury under the laws of the State of California and the United States that the above is true and correct.