UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TICKETMASTER L.L.C., | ) | CASE NO.:  CV 07-2534 ABC (JCx) |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING MOTION TO DISMISS |
| v. | ) | |
| | ) | |
| RMG TECHNOLOGIES, INC., et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| RMG TECHNOLOGIES, INC., | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TICKETMASTER L.L.C., et al., | ) | |
| Counterclaim-Defendants. | ) | |
| _____ | ) | |

Currently pending before the Court is a Motion to Dismiss Counterclaims 1 Through 4, filed December 21, 2007 by Plaintiff/ Counterdefendant Ticketmaster L.L.C. and Counterdefendant IAC/Interactivecorp (collectively, "Ticketmaster").  Defendant/ Counterclaimant RMG Technologies, Inc. ("RMG") filed its opposition to the motion on January 28, 2008.  Ticketmaster's reply was filed February 11, 2008.  On March 7, 2008, the Court found this Motion

Dockets.Justia.com

appropriate for submission without oral argument and vacated the

hearing set for March 10, 2008.  See Fed. R. Civ. P. 78(b); Local Rule

7-15.  Having considered the materials submitted by the parties and

the case file, the Court hereby GRANTS the Motion.

**BACKGROUND**

RMG alleges that Ticketmaster is in the business of "selling

tickets to individual sports and live entertainment events on behalf

of its clients, who are venues, promoters, entertainers and sports

franchises."  (RMG's First Amended Counterclaims ("FACC"), at ¶ 8.)

Ticketmaster sells these tickets to the public "at prices set by its

clients" (referred to as the "face value" of the tickets), plus

"convenience charges and other charges . . . . tantamount to

Ticketmaster's commission on each sale."  (FACC ¶¶ 9, 15(2).)  Thus

what Ticketmaster provides to its clients are "primary ticket

distribution services," through which professional sports teams,

musicians, theaters, etc., make tickets available to members of the

general public who wish to attend their events.  (FACC ¶¶ 8-10.)

Ticketmaster is alleged to be the exclusive provider of "primary

ticket distribution services" or "primary-ticketing services" for 26

of 30 NBA teams, 31 of 32 NFL teams, 26 of 30 NHL teams, and the "vast

majority of major venues and professional sports franchises."  (FACC

¶¶ 8, 10.)  Further, Ticketmaster is alleged to maintain a "monopoly

in the retail ticketing industry," although that monopoly is

apparently threatened by recent developments in this industry.  (FACC

¶¶ 11-12.)

In response to these threats to its monopoly in the "retail

ticketing industry," Ticketmaster has allegedly "developed a scheme to

obtain a monopoly in the ticket resale market."  (FACC ¶ 14.)  The

exact parameters of the "ticket resale market" are unclear, but it appears that this alleged market includes at least those transactions in which people who have already purchased tickets in the primary ticket market choose to resell those tickets to other purchasers. (FACC ¶ 15(2).)  Ticketmaster apparently facilitates these resale transactions through the "TicketExchange" and "TeamExchange" sections of its website.  (Id.)  Ticketmaster is also alleged to sell tickets at prices above "face value" through the "Auction" section of its website (FACC ¶ 15(3)), but it is not clear whether those tickets have previously been sold and are then resold through the Auction site, or are simply sold for the first time at prices above face value.

As part of this plan to monopolize the ticket resale market, Ticketmaster has allegedly created "Terms of Use" for its website that are designed to reduce competition in that market.  (FACC ¶ 16.) These "Terms of Use," which all Ticketmaster users must agree to abide by in order to use the Ticketmaster website, purportedly:  (1) prohibit users from using the website for commercial purposes; (2) prohibit users from utilizing "automated devices, spiders, robots or bots" to access the website; (3) prohibit users from "viewing more than 1,000 web pages from the site in any twenty four (24) hour period"; and (4) contain a liquidated damages clause requiring anyone who exceeds this 1,000 page limit in 24 hours to pay damages of $10.00 per page for each page over 1,000.  (Id.)  According to RMG, these Terms of Use serve to reduce the number of tickets that "ticket resale brokers" can purchase, while having no effect on the "average ticket buyer."  (FACC ¶ 17.)  While the terms "broker," "ticket broker," and "ticket resale broker" are not expressly defined in the FACC, RMG appears to use these terms to refer to individuals or businesses that

purchase tickets in bulk from sources like Ticketmaster with the intent of reselling them to the general public.  The Terms of Use reduce the number of tickets that brokers can buy "by severely reducing the amount of times that a broker can access Ticketmaster's website in order to purchase their inventory of tickets."  (Id.)

