**EXHIBIT A**

```
MANATT, PHELPS & PHILLIPS, LLP
ROBERT H. PLATT (Bar No. CA 108533)
rplatt@manatt.com
MARK S. LEE (Bar No. CA 094103)
mlee@manatt.com
DONALD R. BROWN (Bar No. CA 156548)
dbrown@manatt.com
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224
```

Attorneys for *Plaintiff*
TICKETMASTER L.L.C.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TICKETMASTER L.L.C., a Virginia limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>RMG TECHNOLOGIES, INC., a Delaware corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. CJ 07-2534 ABC(JWJx)<br><br>**DECLARATIONS OF CHRIS KOVACH, KEVIN MCLAIN, ADAM LIEB, STEVEN J. OBARA AND MARK S. LEE IN SUPPORT OF TICKETMASTER'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: The Hon. Audrey B. Collins<br>Date: September 17, 2007<br>Time: 10:00 a.m.<br>Place: Courtroom 680 |

Plaintiff Ticketmaster L.L.C. presents the following declarations of Chris Kovach, Kevin McLain, Adam Lieb and Mark S. Lee in support of its motion for preliminary injunction.

## **DECLARATION OF KEVIN MCLAIN**

I, Kevin McLain, declare:

1. For the past year I have been the Senior Director of Applications Support for Ticketmaster L.L.C. ("Ticketmaster"), and I have worked for Ticketmaster for approximately ten years. As Senior Director, I am responsible for the day-to-day uptime, maintenance, performance and availability of Ticketmaster's website, www.ticketmaster.com. Based on my experience, I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify to those facts based on that personal knowledge except where otherwise indicated.

2. Ticketmaster or its predecessors have been in the business of distributing tickets to live entertainment and sports events to the general public for many years. It does this for Ticketmaster's clients, who are venues, promoters, entertainers and sports franchises. Ticketmaster's clients hire Ticketmaster to distribute tickets because of its ability to distribute tickets efficiently and fairly.

3. Ticketmaster sells tickets through various channels, including retail ticket outlets and telephone call centers, but a website Ticketmaster administers has become a significant channel for ticket distribution during the past ten years. That website is viewable at "http://www.ticketmaster.com." Ticketmaster's website was created for customers who wish to purchase tickets for their own, personal use. It offers those tickets for sale at prices determined by the client. In the industry, this is commonly called the "face" price. Ticketmaster's website resides in a series of computers located in California and Illinois.

4. Customers who wish to purchase tickets from the ticketmaster.com website typically first visit the home page at the website, then navigate through a series of web pages to buy tickets. Users navigate through those pages by clicking on designated hypertext "links" that are on each of those pages. Typing in the URL for the ticketmaster.com homepage, and clicking on the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

6

DECLARATIONS IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

hypertext links to reach the various other pages that must be viewed to purchase tickets from the ticketmaster.com website, causes copies of each of those pages to be downloaded onto a user's computer, where it typically resides in the computer's Random Access Memory ("RAM"), and to appear on the screen of the customer's computer.

5. Ticketmaster has over the years obtained copyright registrations for its website or portions of its website. Most recently, it obtained copyright registrations for the current version of its website's home page, the pages a website user would visit to purchase tickets, and the copy protection systems used on the website. True copies of Ticketmaster's website registrations are attached as Exhibit 2.

6. Based on my experience in the ticketing industry, that consumer demand for tickets to some popular events exceeds the supply of tickets available for purchase through Ticketmaster. Ticketmaster's clients determine the number of tickets available for purchase to an event at a venue. Ticketmaster cannot order or manufacture more tickets to meet demand. The ticketmaster.com website generally announces in advance when tickets to a particular event will be available for purchase, which is sometimes called the "on sale" day. For popular events, this can create intense competition for tickets when they first become available, as many different people will seek to purchase tickets for the same event from the ticketmaster.com website at the same time, *i.e.,* when those tickets first go on sale. This can be very frustrating for consumers, who find that they are unable to purchase the tickets they want because someone else already purchased them.

