**EXHIBIT  C**

Dockets.Justia.com



THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TICKETMASTER L.L.C., a Virginia limited liability company,<br><br>                    Plaintiff,<br><br>          v.<br><br>RMG TECHNOLOGIES, INC., a Delaware corporation, and DOES 1 through 10, inclusive,<br><br>                    Defendants. | CV 07-2534 ABC (JWJx)<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

Pending before the Court is Plaintiff Ticketmaster LLC's Motion for Preliminary Injunction ("Motion"), filed on August 27, 2007. Defendant RMG Technologies, Inc. ("Defendant" or "RMG") opposed on September 17, 2007, and Plaintiff replied on September 24, 2007. On October 5, 2007, Plaintiff submitted a Court-ordered supplemental declaration of Kevin McLain, and on October 9, 2007, Defendant submitted a supplemental declaration of Cipriano Garibay. The hearing on this matter was held on October 15, 2007. Upon consideration of



1  the parties' submissions, arguments of counsel, and the case file, the
2  Court hereby GRANTS the Motion.

3

4                    **I.   FACTUAL AND PROCEDURAL BACKGROUND**

5       In this action, Plaintiff Ticketmaster ("Plaintiff" or
6  "Ticketmaster") alleges that Defendant RMG ("Defendant" or "RMG") has
7  developed and marketed automated devices to access and navigate
8  through Ticketmaster's website, thereby infringing Ticketmaster's
9  copyrights and violating the website's Terms of Use and a number of
10 federal and state statutes.

11      Plaintiff Ticketmaster sells tickets for entertainment and sports
12 events on behalf of its clients to the general public through a
13 variety of means, including its copyrighted website ticketmaster.com
14 ("website").  (First Amended Complaint ("FAC") ¶ 3.)  Recognizing that
15 competition to purchase tickets can be intense, Plaintiff contends
16 that it attempts to ensure a fair and equitable ticket buying process
17 on the website by contract and through technological means.  (Id.)
18 First, visitors to ticketmaster.com are required to accept contractual
19 provisions set forth in the website's "Terms of Use."  (FAC ¶¶ 16-20.)
20 These terms permit viewers to use ticketmaster.com for personal use
21 only, prohibit commercial use, prohibit the use of automatic devices,
22 prohibit users from accessing ticketing pages more than once during
23 any three second interval, and prohibit consumers from purchasing more
24 than a specific number of tickets in a single transaction.  (FAC ¶¶
25 21-26; Pl.'s Exhs. 8, 9.)

26      Second, Plaintiff contends that it employs a number of
27 technological means to ensure that ticket buying over the website is
28 fair and equitable.  One of these measures is a computer security

                                   2

1   feature known as CAPTCHA that is designed to distinguish between human

2   users and computer programs, and thereby prevent purchasers from using

3   automated devices to purchase tickets.  (FAC ¶ 14.)

4      Plaintiff contends that Defendant RMG markets and sells

5   applications that enable Defendant's clients to use automated devices

6   to enter and navigate through its website in violation of the Terms of

7   Use governing the website, thereby causing injury to Plaintiff.  (FAC

8   ¶¶ 3-5, 17-27.)  For example, Plaintiff contends that Defendant's

9   applications are prohibited "automatic devices," that the applications

10   circumvent Plaintiff's access control and copy protection systems,

11   including CAPTCHA, inundate Plaintiff's computers with thousands of

12   automatic requests thereby preventing ordinary consumers from

13   accessing the website, and enable Defendant's clients to purchase

14   large quantities of tickets.  (FAC ¶¶ 28-30, 34.) Based on these

15   allegations, Plaintiff's FAC, filed on June 25, 2007, states eleven

16   causes of action against Defendant.

17      Plaintiff now moves for a preliminary injunction based on five of

18   its claims.  Plaintiff's evidence in support of the Motion includes

19   declarations from its Senior Director of Applications Support, Kevin

20   McLain, wherein McLain testifies how he was able to trace ticket

21   requests and purchases made on ticketmaster.com back to individual

22   users and, ultimately, to Defendant.  Based on his methodology, McLain

23   discovered, for example, that Chris Kovach, a ticket broker and one of

24   Defendant's clients, made over 9,500 ticket orders – or 24,000 tickets

25   – over the last several years. (McLain Decl. ¶ 24.)  McLain also

26   explains that he identified Gary Charles Bonner and Thomas J. Prior as

27   Defendant's clients.  Using IP addresses registered to Defendant,

28   Bonner made almost 13,000 ticket purchases over several years, and

1   made more than 425,000 ticket requests in a single day.  (Id.)  Using

2   IP addresses registered to Defendant, Prior made almost 22,000 ticket

3   orders over several years, and made more than 600,000 ticket requests

4   in a single day.  (Id.)[1]  Plaintiff also submitted declarations from

5   Kovach, one of Defendant's former clients; Adam Lieb, a computer and

6   internet consultant; Steven Obara, Plaintiff's Director of Customer

7   Service Operations; Mark Lee, an attorney representing Plaintiff in

8   this matter; and a number of exhibits.[2]

9       Defendant challenges the Motion on both legal and factual

10  grounds.  Defendant states that the computer application Plaintiff

11  seeks to enjoin Defendant from using and selling is its Ticket Broker

12  Acquisition Tool ("TBAT"), and that this application is not an

13  "automated device" but, rather, is simply a type of internet browser,

14

---

15      [1]  McLain's Court-ordered Supplemental Declaration, filed on
16  October 5, 2007, explains in detail, to the Court's satisfaction, the
    steps MacLain took to trace ticket purchases to Defendant, using
17  purchases made by Prior as an example.

18      [2]  Defendant objects to these declarations and the exhibits
    attached thereto on numerous grounds.  The Court finds Defendant's
19  objections meritless.  Kovach, McLain, Obara, and Lee supplied
    sufficient foundation that their testimony is based on their personal
20  knowledge and experience.  To the extent they offered opinion
    testimony, they did so in conformance with the Rules of Evidence.  Nor
21  are Defendant's hearsay objections well-taken.  Defendant also objects
    to the Lieb Declaration.  However, Lieb laid a foundation sufficient
22  to show that his testimony is based on personal knowledge, and that
    the opinions he offers are not "speculative" because they are based on
23  his examination of Kovach's computer and his experience as a computer
    consultant.  Furthermore, in the preliminary injunction context, the
24  Court is not strictly bound by all rules of evidence.  See, e.g.,
    Flynt Distributing Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir.
25  1984) ("The urgency of obtaining a preliminary injunction necessitates
    a prompt determination . . . The trial court may give even
26  inadmissible evidence some weight, when to do so serves the purpose of
    preventing irreparable harm before trial.")  Thus, the Court has
27  discretion to consider the proffered evidence even if it might not be
28  admissible if presented in other settings.