RMG further alleges that in about 2004, it developed "a software application called a Ticket Broker Acquisition Tool" or "TBAT."  (FACC ¶ 7.)  TBAT is used by Ticket Brokers "in purchasing tickets from a variety of ticket selling websites, including, but not limited to ticketmaster.com, tickets.com, evenue.net and other websites, so that tickets can be resold on the ticket resale market."  (Id.)  RMG is not itself a Ticket Broker, and does not buy or sell tickets; "TBAT, as well as its support products, are the only goods and services which RMG creates, markets, licenses, sells, or supports."  (Id.)

Although the FACC is not explicit on this point, it appears, even from RMG's allegations, that TBAT is one of the "automated devices, spiders, robots or bots" that Ticketmaster's Terms of Use prohibit. (FACC ¶ 16.)  Certainly this is the position taken by Ticketmaster, which filed suit against RMG on April 17, 2007, claiming that the use of TBAT violates Ticketmaster's Terms of Use, infringes its copyrights, runs afoul of several federal statutes, and gives rise to a number of state law contract and fraud claims.  On October 16, 2007, after a hearing, this Court granted Ticketmaster's motion for a preliminary injunction, and enjoined RMG from "(1) Creating, trafficking in, facilitating the use of or using computer programs or other automatic devices to circumvent the technological copy protection systems in Ticketmaster's website; (2) Using information gained from access of Ticketmaster's website to create computer

programs to circumvent Ticketmaster's copy protection and website regulation systems; (3) Copying or facilitating the copying of portions of Ticketmaster's website in excess of any license Ticketmaster has granted; (4) Purchasing or facilitating the purchase of tickets from Ticketmaster's website for the commercial purpose of reselling them; and (5) Otherwise accessing and using Ticketmaster's website in excess of the license granted by the Terms of Use posted thereon."

After the injunction issued, RMG filed its answer and counterclaim on October 29, 2007; the FACC was later filed on December 3, 2007. RMG has asserted six counterclaims in its FACC: (1) "attempted monopolization" under Section 2 of the Sherman Act; (2) "misuse of copyright"; (3) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (4) declaratory relief; (5) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and (6) violation of California Penal Code § 502. Ticketmaster now moves to dismiss the first three of these claims in their entirety, and the declaratory relief claim in part. As to those claims Ticketmaster currently does not move to dismiss, it has indicated it intends to seek summary adjudication at the appropriate stage of the case.

**LEGAL STANDARD**

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1356. A Rule 12(b)(6)

1  dismissal is proper only where there is either a "lack of a cognizable

2  legal theory" or "the absence of sufficient facts alleged under a

3  cognizable legal theory." Balistreri v. Pacifica Police Dept., 901

4  F.2d 696, 699 (9th Cir. 1988).  To survive a Rule 12(b)(6) motion, a

5  complaint "does not need detailed factual allegations," but the

6  "[f]actual allegations must be enough to raise a right to relief above

7  the speculative level." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955,

8  1964-65 (2007).

9       The Court must accept as true all material allegations in the

10  complaint, as well as reasonable inferences to be drawn from them.

11  Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  Furthermore,

12  the complaint must be read in the light most favorable to plaintiff.

13  Id.  However, the Court need not accept as true any unreasonable

14  inferences, unwarranted deductions of fact, or conclusory legal

15  allegations cast in the form of factual allegations.  Id.; Western

16  Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

17                              **DISCUSSION**

18  **I.   Attempted Monopolization of the Secondary Market**

19       Ticketmaster attacks RMG's attempted monopolization claim on

20  numerous grounds, starting with the argument that RMG has failed to

21  allege a "relevant product market." As it is necessary to have an

22  operative definition of the relevant product market at issue in order

23  to analyze a number of Ticketmaster's other arguments, that is the

24  first question that should be addressed.  See Newcal Indus., Inc. v.