7. To give everyone a fair chance to purchase those tickets, Ticketmaster has gone to considerable expense to insure that its website is robust and has the technical ability to handle large numbers of virtually simultaneous ticket offers for the many events for which it offers tickets. Ticket requests generally will at least temporarily "reserve" and thus make unavailable, tickets to

1  an event long before the website can service all of the requests for an event.
2  Ticketmaster also has undertaken technical efforts to make the ticket purchasing
3  process used on the ticketmaster.com website as quick, easy and fair to customers
4  as possible. Ticketmaster spends substantial time, energy and resources to maintain
5  a current, accurate and easily understood website for the benefit of the public, as
6  well as its clients.

7      8.    I don't want to describe the technical measures that Ticket-
8  master has undertaken to maintain a fair website in much detail, as that detail might
9  help others circumvent them. However, generally, Ticketmaster uses various
10 means to try to regulate the speed with which users could copy pages from the
11 website. It utilizes technical restrictions on the number of tickets that can be
12 purchased in a single transaction. Finally, it utilizes technical measures to try to
13 prevent the use of automated devices, called computer programs, "software robots,"
14 or "bots," so that users of such devices will not have an unfair advantage over
15 human consumers who do not use such devices in the ticket purchasing process.

16     9.    I can disclose in some detail one technical measure Ticketmaster
17 undertook, because it is already publicly perceptible whenever someone buys
18 tickets on ticketmaster.com. It involves a security program commonly known as
19 CAPTCHA, which stands for "Completely Automated Public Turing Test to tell
20 Computers and Humans Apart." It is a program that is designed to distinguish
21 between human users and bots. With CAPTCHA, when a user submits a ticket
22 request, a box appears on the screen with stylized random characters partially
23 obscured behind hash marks, which the user is instructed to retype in order to
24 proceed with a ticket request. Most automated devices cannot decipher and retype
25 the stylized random characters, and thus cannot proceed past that screen to
26 complete a ticket transaction. CAPTCHA blocks automated access to, and
27 unauthorized copying of, ticket purchase pages on the website. A true copy of an
28 exemplar CAPTCHA page from the Ticketmaster website is attached as Exhibit 3.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

8

DECLARATIONS IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

faces thus appears to be growing. If this trend continues, Ticketmaster will have to spend considerably more to scale the capability of its computer system infrastructure than it would to meet normal incremental growth.

35. These actions of RMG and its customers are very harmful to Ticketmaster. RMG customers appear to have generated millions of ticket requests as described above, and if RMG has ten more similar customers, ten times that many requests could be made, severely straining Ticketmaster's computer system and costing Ticketmaster hundreds of thousands of dollars as described above. Further, we see more and more use of automated devices to access the Ticketmaster website to purchase more and more tickets. Due to the apparently increasing use of unauthorized automated devices to purchase tickets from the Ticketmaster website, I believe Ticketmaster will have to spend considerably more going forward if it is unable to stop this conduct through legal processes.

36. These actions are also harming the goodwill Ticketmaster possesses with the public. The excess consumer demand I described above can make the ticket purchasing process frustrating for consumers even when the process is fair. Ticketmaster's clients let Ticketmaster sell their event tickets because of Ticketmaster's demonstrated ability to efficiently and fairly distribute them. RMG's use of automated devices undermines this effort, because those programs can navigate through Ticketmaster's website, block human users' access to tickets, and purchase tickets at a speed that legitimate consumers who do not use such devices cannot match. As a result, the inventory of tickets available to consumers who do not use such devices is greatly reduced. Reducing the number of tickets available for consumer purchase through the use of automated devices so that those tickets can be resold at inflated prices threatens to cause even greater consumer frustration and ill will toward Ticketmaster.

37. I could give many examples where consumers were prevented from buying the best tickets to events because of the automated devices RMG

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

16

DECLARATIONS IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Ticketmaster's Terms of Use are attached as Exhibit 8.

15. Ticketmaster's Terms of Use also require users of its website to comply with the ticketmaster.com "ticket purchase policy." The Terms of Use contain a hyperlink to that policy which, among other things, limits users to a specified number of tickets per event. The actual ticket limit is included on the event page for an event, and is confirmed on the ticket purchase page for an event. These limits are intended to allow more users to have fair access to event tickets. A true copy of the ticketmaster.com ticket purchase policy is attached as Exhibit 9.