1   akin to Internet Explorer, requiring human interaction. (Garibay

2   Decl. ¶¶ 3, 4) Defendant also urges that it should not be bound by the

3   Terms of Use and that, in any case, Plaintiff has presented no

4   evidence upon which it - as opposed to the persons using TBAT - can be

5   enjoined.  Defendant also argues that Plaintiff's legal theories are

6   flawed in various ways.[3]

7

8           II.   LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

9           To obtain a preliminary injunction, a plaintiff must show

10  "either: (1) a likelihood of success on the merits and the possibility

11  of irreparable injury; or (2) that serious questions going to the

12  merits were raised and the balance of hardships tips sharply in its

13  favor." Walczak v. EPL Prolong, Inc., 198 F.3d 725, 731 (9th Cir.

14  1999).  "These two alternatives represent extremes of a single

15  continuum, rather than two separate tests." Id.  (internal quotations

16  omitted).  "Thus, the greater the relative hardship to [a plaintiff],

17  the less probability of success must be shown." Id.; see also

18  International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822

19  (9th Cir. 1993).  "The district court must also consider whether the

20  public interest favors issuance of the injunction." Southwest Voter

21  Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th Cir.

22

23  ───────────────

    [3]   The Court rejects Defendant's argument that the Motion should

24  be denied as premature because it was brought prior to the Court's
    ruling on Defendant's Motion to Dismiss.  Defendant also appears to

25  argue, rather inconsistently, that the Motion is untimely because it
    was filed approximately three months after Plaintiff obtained the

26  Kovach Declaration.  None of the cases Defendant cites is persuasive.
    In view of the facts and posture of this case, the Court finds that

27  the Motion is neither premature nor untimely.  In any event, the Court
    did consider the motion to dismiss together with the present Motion,

28  and issued an order on October 12, 2007 denying the motion to dismiss.

2003). A preliminary injunction is an "extraordinary remedy" for which the need must be "clear and unequivocal." <u>Shelton v. National Collegiate Athletic Ass'n</u>, 539 F.2d 1197, 1199 (9th Cir. 1976).

### III. ANALYSIS

The five claims on which Plaintiff seeks a preliminary injunction are its claims for violation of the United States Copyright Act, 17 U.S.C. § 501 <u>et seq.</u>, the Digital Millenium Copyright Act ("DMCA") 17 U.S.C. § 1201, California Penal Code § 502, and the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. § 1030(g), and on its breach of contract claim.

**A. Likelihood of Success on the Merits.**

    **1.  <u>Plaintiff's Copyright Claim</u>**

To prevail on its claim for copyright infringement, Plaintiff must (1) "show ownership of the allegedly infringed material and (2) [it] must demonstrate that the alleged infringers violate[d] at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1013 (9th Cir. 2001). Plaintiff alleges that Defendant is violating its copyright in the ticketmaster.com website.

Plaintiff has submitted evidence that it owns registered copyrights in the website ticketmaster.com, and, separately, in portions of the website. (Lee Decl. ¶ 2; McLain Decl. ¶ 5, Pl.'s Exh. 2.) "A website may constitute a work of authorship fixed in a tangible medium of expression . . . Copyright protection for a website may extend to both the screen displays and the computer code for the website." <u>Integrative Nutrition, Inc. v. Academy of Healing Nutrition</u>, 476 F.Supp. 2d 291, 296 (S.D.N.Y. 2007). Defendant does

1   not dispute Plaintiff's claim that its website is copyrighted.

2   Plaintiff has thus satisfied the first element of its copyright claim.

3       Plaintiff alleges that Defendant infringes its copyrights in

4   ticketmaster.com both directly and indirectly.  First, Plaintiff

5   states that each time Defendant views a page from ticketmaster.com, a

6   copy of that page is necessarily downloaded or "cached" from

7   Plaintiff's computers onto the Defendant's computer's random access

8   memory ("RAM"), thus rendering Defendant <u>directly liable</u> for such

9   copying.  (Mot. 13:9-12; McLain Decl. ¶ 4.)  Plaintiff also argues

10  that Defendant directly participates in its clients' unauthorized

11  access of the website because its clients do not acquire physical

12  possession of the software.  Rather, Defendant's devices are kept on

13  Defendant's own computer systems; in order to gain access to

14  Defendant's devices, its clients must log onto Defendant's website

15  ticketbrokertools.com, and use the devices hosted on

16  ticketbrokertools.com to improperly access ticketmaster.com.  (Mot.

17  6:18-24; Kovach Decl. 2:18-25.)  Thus, Defendant allows and, indeed,

18  requires its clients to go through its own infrastructure in order to

19  use the devices that access ticketmaster.com.  Defendant denies this

20  factual allegation and states that "TBAT [has never been] operated

21  from RMG's computer system on behalf of any client, as it is not, nor

22  has it ever, been centrally run on behalf of any client."  (Garibay

23  Decl. ¶ 5.)

24      Second, Plaintiff states that Defendant is <u>indirectly liable</u> for

25  contributory infringement, vicarious infringement, and inducing

26  copyright infringement because it provides its clients with bots and

27  other automated devices to infringe Plaintiff's copyright in its

28  website.  (Mot. 15:9-14.)  Both direct and indirect infringement occur

7

1   insofar as the person viewing the website does so in excess of the
2   authorization Plaintiff grants through the website's Terms of Use.

### a.   **Defendant's Direct Liability for Copyright Infringement**

5       Defendant's _direct_ liability for copyright infringement is based
6   on the automatically-created copies of ticketmaster.com webpages that
7   are stored on Defendant's computer each time Defendant accesses
8   ticketmaster.com.  (Lieb Decl. ¶ 9.)  Defendant does not contest that,
9   as a technological question, whenever a webpage is viewed on a
10  computer, a copy of the viewed page is made and stored on the viewer's
11  computer.  However, Defendant contends that such "cached" copies are
12  not "copies" within the meaning of the Copyright Act, that such copies
13  could not give rise to copyright liability because their creation
14  constitutes fair use, and that Plaintiff has not shown that any pages
15  from ticketmaster.com were ever downloaded or stored on Defendant's
16  computer.

17      Section 101 of the Copyright Act defines "copies" as "material
18  objects, other than phonorecords, in which a work is fixed by any
19  method now known or later developed, and from which the work can be
20  perceived, reproduced, or otherwise communicated, either directly or
21  with the aid of a machine or device."  17 U.S.C. § 101.  The Copyright
22  Act also provides that "[a] work is 'fixed' in a tangible medium of
23  expression when its embodiment in a copy or phonorecord, by or under
24  the authority of the author, is sufficiently permanent or stable to
25  permit it to be perceived, reproduced, or otherwise communicated for a
26  period of more than transitory duration."  _Id._

27      The copies of webpages stored automatically in a computer's cache
28  or random access memory ("RAM") upon a viewing of the webpage fall

1  within the Copyright Act's definition of "copy."  See, e.g., MAI

2  Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 519 (9th Cir.