25  Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008) ("The first

26  question we must address is whether Newcal's antitrust claims allege

27  any legally cognizable 'relevant market.'"); Big Bear Lodging Ass'n v.

28  Snow Summit, Inc., 182 F.3d 1096, 1104 (9th Cir. 1999) (affirming

dismissal of attempted monopolization claim based in part on failure to "sufficiently identify the markets affected by Defendants' alleged antitrust violations," because "[m]onopolization claims can only be evaluated with reference to properly defined geographic and product markets"); Forsyth v. Humana, Inc., 114 F.3d 1467, 1477 (9th Cir. 1997) (holding that resolution of both actual monopolization and attempted monopolization claims "is dependent upon a definition of the relevant market").

RMG argues, first, that the "relevant market" question is typically a fact issue, not suited for disposition on a motion to dismiss. While it may be true that the validity of a properly alleged market is generally a fact question, however, a complaint which fails even to identify the relevant market at issue is vulnerable to a motion to dismiss. Tanaka v. University of So. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001); Big Bear Lodging, 182 F.3d at 1104. Likewise, "a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." Newcal Indus., 513 F.3d at 1045; Tanaka, 252 F.3d at 1063 (affirming dismissal of case on grounds that "markets" identified in first amended complaint were not "appropriately defined for antitrust purposes, even at this stage of the litigation").

RMG does go on to argue that it properly alleged a relevant market, assuming that question can be reached at this stage of the case. In order to determine whether RMG's allegations are sufficient, the Court must, of course, look to those allegations themselves, and not to RMG's characterization of the allegations in its opposition brief. Having reviewed the allegations in the FACC, however, the Court cannot agree with RMG that any relevant market has been properly

1  identified.

2      "Antitrust law requires allegation of both a product market and a

3  geographic market." Newcal Indus., 513 F.3d at 1045 n.4.  The

4  geographic market includes the area of "effective competition," or

5  that area "where buyers can turn for alternative sources of supply."

6  Tanaka, 252 F.3d at 1063 (internal quotations omitted).  The product

7  market includes that "pool of goods or services that enjoy reasonable

8  interchangeability of use and cross-elasticity of demand." Id.  Thus,

9  "the market must encompass the product at issue as well as all

10 economic substitutes for the product." Newcal Indus., 513 F.3d at

11 1045.  "If consumers view the products as substitutes, the products

12 are part of the same market." Rebel Oil Co. v. Atlantic Richfield

13 Co., 51 F.3d 1421, 1435 (9th Cir. 1995).

14      The allegations of the FACC are hopelessly muddled as to what

15 product market (or markets) are at issue here.  Certain allegations

16 pertain to "ticket distribution services," while others pertain to

17 tickets themselves, and both distribution services and tickets are

18 further sometimes divided into sales in the "primary" and "secondary"

19 markets.  Thus any number of markets might be intended:  the market

20 for "primary ticket distribution services," the market for "secondary

21 ticket distribution services," the market for "ticket distribution

22 services" for any and all tickets, the market for tickets that have

23 never been sold before, the market for tickets that have been sold

24 before, the market for tickets regardless of whether or not they have

25 been sold before . . . and so on.  Whether any of these product

26 markets might ultimately turn out to be valid or not, it is currently

27 impossible to tell from the FACC which one(s) RMG may be trying to

28 base its case on.

It does not suffice to refer to the "retail ticket sales market" or the "ticket resale market," as RMG does in the FACC, because either of those terms could encompass both tickets and ticket distribution services -- and the Court has no difficulty whatsoever in finding, as a matter of law, that ticket distribution services and tickets do not belong in the same market.  What happens in one market may be relevant to what happens in the other market, but in no sense whatsoever are "ticket distribution services" a viable substitute for tickets themselves.  There is no "interchangeability of use" or "cross-elasticity of demand" between tickets and ticket distribution services.  Someone who wants to attend a Lakers game is not going to find that the opportunity to sell tickets on TeamExchange is a reasonable substitute for a ticket to the game.  The question of whether tickets to a Clippers game would be an acceptable substitute for Lakers tickets might have to wait until summary judgment, but the suggestion in the FACC that tickets and ticket distribution services are part of the same market, implying that a contract for distribution services would be an acceptable substitute for tickets to any basketball game (or other event), is simply "facially unsustainable."