16. Excess consumer demand for tickets to popular events has led some individuals and businesses to seek to purchase tickets, not for their own personal use, but instead to resell them to other consumers at higher than the "face" price. Such individuals and businesses often call themselves "ticket brokers," though others sometimes less flatteringly call them "ticket scalpers."

17. Ticketmaster monitors the ticket purchasing patterns and traffic on its website to insure that the website is adequately serving the needs of its customers. Recently, complaints by clients and consumers to the effect that the best tickets to popular events seemed to be less and less available through ticketmaster.com caused Ticketmaster to expand its monitoring activities. As a result of this more intensive monitoring, Ticketmaster became aware of an unusually high volume of requests for popular events even after Ticketmaster's allocation of tickets was at or near exhaustion. This volume and pattern is inconsistent with manual requests by normal consumers, but consistent with automated requests, because the public generally does not know, as brokers do, that venues sometimes release additional tickets at or near the date of an event. This caused Ticketmaster to suspect that some ticket brokers, and perhaps others, were and are using computer programs or other automated devices to buy tickets.

18. Further monitoring uncovered additional evidence that brokers were using computer programs that successfully circumvented Ticketmaster's

security measures and "cut in line" in front of human consumers to buy tickets. These automated devices can circumvent the technical restrictions on the number of ticket purchases in a single transaction, that regulate the speed with which users can copy pages from the site, and can solve the CAPTCHA (i.e., decipher the stylized characters and enter them automatically). Individuals use these automatic devices to purchase large quantities of tickets, in violation of the Terms of Use.

19. Users of such prohibited devices have an unfair advantage in obtaining tickets to popular events, and use of these devices erodes Ticketmaster's ability to offer a level playing field to the ticket-buying public. Such actions reduce the number of tickets available for Ticketmaster's normal customers at the "face" price. Moreover, the automated devices inundate Ticketmaster's website with many more sustained and repeated ticket requests, which places a strain on Ticketmaster's website infrastructure.

20. Upon discovering this problem, Ticketmaster began trying to discover who is using those technological measures, so that it can take appropriate action to stop them. I have been involved in efforts to discover who was doing that, and to create technical countermeasures try to eliminate, or at least reduce, those actions.

21. Many Ticketmaster employees have been given assignments to deal with this problem. Some people were asked to strengthen the technical measures used on Ticketmaster's website to try and eliminate, or at least reduce, use of those automated devices. Others were tasked with assessing, and if necessary, increasing the capacity of Ticketmaster's computer systems to handle the increased traffic which appeared to be cause by use of these automated devices. I cannot calculate precisely how much time was spent by Ticketmaster's employees in response to this problem; we do not keep precise records of the amount of time we spend on specific tasks that would permit me to make that calculation at this time. However, based on my own involvement and interactions with others, I know

that many people have spent many hours trying to stop these automated intrusions into our website. I estimate the value of the time those employees spent on these problems to be at least tens of thousands of dollars per year every year since the problem was discovered through mid-2006. Since then, the value of that time has greatly increased. I estimate that Ticketmaster is incurring costs of hundreds of thousands of dollars per year on an annualized basis since that time.

22. Earlier this year, we developed technology that sometimes allows us to detect the use of automated devices on our website, and to refuse a connection with the computer that is using such devices. We identify such computers by their internet protocol ("IP") address. However, these efforts did not slow the problem down because, we believe, the automated devices quickly shift to another IP address so a subsequent request from the same person can appear to be a new request from a new person.

23. Although we could not effectively stop use of these automated devices on ticketmaster.com, Ticketmaster did develop means to measure when people are accessing its systems with those automated devices, and has periodically utilized those methods to determine how much the total traffic on the Ticketmaster website comes from use of those automated devices. Based on those methods, I estimate that on some days up to 80% of all ticket requests made on the Ticketmaster website are generated by use of automated devices or "bots."

24. After extensive efforts, Ticketmaster has been able to discover the identities of a few of the individuals or companies who use these automated systems. One individual who Ticketmaster determined was using computer programs to circumvent Ticketmaster's CAPTCHA and other copy protection systems is named Chris Kovach. Through matching various names, IP addresses and credit card information, Ticketmaster was able to uncover over 9,500 ticket orders for almost 24,000 tickets placed by Mr. Kovach over the last several years through what we believed to be use of computer programs. Mr. Kovach admitted to