3  1993) ("We recognize that these authorities are somewhat troubling

4  since they do not specify that a copy is created regardless of whether

5  the software is loaded into the RAM, the hard disk or the read only

6  memory ('ROM'). However, since we find that the copy created in the

7  RAM can be 'perceived, reproduced, or otherwise communicated,' we hold

8  that the loading of software into the RAM creates a copy under the

9  Copyright Act.")  See also Twentieth Century Fox Film Corp. v.

10 Cablevision Systems Corp., 478 F.Supp. 2d 607, 621 (S.D.N.Y. 2007)

11 (agreeing with the "numerous courts [that] have held that the

12 transmission of information through a computer's random access memory

13 or RAM . . . creates a 'copy' for purposes of the Copyright Act," and

14 citing cases.)  Thus, copies of ticketmaster.com webpages

15 automatically stored on a viewer's computer are "copies" within the

16 meaning of the Copyright Act.

17     The Court must next determine whether Plaintiff has shown by a

18 preponderance of the evidence that Defendant did in fact view the

19 website, thereby copying its webpages.  Although Plaintiff does not

20 present direct evidence of such viewing, the logic from which such an

21 inference may be drawn is compelling.  Plaintiff presents expert

22 testimony that Defendant necessarily had to view ticketmaster.com in

23 order to create the applications that enable Defendant's clients to

24 enter and navigate through the website.  (Lieb Decl. ¶ 9.)  Indeed, in

25 order to test the applications to determine whether they worked as

26 intended, Defendant would have had to actually use the applications to

27 purchase tickets from the website.  (Id.)  By Defendant's own

28 description, TBAT is "a browser geared for the purchase of tickets

1  from a variety of websites including . . . ticketmaster.com."

2  (Garibay Decl. ¶ 5.)  It also follows that Defendant's clients would

3  have had to visit the website, and thus copy pages, in order to use

4  Defendant's applications to make ticket purchases through

5  ticketmaster.com.  The Court thus finds that Plaintiff is indeed

6  likely to prove that Defendant visited (and used) ticketmaster.com and

7  necessarily made copies of pages from the copyrighted website.

8       Plaintiff also argues that Defendant is directly liable for

9  infringement because Defendant requires and/or allows its clients to

10 work through its website and computer system in order to use its

11 ticket purchasing software to access ticketmaster.com.  Defendant

12 disputes this allegation.  However, the Court finds it unnecessary to

13 address Plaintiff's likelihood of showing that Defendant acts as an

14 intermediary for its clients' unauthorized use of ticketmaster.com.

15 As discussed above, Plaintiff will likely succeed in its claim for

16 direct liability by showing that Defendant itself viewed and/or used

17 the website.[4]

18      Next, the Court will consider whether Plaintiff is likely to

19 demonstrate that such copying constitutes copyright infringement.

20 Plaintiff contends that Defendant infringed its copyrights by

21 accessing and using the copyrighted website in excess of the

22 authorization granted in the website's Terms of Use, which Plaintiff

23 contends creates a non-exclusive license to view (and thus copy) pages

24 from the website.  Defendant presents a number of legal and factual

25 _____

26    [4]  In addition, even accepting Defendant's version of the facts –
   that its clients download TBAT onto their own computers and operate it
27 independent of Defendant – Defendant would still be liable for
   contributory infringement, discussed infra.
28

1  arguments against this theory, but none of them is meritorious.

2      First, the Court agrees that the Terms of Use presented on

3  ticketmaster.com create a non-exclusive license to copy the website.

4  "The word 'license,' means permission, or authority; and a license to

5  do any particular thing, is a permission or authority to do that

6  thing." Federal Land Bank of Wichita v. Board of County Com'rs, 368

7  U.S. 146, 154 (1961). "No magic words must be included in a document"

8  to create a copyright license. Radio Television Espanola S.A. v. New

9  World Entertainment, Ltd., 183 F.3d 922, 927 (9th Cir. 1999).

10 Furthermore, nonexclusive licenses can be implied from conduct. See

11 Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558-559 (9th Cir.

12 1990) (holding that by creating a work at defendant's request and

13 handing it over to defendant to copy and distribute, plaintiff granted

14 defendant an implied nonexclusive license to the work.) Use of a work

15 in excess of a license gives rise to liability for copyright

16 infringement. LGS Architects, Inc. v. Concordia Homes of Nevada, 434

17 F.3d 1150, 1156 (9th Cir. 2006) ("When a licensee exceeds the scope of

18 the license granted by the copyright holder, the licensee is liable

19 for infringement.")

20     Plaintiff has presented evidence showing that access to the

21 website is governed by specific Terms of Use, and that any person

22 viewing the website is put on notice of the Terms of Use. For

23 example, the ticketmaster.com homepage displays the following warning:

24 "Use of this website is subject to express Terms of Use which prohibit

25 commercial use of this site. By continuing past this page, you agree

26 to abide by these terms." (McLain Decl. ¶ 10; Pl.'s Exh. 4.) The

27 underlined phrase "Terms of Use" is a hyperlink to the full Terms of

28 Use; the same phrase appears on almost every page of ticketmaster.com.

1  (Id. ¶¶ 10-11; Pl.'s Exhs. 4-5.)  In addition, since 2003, users of

2  ticketmaster.com have had to affirmatively agree to the Terms of Use

3  as part of the procedure to set up an account, and since mid-2006,

4  users have had to affirmatively agree to the Terms of Use for every

5  ticket purchase.  (Id. ¶¶ 12, 13; Pl.'s Exhs. 6, 7.)

6      Having determined that Plaintiff is highly likely to succeed in

7  showing that Defendants viewed and navigated through ticketmaster.com,

8  the Court further concludes that Plaintiff is highly likely to succeed

9  in showing that Defendant received notice of the Terms of Use and

10  assented to them by actually using the website.  See, e.g.,

11  Register.com, Inc. v. Verio, Inc., 126 F.Supp. 2d 238, 248 (S.D.N.Y.

12  2000) (where website's terms of use stated "by submitting this query,

13  you agree to abide by these terms," court held "there can be no

14  question that [the user of website] manifested its assent to be bound"

15  by the terms of use when it electronically submitted queries to the

16  database); Hotmail Corp. v. Van$ Money Pie Inc., 1998 WL 388389, 2, 6

17  (N.D. Cal. 1998) (granting preliminary injunction based in part on

18  breach of "Terms of Service" agreement, to which defendants had

19  assented.)  Indeed, Defendant does not seriously contest that it was

20  on notice of the Terms of Use; rather, Defendant argues that the Terms

21  of Use do not amount to an agreement or a license, and that the Terms

22  are too uncertain to be enforced.  The Court finds no merit in these

23  arguments.