RMG does not appear to have appreciated the implications of this distinction when drafting the FACC; its allegations blur the line between tickets and ticket distribution services.  Ticketmaster is alleged to have a monopoly in the "retail ticketing industry" (FACC ¶ 11), but apparently not because it has a monopoly on retail tickets; rather, RMG alleges that Ticketmaster's "market share for primary ticket distribution services purchased by major venues" is "somewhere

between 60% and 90%."[1]  (FACC ¶ 10).  So if Ticketmaster's market

share for primary ticket distribution services is why it allegedly has

a monopoly in the retail ticket market, then is Ticketmaster

purportedly trying to achieve a monopoly in the ticket resale market

by increasing its market share for secondary ticket distribution

services?  Perhaps -- RMG refers repeatedly to Ticketmaster's

TicketExchange and TeamExchange services, which appear to offer

secondary ticket distribution services to fans who already have

tickets but cannot use them (see, e.g., FACC ¶ 15(2)), and also

alleges that Ticketmaster is attempting to purchase software companies

that "create software for the purpose of reselling tickets" (FACC ¶

23(3)).  On the other hand, the FACC refers to the "supply and

selection of tickets on the resale market."  (FACC ¶ 24).  And, while

it is the allegations that control, RMG does claim in its brief that

the products at issue are "tickets which have already been sold at

retail" (Opp'n at 4), not services that enable people who already have

some of those tickets to resell them.[2]  It is not that RMG cannot

include allegations regarding multiple markets in its pleading, if

necessary to explain what occurred, but if RMG intends to pursue an

_____

    [1]Ticketmaster is not alleged to be a "producer" of tickets; in
other words, RMG does not claim that Ticketmaster itself owns venues
or organizes events to which tickets could be sold.  Thus Ticketmaster
does not appear to have any ability to increase the total number of
valid tickets extant at any given time.

    [2]How tickets sold on the Auction site fit into this market is not
clear.  RMG argues that the sale of tickets on Ticketmaster's Auction
site is part of Ticketmaster's plan to monopolize the market for
"tickets which have already been sold at retail," but the allegations
regarding the Auction site do not explain whether those tickets have
previously been sold at retail.  Perhaps RMG really means to define
the market as including not just "tickets that have previously been
sold at retail," but all tickets ever sold at amounts above face
value?

antitrust claim, it has to be clear about the market in which the alleged antitrust violation occurred, and be consistent about how the various parties at issue are involved in <u>that</u> market.

As noted, RMG tries to clarify in its opposition brief that what it meant to plead is that the products at issue in the relevant market for its antitrust claim are "tickets which have already been sold at retail" (Opp'n at 4), and that the appropriate geographic market is "the United States" (Opp'n at 5). If that is truly how RMG wants to focus its claims, then it needs to amend its pleading to conform the allegations to that theory of the case. However, RMG should be aware that defining the market in this way will undoubtedly give rise to numerous problems in the future, with both the "product" definition and the "geographic" definition of this market. Is any and every resale ticket in the country really a substitute for every other such ticket? Will the average Raiders fan in Oakland be satisfied with a ticket to see "Disney on Ice: Princess Wishes" in Miami? Will the 12-year-old Hannah Montana fan in Seattle (and her parents) find that tickets to see Marilyn Manson perform in Philadelphia are an acceptable substitute? This may or may not be something that can be addressed on a motion to dismiss, but the Court is reasonably certain it can expect argument over whether these tickets all "enjoy reasonable interchangeability of use and cross-elasticity of demand," within one area of "effective competition."[3]

---

[3]Another potential problem with this geographic definition is suggested by the allegation in the FACC that "less than a dozen states in the U.S. even have anti-ticket reselling laws on their books." (FACC ¶ 13.) So in as many as 11 states, or over 20% of the geographic market proposed by RMG, the "ticket resale market" may exist, if at all, only in violation of state law. Surely RMG does not
(continued...)