24      The Terms of Use governing ticketmaster.com include the following

25  terms:

26      "You [the viewer] agree that you are only authorized to
        visit, view and to retain a copy of pages of this Site for

27      your own personal use, and that you shall not duplicate,
        download, [or] modify . . . the material on this Site for

28      any purpose other than to review event and promotions

12

1    information, for personal use . . ." (Pl.'s Exh. 8 at 70.)

2    "No . . . areas of this Site may be used by our visitors for
     any commercial purposes . . ." (Id. at 71.)

3

4    "You agree that you will not use any robot, spider or other
     automated device, process, or means to access the Site . . .
5    You agree that you will not use any device, software or
     routine that interferes with the proper working of the Site
6    nor shall you attempt to interfere with the proper working
     of the Site." (Id. at 71.)

7    "You agree that you will not take any action that imposes an
     unreasonable or disproportionately large load on our
8    infrastructure." (Id. at 71-72.)

9    "You agree that you will not access, reload or 'refresh'
     transactional event or ticketing pages, or make any other
10   request to transactional servers, more than once during any
     three second interval." (Id. at 72.)

11

12   "You do not have permission to access this Site in any way
     that violates . . . these terms of use." (Id. at 72.)

13   "You understand and agree that . . . Ticketmaster may
     terminate your access to this Site, cancel your ticket order
14   or tickets acquired through your ticket order . . . if
     Ticketmaster believes that your conduct or the conduct of
15   any person with whom Ticketmaster believes you act in
     concert . . . violates or is inconsistent with these Terms
16   or the law, or violates the rights of Ticketmaster, a client
     of Ticketmaster or another user of the Site." (Id. at 72.)

17

18        Viewers are thus authorized to view - and thereby copy – pages of

19   the website when they do so in accordance with the Terms of Use.  In

20   addition, Plaintiff reserves the right to terminate any person's

21   access to the website if it believes that person violated the Terms of

22   Use.  Thus, by the Terms of Use, Plaintiff grants a nonexclusive

23   license to visitors to copy pages from the website in compliance with

24   those Terms.  Inasmuch as Defendant used the website, Defendant

25   assented to the terms.

26        Nor are the terms so vague as to be unenforceable.  The above

27   terms permit access for personal use only, prohibit commercial use,

28   prohibit the use of bots and automated devices, limit the frequency

1  with which users can make requests through the website, and require

2  the user to agree not to interfere with the proper working of the

3  website.  Defendant argues, however, that the term "automated device"

4  is confusing.  Specifically, Defendant's President, Cipriano Garibay,

5  a software designer, testifies in his declaration that TBAT - which he

6  appears to claim is the only product in issue in this case - is just a

7  web browser and is not an "automated device" because it requires human

8  interaction to function.  (Garibay Decl. ¶ 4.)  Garibay further claims

9  that he does not know what Plaintiff is referring to by the term

10  "automated device" because "every computer in the world, as well as

11  all computer programs and web browsers, have [sic] a large degree of

12  automation built in since they are not run manually.  Clearly,

13  Ticketmaster is not seeking to prohibit all computers and browsers

14  from accessing its website, otherwise the website would be useless.

15  However, as Ticketmaster has not defined 'automated device' in its

16  'Terms of Use,' I can only speculate as to what it means by same."

17  (Id.)

18      This claim is specious.  First, the term "automated device"

19  appears in the provision in which website viewers agree to "not use

20  any robot, spider or other automated device, process, or means to

21  access the Site." (emphasis added).  Although the terms of use include

22  no additional definition of "automated device," they identify robots

23  and spiders as examples of such devices, which Garibay states are

24  "programs which by their very nature run without interfacing with

25  humans."  (Garibay Decl. ¶ 4.)  Plaintiff has submitted credible

26  testimony showing that Defendant's applications are, in fact,

27  automated devices.  For example, Adam Lieb, a computer consultant who

28  studied a directory Defendant placed on Kovach's computer, testifies

14

that "the term 'automated device' is easy to understand in the context
of computer programming" - a field in which Garibay claims 10 years of
experience - and that Defendant's programs are automated devices.
(Lieb Reply Decl. ¶ 2; Garibay Decl. ¶ 1.)  Lieb distinguishes
Defendant's programs from conventional internet browsers - which he
agrees are not automated devices - and explains that even though
Defendant's programs may require human initialization or set up, they
generate automated requests thereafter.  Based on his examination of
the "super proxy" log files on Kovach's computer, Lieb states that
"several webpage requests per second were made to Ticketmaster, via
the proxy, from the same source IP address.  Thousands of requests
were made per day.  No human would be able to generate that many
requests during manual, non-automated web browsing.  These were
automated request[s] made by an 'automated device.'"  (Lieb Reply
Decl. ¶ 4.)

     Based on his personal experience, Kovach describes Defendant's
software as "including automated devices that RMG calls 'workers' that
can automatically navigate the Ticketmaster website . . . [M]y level
of service enabled me to use multiple workers - sometimes over one
hundred of them - simultaneously to search for and request tickets."
(Kovach Decl. ¶ 5.)  Kovach further describes how he could command the
workers to search for tickets according to parameters that he would
set, and that the workers would search for tickets automatically and
alert him when they found tickets matching his parameters.  (Kovach
Decl. ¶¶ 6-7, 9.)  Indeed, Defendant's own website advertises its
products as "let[ting] you do the work of a dozen people at once.
Just enter the event information . . . and the moment the event goes
on sale, *PurchaseMaster* goes into action."  (Pl.'s Exh. 1.)  In view

15

1  of all of the evidence, Plaintiff is highly likely to succeed on its

2  claim that Defendant's applications are automated devices that violate

3  the Terms of Use.

4       However, even setting aside Plaintiff's prohibition of automated

5  devices, the application as described would violate other provisions

6  of the Terms of Use.  For example, using an application that enables a

7  person to make several requests per second would violate the provision

8  limiting the frequency of requests to no more than one every three

9  seconds.  Furthermore, use of an application designed to thwart

10  Plaintiff's access control by, in Defendant's own description,

11  "stealth technology [that] lets you hide your IP address, so you **never**

12  **get blocked by Ticketmaster**," (Pl.'s Exh. 1) (original emphasis) would

13  breach the user's agreement to "not use any device, software or

14  routine that interferes with the proper working of the Site nor shall

15  you attempt to interfere with the proper working of the Site." See

16  also Kovach Decl. ¶ 8 (explaining his understanding that the "workers

17  are specifically designed to navigate or otherwise avoid various

18  security measures on Ticketmaster's website.").