1      Further, as overbroad as this definition appears in some

2 respects, it seems too narrow in others.  Why are retail and resale

3 tickets not acceptable economic substitutes for each other?  The Court

4 is reasonably sure that the aforementioned hypothetical Hannah Montana

5 fan would not care whether her ticket was purchased through

6 Ticketmaster in the "retail" market or from a ticket broker in the

7 "resale" market (although her parents might), as long as she is able

8 to attend the concert.  Again, this might be a question for summary

9 judgment rather than a Rule 12(b)(6) motion, but RMG would be well-

10 advised to consider these likely problems in deciding whether and how

11 to amend its antitrust claim.

12      Ticketmaster also argues that RMG has failed to allege facts

13 showing a "dangerous probability" that Ticketmaster will be successful

14 in its alleged plan to monopolize the "ticket resale market."  Failure

15 to allege "a dangerous probability of success of achieving monopoly

16 power in a particular market" is grounds for dismissal of a claim for

17 attempted monopolization.  <u>Big Bear Lodging</u>, 182 F.3d at 1104.

18 Without a clearer idea of the boundaries of the market at issue,

19 however, it is difficult to analyze whether anyone may have any

20 probability of forming a successful monopoly in that market.  However,

21 even assuming that the "ticket resale market" had been adequately

22 defined, RMG's allegations regarding Ticketmaster's ability to

23 monopolize that market appear insufficient.  While it is not enough,

24 by any means, to simply recite the elements of a cause of action, <u>see</u>

25 <u>Twombly</u>, 127 S. Ct. at 1965, parties who choose to recite the elements

26

27     [3](...continued)

28 really intend to argue that the Sherman Act protects RMG's right to
participate in an illegal market.

of a cause of action as a starting point for further factual
allegations should at least recite those elements correctly. By
contrast, RMG has alleged that there is "a dangerous <u>possibility</u> that
Ticketmaster and IAC will succeed in their attempt to monopolize the
ticket resale market." (FACC ¶ 23 (emphasis added).) This may be
nothing more than a typographical error, but it does cast doubt on
whether RMG has even attempted to allege facts that would support the
correct standard. Further, many of Ticketmaster's arguments as to why
RMG's allegations fail appear well-taken; and while there is no need
to examine those arguments in detail unless RMG manages to identify a
proper market, RMG should consider Ticketmaster's arguments on this
issue if it chooses to amend its counterclaims.

Finally, Ticketmaster notes in a footnote in its motion that RMG
lacks "antitrust standing" to assert its attempted monopolization
claim. (Motion at 8 n.4.) The Court is somewhat puzzled as to why
this argument was relegated to a footnote, but in light of the fact
that the question of antitrust standing, like many other issues raised
by Ticketmaster, will be affected by the definition of the "relevant
market" eventually adopted by RMG, there is little sense in examining
the question in detail at this time. However, under any of the
potential markets that may be at issue here, whatever combination of
tickets or ticket distribution services may be involved, the Court
anticipates that RMG's antitrust standing will be subject to
challenge. It is difficult to see how RMG would be considered a
participant in any market in which Ticketmaster is involved, whether
for tickets or ticket distribution services. Nor is it obvious that
RMG's alleged injury flows from any unlawful conduct, or is the type
of injury that the antitrust laws were intended to prevent. <u>Glen</u>

1  Holly Entertainment Inc. v. Tektronix Inc., 352 F.3d 367, 371-72 (9th

2  Cir. 2003) (listing elements of "antitrust injury," the most important

3  factor in determining "antitrust standing"); American Ad Mgmt., Inc.