19       Finally, Defendant argues in summary fashion that to the extent

20  Plaintiff's claim is predicated on automatically-made cache copies of

21  Plaintiff's webpages, such cache copies constitute fair use as a

22  matter of law under Perfect 10, Inc., v. Amazon.com, Inc., 487 F.3d

23  701, 716 (9th Cir. 2007).  This argument is unavailing for several

24  reasons.  First, "[b]ecause the defendant in an infringement action

25  has the burden of proving fair use, the defendant is responsible for

26  introducing evidence of fair use in responding to a motion for

27  preliminary relief." Perfect 10, 487 F.3d at 714.  Here, Defendant

28  has come forward with no evidence of fair use.  Nor did Defendant

1  attempt to explain how its use satisfies any of the four fair use

2  factors set forth in 17 U.S.C. § 107. Accordingly, the fair use

3  defense fails to defeat Plaintiff's Motion on these grounds alone.

4      Second, Perfect 10 does not stand for the absolute principle of

5  law that Defendant attributes to it. Rather, Perfect 10 addressed,

6  among other questions, whether users who link to infringing websites

7  and thus make automatic cache copies of those infringing websites

8  themselves commit copyright infringement. The Ninth Circuit agreed

9  with the district court that such conduct was "fair use **in this**

10 **context**" because the caching was "noncommercial, transformative . . .

11 and has a minimal impact on the potential market for the original

12 work." Perfect 10, 487 F.3d at 726 (emphasis added) (quoting district

13 court). Significantly, the Court also noted that "a cache copies no

14 more than necessary to assist the user in Internet use," and, in the

15 case before it, the "background copying has no more than a minimal

16 effect" on the plaintiff's rights. Id. In this context, by contrast,

17 Defendant is not an "innocent" third-party visitor to another person's

18 infringing site. Instead, the purpose of Defendant's viewing

19 ticketmaster.com and the copying that necessarily entails is to engage

20 in conduct that violates the Terms of Use in the ways described above.

21 In addition, Defendant's use of the website is to further its own

22 commercial objectives, that is, to create and sell ticket purchasing

23 applications that can gain unauthorized access to ticketmaster.com.

24 Furthermore, in this case, such copying has a significant, as opposed

25 to minimal, effect on Plaintiff's rights because Defendant's conduct

26 empowers its clients to also violate the Terms of Use, infringe on

27 Plaintiff's rights, and collectively cause Plaintiff the harm

28 described below. For all of these reasons, Defendant's fair use

1  defense fails.

2      Because the Court finds that Plaintiff has a strong likelihood of

3  proving that Defendant violated ticketmaster.com's Terms of Use by

4  using automated devices, making excessive requests, and interfering

5  with the proper working of the website when it used and/or designed

6  applications that access ticketmaster.com, the Court finds that

7  Plaintiff has a strong likelihood of succeeding on the merits of its

8  claim for direct copyright infringement.

9              b.    **Defendant's Indirect Liability for Copyright**

10                   **Infringement**

11      Plaintiff also argues that it has a strong likelihood of success

12  on its claim for <u>indirect</u> copyright infringement.  The Court agrees.

13      "One infringes contributorily by intentionally inducing or

14  encouraging direct infringement, and infringes vicariously by

15  profiting from direct infringement while declining to exercise a right

16  to stop or limit it." <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster</u>,

17  <u>Ltd.</u>, 545 U.S. 913, 930-931 (2005) (citations omitted).  Although

18  "[t]he Copyright Act does not expressly render anyone liable for

19  infringement committed by another, these doctrines of secondary

20  liability emerged from common law principles and are well-established

21  in the law." <u>Id.</u>  In <u>Grokster</u>, the Supreme Court held that "one who

22  distributes a device with the object of promoting its use to infringe

23  copyright, as shown by clear expression or other affirmative steps

24  taken to foster infringement, is liable for the resulting acts of

25  infringement by third parties." <u>Id.</u> at 936-937.  Evidence to support

26  an inducement theory includes, for example "advertisement[s] or

27  solicitation[s] that broadcast[] a message designed to stimulate

28  others to commit violations." <u>Id.</u> at 937.  Here, as described above,

1  there is substantial evidence that Defendant designed its application

2  for the purpose of giving its clients unauthorized access to

3  ticketmaster.com; Defendant even advertises its product as "stealth

4  technology [that] lets you hide your IP address, so you **never get**

5  **blocked by Ticketmaster**" (Pl.'s Exh. 1.) (original emphasis.)

6  Designing and marketing a device whose purpose is to allow

7  unauthorized access to, and thus to infringe on, a copyrighted website

8  is sufficient to trigger contributory liability for infringement

9  committed by the device's immediate users.  <u>See, e.g.</u>, <u>Fonovisa, Inc.</u>

10 <u>v. Cherry Auction, Inc.</u>, 76 F.3d 259, 264 (9th Cir. 1996) (stating

11 that providing the site and facilities for known infringing activity

12 is sufficient to establish contributory liability, and quoting with

13 approval 2 William F. Patry, <u>Copyright Law & Practice</u> 1147, "[m]erely

14 providing the means for infringement may be sufficient" to incur

15 contributory copyright liability.).

16      As discussed in the Background section, Plaintiff has presented

17 examples of Defendant's clients making numerous ticket purchases and

18 ticket requests using Defendant's applications and resources,

19 including the examples of Bonner making more than 425,000 requests in

20 a single day, and Prior making more than 600,000 requests in a single

21 day, both through IP addresses registered to Defendant. (McLain Decl.

22 ¶ 24.)  Requests so numerous cannot be made other than with automated

23 devices.  (<u>See</u> Lieb Reply Decl. ¶ 4.)  Kovach testified how he used

24 Defendant's applications to make automated ticket requests, and that

25 Defendant made representatives available to help him use its

26 applications, circumvent Plaintiff's security measures, and set up his

27 hardware for optimal use.  (Kovach Decl. ¶¶ 6-11.)  Such uses infringe

28 on Plaintiff's copyrights for the reasons stated above with regard to

1    Defendant's direct infringement.

2    Based on this evidence, the Court finds that Plaintiff is highly

3    likely to prove that Defendant induced or encouraged its clients'

4    direct infringement by providing them with devices that gain them

5    unauthorized access to and use of ticketmaster.com. Plaintiff is

6    therefore highly likely to succeed in its claim against Defendant for

7    contributory infringement.

8        **2.**  **Plaintiff's Claim Under the Digital Millenium**

9           **Copyright Act**

10   Plaintiff alleges that Defendant has violated the Digital

11   Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201 et seq., by

12   trafficking in technological products, services, devices, or

13   components that are primarily designed to circumvent Plaintiff's

14   access control and copy protection systems. (FAC ¶¶ 51-55.)