4  v. General Tel. Co., 190 F.3d 1051, 1055 (9th Cir. 1999) (same).  The

5  Court therefore expects that should RMG choose to amend its attempted

6  monopolization claim, and should Ticketmaster thereafter again move to

7  dismiss, the parties will fully brief the question of standing, unless

8  RMG presents dramatically different allegations in the future.

9  **II.  Misuse of Copyright**

10     Ticketmaster argues that "copyright misuse" is an affirmative

11  defense to a claim for copyright infringement, and does not support an

12  independent claim for damages.  The Court agrees.  Altera Corp. v.

13  Clear Logic, Inc., 424 F.3d 1079, 1090 (9th Cir. 2005) (affirming

14  district court's refusal to "extend[] the doctrine of copyright misuse

15  beyond 'its logical place as a defense to a claim of copyright

16  infringement'"); Practice Mgmt. Info. Corp. v. American Medical Ass'n,

17  121 F.3d 516, 520 (9th Cir. 1997) (adopting rule that "misuse is a

18  defense to copyright infringement"); Metro-Goldwyn-Mayer Studios Inc.

19  v. Grokster, Ltd., 269 F. Supp.2d 1213, 1225 (C.D. Cal. 2003) (noting

20  that, as even defendant conceded, "copyright misuse cannot found a

21  claim for damages").  Accordingly, Ticketmaster's motion to dismiss is

22  hereby GRANTED as to RMG's Second Counterclaim, for "Misuse of

23  Copyright."  And as this holding is not based on the way in which this

24  claim was pled, but on the fact that no such claim can ever be pled,

25  the dismissal of this claim is WITH PREJUDICE, as no possible

26  amendment could save it.

27     Further, to the extent that RMG's Fourth Counterclaim, for

28  Declaratory Relief, is based on copyright misuse, that claim too is

hereby DISMISSED WITH PREJUDICE.  RMG can and has asserted copyright misuse as an affirmative defense, and whatever benefit the theory of copyright misuse may afford RMG can be fully realized in this context. There may be cases in which asserting such a cause of action for copyright misuse would be proper, such as when no claim for copyright infringement has been asserted to which the defense of misuse could be raised.  See Open Source Yoga Unity v. Choudhury, 2005 WL 756558, *8 (N.D. Cal. Apr. 1, 2005).  This is not such a case, however.  RMG has identified no reason why allowing it to seek declaratory relief on a claim for copyright misuse in addition to litigating its affirmative defense of copyright misuse might "serve the purposes of declaratory relief, such as clarifying and settling the legal relations of the parties, or affording a declaratory plaintiff relief from the 'uncertainty, insecurity, and controversy giving rise to the proceeding.'"  Metro-Goldwyn-Mayer Studios, 269 F. Supp. 2d at 1226 (quoting Bilbrey v. Brown, 738 F.2d 1462, 1470 (9th Cir. 1984)).  On the contrary, the presence of a declaratory relief claim for copyright misuse here would be duplicative, and a needless waste of judicial resources.  Id.

**III. California Unfair Competition Law**

Ticketmaster argues that RMG's counterclaim for state law unfair competition should be dismissed because California law does not recognize antitrust claims based on unilateral conduct.  RMG avoids this argument somewhat in its response, arguing only that section 17200 claims can be based on violations of the federal Sherman Act, and, since it has pled a viable Sherman Act claim, its 17200 claim should therefore also survive.  Under this logic, since the Court has found that RMG has in fact not pled a viable Sherman Act claim, there

1  is nothing left on which to predicate the 17200 claim.  Accordingly,
2  that claim is also hereby DISMISSED, without prejudice.

3                              CONCLUSION

4      For the reasons set forth above, Ticketmaster's motion to dismiss
5  is GRANTED.  RMG's First and Third Counterclaims are hereby DISMISSED,
6  with leave to amend.  RMG's Second Counterclaim is DISMISSED WITH
7  PREJUDICE, as is RMG's Fourth Counterclaim, to the extent it is based
8  on copyright misuse.  RMG shall have 30 days from the date of this
9  order in which to file any further amended counterclaims.

10

11  **IT IS SO ORDERED.**

12

13  **DATED:    March 10, 2008**

14

15                              _____
                                    **AUDREY B. COLLINS**
16                              **UNITED STATES DISTRICT JUDGE**

17

18

19

20

21

22

23

24

25

26

27

28