15   Plaintiff's Motion relies on two provisions of the DMCA.

16   First, Plaintiff claims that Defendant is liable under section

17   1201(a)(2), which prohibits trafficking in devices designed to

18   circumvent "technological measure[s] that effectively control[] access

19   to a work protected under this title." 17 U.S.C. § 1201(a)(2). "A

20   plaintiff alleging a violation of § 1201(a)(2) must prove: (1)

21   ownership of a valid copyright on a work, (2) effectively controlled

22   by a technological measure, which has been circumvented, (3) that

23   third parties can now access (4) without authorization, in a manner

24   that (5) infringes or facilitates infringing a right protected by the

25   Copyright Act, because of a product that (6) the defendant either (i)

26   designed or produced primarily for circumvention; (ii) made available

27   despite only limited commercial significance other than circumvention;

28   or (iii) marketed for use in circumvention of the controlling

1  technological measure." <u>Chamberlain Group, Inc. v. Skylink</u>

2  <u>Technologies, Inc.</u>, 381 F.3d 1178, 1203 (Fed. Cir. 2004).

3      The Court finds that Plaintiff is likely to prevail on its

4  section 1201(a)(2) claim.  Specifically, as stated above, Plaintiff is

5  likely to prove that (1) Plaintiff owns copyrights to ticketmaster.com

6  and specific portions thereof; (2) Plaintiff employs "technological

7  measures" such as CAPTCHA to block automated access to its copyrighted

8  ticket purchase pages; (3) Defendant's clients are third parties who

9  can now access those copyrighted pages; (4) these parties access those

10 pages without Plaintiff's authorization;(5) that this access infringes

11 Plaintiff's rights because it entails copying those pages in excess of

12 the third parties' license to do so; and (6)(i),(iii) these third

13 parties have such access because of Defendant's products designed

14 primarily for circumvention, and marketed for use in circumvention, of

15 the controlling technological measure.

16      The majority of Defendant's challenges to Plaintiff's Motion on

17 the DMCA claim are repetitive of its arguments with regard to the

18 copyright claim, and are unavailing for the same reasons.  Defendant's

19 only unique arguments as to the DMCA claim are that CAPTCHA is not a

20 system or a program, but is simply an image (Def.'s Opp'n 17:7-8;

21 Garibay Decl. ¶ 6), and that CAPTCHA is designed to regulate ticket

22 sales, not to regulate access to a copyrighted work.  (Def.'s Opp'n

23 17:9-20.)

24      First, the Court notes that the DMCA does not equate its use of

25 the term "technological measure" with Defendant's terms "system" or

26 "program."  In any case, Plaintiff has submitted evidence that CAPTCHA

27 is a technological measure that regulates access to a copyrighted

28 work.  Although the DMCA does not appear to include a definition of

1  the term, it states that "a technological measure 'effectively

2  controls access to a work' if the measure, in the ordinary course of

3  its operation, requires the application of information, or a process

4  or a treatment, with the authority of the copyright owner, to gain

5  access to the work." 17 U.S.C.A. § 1201(a)(3)(B).  When the user makes

6  a ticket request on ticketmaster.com, CAPTCHA presents "a box with

7  stylized random characters partially obscured behind hash marks."

8  (McLain Decl. ¶ 9.)  The user is required to type the characters into

9  an entry on the screen in order to proceed with the request.  (Id.)

10  Most automated devices cannot decipher and type the random characters

11  and thus cannot proceed to the copyrighted ticket purchase pages.

12  Thus, because CAPTCHA "in the ordinary course of its operation,

13  requires the application of information . . . to gain access to the

14  work," it is a technological measure that regulates access to a

15  copyrighted work.  Plaintiff is therefore likely to prevail on its

16  DMCA § 1201(a)(2) claim.

17      Section 1201(b)(1) similarly prohibits trafficking in devices

18  primarily designed or produced for the purpose of circumventing

19  "protection afforded by a technological measure that effectively

20  protects a right of a copyright owner under this title in a work or a

21  portion thereof."  See Sony Computer Entertainment America, Inc. v.

22  Divineo, Inc., 457 F.Supp. 2d 957, 964 (N.D. Cal. 2006).  Sections

23  1201(a)(2) and 1201(b)(1) differ only in that 1201(a)(2) makes it

24  wrongful to traffic in devices that circumvent technological measures

25  that control access to protected works, while 1201(b)(1) makes it

26  wrongful to traffic in devices that circumvent technological measures

27  that protect rights of a copyright owner in a work.  Here, CAPTCHA

28  both controls access to a protected work because a user cannot proceed

22

1  to copyright-protected webpages without solving CAPTCHA, and <u>protects</u>

2  <u>rights</u> of a copyright owner because, by preventing automated access to

3  the ticket purchase webpage, CAPTCHA prevents users from copying those

4  pages.  For the foregoing reasons, the Court finds that Plaintiff is

5  likely to prevail on its DMCA §§ 1201(a)(2) and 1201(b)(1) claims.

6       3.    **Plaintiff's Breach of Contract Claim**

7      Plaintiff argues that Defendant is breaching the ticketmaster.com

8  Terms of Use in numerous ways, and is therefore liable for breach of

9  contract.  (FAC ¶¶ 84-93.)  The facts and issues that this claim

10  raises are the same as those raised by Plaintiff's contention, in

11  connection with its copyright claims, that Defendant breached the

12  Terms of Use.  The Court addressed the merits of that claim in its

13  discussion of Plaintiff's claim for copyright infringement, and

14  concluded that Plaintiff is highly likely to prove that use of

15  ticketmaster.com is governed by the Terms of Use; that Defendant was

16  on notice of, and assented to, the Terms of Use; and that Defendant

17  violated the Terms of Use by using automated devices to access the

18  website, using an application that makes several requests per second

19  (in violation of the provision limiting the frequency of requests to

20  no more than one every three seconds), and by using an application

21  designed to thwart Plaintiff's access controls (which breaches the

22  user's agreement to "not use any device, software or routine that

23  interferes with the proper working of the Site nor shall you attempt

24  to interfere with the proper working of the Site."). The Court

25  therefore finds that Plaintiff is likely to prevail on its breach of

26  contract claim.

27  //

28  //

4.    **Plaintiff's Computer Fraud and Abuse Act Claim**

Plaintiff also argues that it is likely to prevail on its claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. Although the CFAA is a criminal statute, it permits "any person who suffers damage or loss" through a violation of its provisions "to maintain a civil action . . . to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). To prevail on its CFAA claim, Plaintiff must demonstrate that Defendant "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access, and thereby obtain[ed] information from any protected computer," 18 U.S.C. § 1030(a)(2)(C), or that Defendant "knowingly cause[d] the transmission of a program . . . and . . . cause[d] damage without authorization to a protected computer." 18 U.S.C. § 1030(a)(5)(A)(i). Plaintiff must also demonstrate that Defendant's unauthorized access caused $5,000 in loss or damage during a one year period. 18 U.S.C. § 1030(a)(5)(B)(i).

It appears likely that Plaintiff will be able to prove that Defendant gained unauthorized access to, and/or exceeded authorized access to, Plaintiff's protected computers, and caused damage thereby. Based on the statute and the cases Plaintiff cites, the Court also agrees that the required $5,000 of harm may consist of harm to a computer system, and need not be suffered by just one computer during one particular intrusion. See, e.g., Creative Computing v. Getloaded.com LLC, 386 F.3d 930, 934-935 (9th Cir. 2004) (interpreting the CFAA). However, because Plaintiff has not quantified its harm as required by the statute or even attempted to show what portion of the harm is attributable to Defendant, the Court cannot find that Plaintiff has affirmatively shown that its harm caused by Defendant

1  exceeds the $5,000 minimum.  Thus, the CFAA claim does not provide a

2  basis for a preliminary injunction.

3      In light of the Court's rulings on Plaintiff's copyright, DMCA,

4  and breach of contract claims, the Court need not address whether

5  Plaintiff is likely to succeed on its claims under California Penal

6  Code § 502, the fifth basis asserted for the preliminary injunction.

7      **B.    Irreparable Harm**

8      Having determined that Plaintiff has a strong likelihood of

9  success on the merits of its copyright, DMCA, and breach of contract

10  claims, the Court now addresses whether Plaintiff has shown "the

11  possibility of irreparable injury."  Walczak, 148 F.3d at 731.

12      For Plaintiff's copyright claim, "a showing of a reasonable

13  likelihood of success on the merits raises a presumption of

14  irreparable harm."  LGS Architects, Inc. v. Concordia Homes of Nevada,

15  434 F.3d 1150, 1155 (9th Cir. 2006) (citing Johnson Controls, Inc. v.

16  Phoenix Control Sys., Inc., 886 F.2d 1173, 1174 (9th Cir. 1989).  "A

17  copyright holder seeking a preliminary injunction is therefore not

18  required to make an independent demonstration of irreparable harm."

19  LGS Architects, 434 F.3d at 1155-56.  Here, because Plaintiff has

20  shown a strong likelihood of success on the merits of its copyright

21  claim, the Court presumes irreparable harm.  Defendant has done

22  nothing to rebut that presumption.

23      The Court also finds that Plaintiff has otherwise shown the

24  possibility of irreparable harm required to support the issuance of a

25  preliminary injunction on its DMCA and breach of contract claims.

26  Specifically, Plaintiff has submitted extensive evidence demonstrating

27  that it is suffering a loss of goodwill with the buying public in that

28  there is a growing public perception that Plaintiff does not provide

1  the public with a fair opportunity to buy tickets due to automated

2  purchases.  (Obara Decl. ¶¶ 4-5.)  Such evidence includes numerous

3  complaints from consumers about the unavailability of tickets, some of

4  which manifest extreme dissatisfaction with Plaintiff and voice

5  suspicions that Plaintiff is colluding with ticket brokers to deny

6  consumers tickets.  (Id.; Pl.'s Exh. 19.)[5]  Plaintiff has also

7  submitted consumer comments posted on blogs expressing similar

8  sentiments (Pl.'s Exh. 20)[6] and numerous news stories discussing the

9  unavailability of tickets. (See Pl's. Exh. 24.)  For example, many of

10  the news stories concern the unavailability of tickets to concerts in

11  Hannah Montana's "Best of Both Worlds" tour.  Based on the reports,

12  many parents expressed disappointment and outrage at Plaintiff because

13  tickets to many Hannah Montana concerts throughout the nation (Bossier

14  City, Louisiana; Miami, Florida; Atlanta, Georgia; and Kansas City,

15  Missouri, for example) were snapped up within several hours - and

16  sometimes within minutes - of their release for sale.  It also appears

17  that the public's difficulty obtaining tickets to the Hannah Montana

18  concerts was so severe and created such an outcry that the Attorneys

19

20  [5]  Plaintiff's brief quotes several of the complaints compiled in
Exhibit 19.  (See Mot. 10, fn. 8.)  One such complaint states: "I
21  would like to know how within 20 seconds of a show going on sale I
could not find ANY seats together at ANY price at this event.
22  However, there are gobs of them for sale on many different scalper
sites.  How is this possible and why is this tolerated.  The only
23  explanation for this is that people inside TM are in cahoots with
these criminals.  I would just like to know if there are any plans
24  whatsoever to address this situation."

25  [6]  For example, the following is a comment posted by someone who
could not obtain tickets to a performance of the rock group "Rush": "I
26  am absolutely irate about TicketBxxxxxd and its practices.  As has
been mentioned on this site already, the whole process of getting
27  tickets to concerts has gotten completely out of control with
scalpers, brokers, and God-knows-who-else trying to make a buck at the
28  expense of fans."  (Mot. 11, fn. 9.)

General of Missouri and Arkansas initiated investigations into

Plaintiff's ticket selling practices.  (See Pl.'s Exhs. 26, 27.)

Such evidence demonstrating public dissatisfaction with Plaintiff

is properly before the Court as non-hearsay evidence.  See, e.g.,

Academy of Motion Picture Arts and Sciences v. Creative House

Promotions, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991) (error for the

district court not to consider newspaper articles and telephone calls

as evidence of actual confusion).  In addition, to the extent some of

the newspaper articles may be offered for a hearsay purpose, the Court

has wide latitude to consider such evidence in the preliminary

injunction context.  Republic of the Phillipines v. Marcos, 862 F.2d

1355, 1363 (9th Cir. 1988) (stating that it "was within the discretion

of the district court to accept this hearsay for purposes of deciding

whether to issue the preliminary injunction.")

Although the extent of Defendant's culpability for such harm to

Plaintiff's goodwill cannot yet be ascertained, it is likely that some

of Defendant's clients were able to obtain tickets to such concerts by

using Defendant's applications.  (See Suppl. Decl. McLain ¶¶ 4-5;

Suppl. Lee Decl. ¶¶ 1-3; Pl.'s Exh. 23.)  Given the alleged extent of

Defendant's participation in the hundreds of thousands of automated

ticket requests wrongfully made of Plaintiff's website, it is likely

that Defendant's conduct has caused, and will continue to cause, some

portion of Plaintiff's loss of goodwill unless Defendant's conduct is

enjoined.  As a consequence of Plaintiff's loss of consumer goodwill,

Plaintiff also faces the possibility of loss of goodwill and loss of

business from its clients.  (McLain Reply Decl. ¶ 7.)

Defendant argues that Plaintiff is not harmed when its inventory

of tickets is bought up immediately upon release because Plaintiff is

27

1  paid full price for each ticket, and receives the same service fees

2  and profits, whether the tickets are purchased by Defendant's clients

3  or by other consumers. (Def.'s Opp'n 11:11-21.) However, that

4  argument ignores the harm to goodwill that Plaintiff is suffering.  In

5  this Circuit, intangible injuries, such as damage to goodwill, can

6  constitute irreparable harm.  See Rent-A-Center, Inc. v. Canyon

7  Television and Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir.

8  1991); see also, Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush

9  and Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of

10 threatened loss of prospective customers or goodwill certainly

11 supports a finding of the possibility of irreparable harm."); eBay,

12 Inc. v. Bidder's Edge, Inc., 100 F.Supp.2d 1058, 1066 (N.D. Cal. 2000)

13 ("Harm resulting from lost profits and lost customer goodwill is

14 irreparable because it is neither easily calculable, nor easily

15 compensable and is therefore an appropriate basis for injunctive

16 relief.")  Plaintiff has also submitted evidence that it has attempted

17 to use technological countermeasures to prevent automated ticket

18 requests, but that such efforts had only limited success and, in each

19 instance, were quickly thwarted. (McLain Decl. ¶¶ 23-24, 26-27, 31-

20 33.)  Thus, the Court is not persuaded by Defendant's argument that

21 Plaintiff's self-help measures (such as "blacklisting" IP addresses)

22 are enough to prevent irreparable harm and thus obviate the need for

23 injunctive relief.  In addition to the countermeasures being

24 ultimately ineffective, the cost to Plaintiff of developing and

25 implementing them is not easily calculable. (Id.)  For the foregoing

26 reasons, the Court finds that Plaintiff has demonstrated the

27 possibility of irreparable harm.

28 //

### C.    Balance of Hardships

Defendant contends that the balance of hardships tips sharply in its favor because it would go out of business if forced to stop selling TBAT.  (Garibay Decl. ¶¶ 3-4.)  However, in the copyright infringement context, once a plaintiff has established a strong likelihood of success on the merits, any harm to the defendant that results from being preliminarily enjoined from continuing to infringe is legally irrelevant.  See Triad Sys. Corp. v. Southeastern Exp. Co., 64 F.3d 1330, 1338 (9th Cir. 1995) (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."); Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 830 (9th Cir. 1997) (holding that it was reversible error for a district court to even consider "the fact that an injunction would be devastating to [defendant's] business," because "where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration.") Thus, the possibility that Defendant will lose all of its profits from the sale of infringing applications does not tip the balance of hardships in Defendant's favor.  Moreover, because Plaintiff has persuasively demonstrated likelihood of success on the merits of several of its claims, the balance of hardships becomes less significant to the Court's analysis.  See id. at 830 ("The balance of hardships factor may assume significance in cases where the plaintiff has not established a strong likelihood of success on the merits, but here [the plaintiff] established that it was likely to succeed on the merits of its copyright claim.").  Therefore, to the extent to which

//

1    the balance of hardships is significant in the instant case, it tips

2    in Plaintiff's favor.

3        **D.    Public Interest**

4        The Court finds that the public interest favors the issuance of a

5    preliminary injunction.  Based on the consumer complaints and news

6    reports referenced above (see Pl.'s Exhs. 19, 20, 24), it is evident

7    that Defendant's conduct not only harms Plaintiff, but also harms the

8    public because it denies consumers the opportunity to purchase tickets

9    at their face price.  Thus, insofar as Defendant's misconduct allows

10   its ticket broker clients to unfairly purchase numerous tickets for

11   resale resulting in immediately sold-out events, ordinary consumers

12   must either forego the event or pay ticket brokers inflated prices for

13   resold tickets.  The public interest therefore weighs in favor of an

14   injunction.

15

16                              **IV.    BOND**

17       Federal Rule of Civil Procedure 65(c) requires Plaintiff to post

18   a bond, in a sum that the Court deems appropriate, for the payment of

19   costs and damages that Defendant may suffer if it is later found to

20   have been wrongfully enjoined.  A bond may not be required, or may be

21   minimal, when the harm to the enjoined party is slight or where the

22   movant has demonstrated a likelihood of success.  See, e.g., Jorgensen

23   v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003); Walczak, 198 F.3d at

24   733.  However, the Court retains discretion to require a bond when the

25   party seeking the injunction has not offered evidence of its own harm

26   in posting a bond, see Barahona-Gomez v. Reno, 167 F.3d 1228, 1237

27   (9th Cir. 1999).

28       Plaintiff asks the Court to require only a nominal bond of $1,000

1  because it has shown a likelihood of success.  Defendant, by contrast,

2  argues that a substantial bond of at least $10 million should be

3  required because the injunction will put it out of business.  Having

4  considered these arguments, the Court ORDERS Plaintiff to post a **bond**

5  **of $300,000,** an amount that is reasonable under the facts of this

6  case, **within ten (10) days of the date of this Order.**  Plaintiff is

7  also ORDERED to prepare a proposed order consistent with this Order,

8  including findings of fact and conclusions of law, **within ten (10)**

9  **days of the date of this Order.**

10

11                              **V.  CONCLUSION**

12       Plaintiff has persuasively demonstrated that it will likely

13  succeed on the merits of its claims that Defendant has infringed

14  Plaintiff's copyrights in the ticketmaster.com website, violated the

15  Digital Millenium Copyright Act, and breached a contract (the

16  website's Terms of Use).  Plaintiff has also shown the likelihood of

17  irreparable harm.  Furthermore, the balance of hardships tips in

18  Plaintiff's favor, not Defendant's.  The public interest also favors

19  ths issuance of a preliminary inunction.  Therefore, the Court hereby

20  **GRANTS** Plaintiff's Motion for Preliminary Injunction and **ENJOINS**

21  Defendant RMG Technologies, Inc., and all persons acting for its

22  benefit or on its behalf, from:

23

24       1.   Creating, trafficking in, facilitating the use of or using

25            computer programs or other automatic devices to circumvent

26            the technological copy protection systems in Ticketmaster's

27            website;

28

1    2.   Using information gained from access of Ticketmaster's

2        website to create computer programs to circumvent

3        Ticketmaster's copy protection and website regulation

4        systems;

5

6    3.   Copying or facilitating the copying of portions of

7        Ticketmaster's website in excess of any license Ticketmaster

8        has granted;

9

10    4.   Purchasing or facilitating the purchase of tickets from

11        Ticketmaster's website for the commercial purpose of

12        reselling them; and

13

14    5.   Otherwise accessing and using Ticketmaster's website in

15        excess of the license granted by the Terms of Use posted

16        thereon.

17

18

19    DATED:    _OCT 16, 2007_

20

21                        **AUDREY B. COLLINS**

                            **UNITED STATES DISTRICT JUDGE**

22

23

24

25

26

27

28