Jay M. Coggan, SBN 86107
jmc@cogganlaw.com
David N. Tarlow, SBN 214050
dnt@cogganlaw.com
Joshua G. Blum, SBN 249082
jgb@cogganlaw.com
COGGAN & TARLOW
1925 Century Park East, Suite 2320
Los Angeles, California 90067
Tel: (310) 407-0922
Fax: (310) 407-0923

Attorneys for Defendant RMG TECHNOLOGIES, INC.,
a Delaware corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TICKETMASTER LLC, a Virginia limited liability company, <br><br> Plaintiffs, <br><br> vs. <br><br> RMG TECHNOLOGIES, INC., a Delaware corporation, and DOES 1 through 10, inclusive, <br><br> Defendants. <br><br>———————————————— <br> RMG TECHNOLOGIES, INC., a Delaware corporation, <br><br> Counterclaim- Plaintiff, <br><br> vs. <br><br> TICKETMASTER LLC, a Virginia limited liability company, IAC/INTERACTIVE CORP., a Delaware corporation and ROES 1 through 10, inclusive <br><br> Counterclaim-Defendants <br> ———————————————— | CASE NO.: CV07-2534 ABC (JCx) <br> Honorable Audrey B. Collins <br><br><br> **DEFENDANT RMG TECHNOLOGIES, INC.'S SECOND AMENDED COUNTERCLAIMS.** <br><br> **JURY DEMAND** |

Dockets.Justia.com

Counterclaim-Plaintiff RMG TECHNOLOGIES, INC. ("RMG"), a Delaware corporation as and for its Counterclaims against TICKETMASTER, LLC, a Virginia limited liability company ("Ticketmaster") and IAC/INTERACTIVE CORP, a Delaware corporation ("IAC") and ROES 1 through 10, states as follows:

**THE PARTIES**

1.    RMG is a corporation, organized and existing under the laws of the State of Delaware.

2.    Counterclaim-Plaintiff is informed and believes and thereon alleges that IAC is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the County of New York, State of New York. Counterclaim-Plaintiff is informed and believes and thereon alleges that IAC is duly registered to do business in the State of California. Upon information and belief, IAC is the parent corporation of Ticketmaster, and Ticketmaster is a wholly owned subsidiary of IAC.

3.    Counterclaim-Plaintiff is informed and believes and thereon alleges that Ticketmaster is a limited liability corporation organized and existing under the laws of the State of Virginia, with its principal place of business located within the City of West Hollywood, State of California.

4.    RMG is informed and believes, and thereon alleges, that at all times material hereto, each of the Counterclaim-Defendants, including those named herein as ROES, are the agents, representatives, servants and employees of the remaining Counterclaim-Defendants, and that all of the acts herein alleged were done in the course and scope of such agency and employment. Counterclaim - Plaintiff is further informed and believes, and thereon alleges, that each of the Defendants is legally responsible for the events that happened referred to herein, and have proximately caused Counterclaim-Plaintiff's damages hereinafter alleged.

**JURISDICTION AND VENUE**

5.    The Court has subject matter jurisdiction over the subject matter of this action under: 28 U.S.C. §§ 1331, 1337, 1338 and 1367(a); the Sherman Anti-Trust Act 15 U.S.C. § 2, *et seq.*, and; The Clayton Act 15 U.S.C. §§ 15 and 26.

6.    Venue in this action is properly within the Central District of California pursuant to 28 U.S.C. §§ 1391 (a) (b) (c) and 1400 (a) because Ticketmaster and IAC transact business in this district.

**RELEVANT MARKET**

7.    These counterclaims arise out of Ticketmaster and IAC's attempted monopolization of the "secondary ticket distribution services" market (hereinafter the "secondary market"). The participants in the secondary market are: 1) ticket brokers; 2) software manufacturers who provide software to ticket brokers which enable them to purchase their inventory of tickets at wholesale and retail; and 3) companies which host websites which enable ticket brokers to distribute their inventory of tickets to their customers. The services which are provided on the secondary market are the distribution of tickets which have previously been sold by primary ticket distribution providers such as Ticketmaster, Tickets.com and evenue.net, and acquired by ticket brokers.

8.    Due to the fact that most of the inventory of tickets which are sold on the secondary market are acquired on the internet, and said tickets are sold by ticket brokers to customers throughout the United States and Canada, the geographic region where the secondary market is located is the entire United States (with the exception of the states Arkansas, Kentucky, Louisiana, Michigan, Minnesota, and the city of Denver) and Canada.

**FACTS COMMON TO ALL COUNTERCLAIMS**

9.    Counterclaim-Plaintiff RMG is engaged in the business of software development. In or about 2004, RMG developed a software application called a Ticket Broker Acquisition Tool ("TBAT"). TBAT was created in order to assist

Second Amended Counterclaims                - 3 -

1   Ticket Brokers in purchasing tickets from a variety of ticket selling websites,

2   including, but not limited to ticketmaster.com, tickets.com, evenue.net and other

3   websites, so that tickets can be distributed on the secondary market. RMG is a

4   participant on the secondary market.

5       10.   Counterclaim-Plaintiff is informed and believes and thereon alleges

6   that prior to 2004, Ticketmaster was exclusively a participant on the "primary

7   ticket distribution services" market (hereinafter "primary market"), located in the

8   geographic region of the entire United States and Canada, and was not a

9   participant on the secondary market. The primary market provides retail and ticket

10  distribution services on behalf of venues, sports franchises, artists and promoters.

11  The distribution of each ticket which occurs on the primary market is the first sale

12  of said ticket at the retail price, often called the face price.

13      11. Ticketmaster is still a participant on the primary market. Upon

14  information and belief, Ticketmaster is the exclusive provider of ticket distribution

15  services on the primary market for the vast majority of major venues and

16  professional sports franchises, including, for example, 26 of 30 NBA teams, 31 of

17  32 National Football League Teams, 26 of 30 National Hockey League Teams,

18  their associated arenas, and their associated stadiums, as well as artists and

19  promoters.

20      12.   Upon information and belief, Ticketmaster's share of this primary

21  market in the United States is at least 60 percent and more likely closer to 70

22  percent. Ticketmaster, according to published industry data, controls the

23  distribution for approximately 88 percent of available seats in top arenas, 91

24  percent of the available seats in top amphitheaters, 72 percent of the seats in top

25  theaters, and 80 percent or more of the seats available in top clubs.

26      13.   Upon information and belief, there are significant barriers to entry

27  into the primary market throughout the United States, including the need to

28  develop, maintain and efficiently operate the required ticketing software and

Second Amended Counterclaims          - 4 -

1    hardware computer systems, the ability to provide substantial up-front payments to

2    customers, the ability to demonstrate the reliability of its computer systems, and

3    Ticketmaster's own anticompetitive practices including tying agreements,

4    long-term exclusive contracts and the threat of unfounded litigation.

5         14.    Upon information and belief, many of the country's top concert

6    venues have entered into long-term exclusive deals with Ticketmaster, under which

7    Ticketmaster is granted the exclusive right to all non-box office sales of tickets for

8    all the events held at that venue.  Ticketmaster is reported to have such exclusive

9    dealing agreements with approximately 89 percent of the arenas in the top-50

10   Pollstar list, approximately 88 percent of the top amphitheaters which made that

11   list; more than 70% of the top theaters on the list and more than 75% of the top

12   clubs in the United States on that list.  In short, Ticketmaster has exclusive deals

13   with most of the arenas which have contracted to give Ticketmaster the right to

14   distribute their non-box office seats through the primary market.

15        15.    In addition, upon information and belief, Ticketmaster has entered

16   into exclusive dealing arrangements with many concert promoters who contract

17   with the artists scheduled to perform at the concert to undertake responsibility for

18   arranging for the use of the venue, advertising and otherwise promoting the event

19   and paying the artists.

20        16.    Upon information and belief, these exclusive dealing arrangements

21   with venues and promoters have terms that range from three to ten or more years

22   in length.  The average term is five to seven years.

23        17.    Upon information and belief, in order to induce venues and promoters

24   to enter into these long-term agreements, Ticketmaster pays any of them up-front

25   payments which often consist of more than $1,000,000.  Ticketmaster also offers

26   venues and promoters rebates or kickbacks out of the various service and other

27   fees it charges consumers who purchase tickets through the Ticketmaster system.

28        18.    Upon information and belief, Ticketmaster, because of its monopoly

Second Amended Counterclaims        - 5 -

position on the primary market and market power, charges consumers supracompetitive prices for service fees, handling fees, processing fees and shipping fees ("fees"). Often these fees collectively increase the price of a ticket to the consumer by more than 50% over the ticket's face value. There are no effective constraints on Ticketmaster's ability to charge consumers these supracompetitive fees because box-office sales for most concerts and other events are minimal and are continuing to decrease as consumers realize they have a better chance of obtaining a better seat online or over the telephone from Ticketmaster. Internet sales now account for the majority of Ticketmaster's annual revenues. These fees are tantamount to Ticketmaster's commission for the sale of each ticket.

19.     Counterclaim-Plaintiff is informed and believes and thereon alleges that Ticketmaster sells tickets to live events at prices set by its clients.

20.     Upon information and belief, Ticketmaster maintains a monopoly in the primary market. Counterclaim-Plaintiff is informed and believes and thereon alleges that many of Ticketmaster's long term contracts with its clients are expiring, and many of those clients are threatening not to renew with Ticketmaster.

21.     Upon information and belief, Ticketmaster's largest client is currently the company Live Nation. Sales from shows put on by Live Nation have been reported in various publications to represent approximately 15% to 20% of Ticketmaster's approximately one billion dollars in yearly revenue. Upon information and belief, Live Nation decided to terminate its relationship with Ticketmaster and to sell tickets for its events "in house." Additionally, upon information and belief, in the past, artists such as Pearl Jam have boycotted Ticketmaster in order to protest Ticketmaster's monopoly in the retail ticketing industry. Upon information and belief, Pearl Jam requested that the U.S. Department of Justice examine Ticketmaster's monopolistic tendencies.

22.     Most recently, upon information and belief, Ticketmaster has sued the Cleveland Cavaliers basketball franchise for, *inter alia,* breach of contract, in an apparent attempt to expand its contractual rights with the Cavaliers for the retail sale of the team's tickets, to ticket distribution services on the secondary market for the resale of Cavaliers' season ticket holders tickets.  Upon information and belief, in response to this lawsuit, the Cavaliers have filed claims against Ticketmaster under the Sherman Antitrust Act alleging that Ticketmaster is a monopoly which is illegally and unlawfully seeking to force the Cavaliers to use its TeamExchange website for ticket distribution services on the secondary market. Upon information and belief, the Cavaliers instead wish to use their own ticket distribution services.

23.     Upon information and belief, activities engaged in by sports leagues, venues, promoters and resale websites, such as the agreement between Major League Baseball and Stubhub for ticket distribution services of baseball tickets on the secondary market, and between Live Nation and Ebay, Inc. for the auction sales of Police concert tickets, coupled with the fact no state in the U.S. prohibits the resale of tickets, have demonstrated to Ticketmaster and IAC that the secondary market is legitimate, thriving, and vibrant in this country.  Upon information and belief, Ticketmaster actually has lobbied legislatures throughout the country to do away with laws that restrict the resale of tickets so that its own TicketExchange and TeamExchange websites are not deemed illegal or restricted.

24.     Upon information and belief, Ticketmaster and IAC have been aware that there would come a time when their monopoly in the primary market would end, and their best opportunities to make money for their ticket distribution services would be through the monopolization of the secondary market. Ticketmaster and IAC have been bracing for this reality for quite some time, and accordingly, have developed a scheme to obtain a monopoly in the secondary market.

25.     Upon information and belief, in an attempt to obtain a monopoly in the secondary market:

> (1) Upon information and belief, Ticketmaster and IAC have actively engaged in negotiations to purchase some of the largest ticket brokers in the country who are participants on the secondary market. Counterclaim-Plaintiff is informed and believes and thereon alleges that some of said ticket brokers currently utilize automated devices to purchase tickets off Ticketmaster's website;
>
> (2) Upon information and belief, on January 15, 2008, Ticketmaster acquired TicketsNow.com, a ticket brokerage and bulletin board, which is also a participant on the secondary market. By doing so, Ticketmaster became the second largest seller of tickets on the secondary market. As Ticketmaster President and CEO Sean Moriarity explained in a public statement: "the combination of Ticketmaster and TicketsNow will redefine the event ticket resale category. We are going to provide fans more options and the most secure, reliable and convenient way to buy tickets to the events they want to attend at a price they are willing to pay";
>
> (3) Upon information and belief, Ticketmaster has entered the secondary market and resold tickets on its own website in the TicketExchange and TeamExchange portions of its website, where "fans" can resell their tickets at prices above face value, and buyers can pay Ticketmaster further charges ranging from approximately $6.00 to $29.95 for their ticket distribution services;
>
> (4) Upon information and belief, Ticketmaster has commenced providing ticket distribution services for tickets on the auction portion of its website where Ticketmaster resells tickets on behalf of itself, often times for prices which are several times higher than face

1 value of the ticket;

2 (5) Upon information and belief, Ticketmaster and IAC have

3 attempted to purchase software companies who develop ticket

4 distribution services software, including, but not limited to Paciolan;

5 (6) Ticketmaster has used predatory litigation against software

6 companies who participate on the secondary market by manufacturing

7 and marketing software which allow their ticket broker customers to

8 quickly and efficiently purchase tickets on websites of ticket

9 distribution service companies on the primary market, including, but

10 not limited to ticketmaster.com, as well as their ticket broker

11 customers who use said software, in order to drive those entities and

12 persons out of the secondary market, even though said software

13 companies and brokers are engaging in the exact same activities as

14 Ticketmaster and the brokers and software companies which

15 Ticketmaster and IAC are actively attempting to acquire; and

16 (7) Ticketmaster has created contract provisions on it the "terms of

17 use" portion of its website which are intended to, and when enforced,

18 as here, do produce a direct and immediate effect on competition

19 between competitive ticket sellers (RMG's customers) and

20 Ticketmaster.  These contract provisions, which are direct restraint on

21 alienation, are devices employed by Ticketmaster to further its

22 attempt to obtain a monopoly in the secondary market, by reducing

23 the number of tickets which ticket brokers (other than Ticketmaster)

24 in the secondary market may obtain in order to distribute, driving

25 legitimate ticket brokers out of the secondary market because of lack

26 of available inventory and for fear of being sued by Ticketmaster for

27 using its website for commercial purposes, thereby, reducing the

28 number of available and actual customers of RMG.

Second Amended Counterclaims  - 9 -

26.     Upon information and belief, Ticketmaster's "terms of use" of its website have been created to obtain a monopoly in the secondary market.  These "terms of use" are both invalid and unenforceable.  The "terms of use" allegedly: 1) prohibit users from using its web site for commercial purposes (even though Ticketmaster's website TicketExchange and TeamExchange allow its customers to resell their tickets for commercial purposes on Ticketmaster's website); 2) prohibit users from using automated devices, spiders, robots or bots while surfing the website; 3) prohibit users from viewing more than 1,000 web pages from the site in any twenty four (24) hour period; 4) purport to contain a punitive liquidated damages clause which requires any user who accesses more than 1,000 pages of the site in any twenty four (24) hour period to pay liquidated damages of $10.00 per page after the first 1,000 pages; 5) prohibit users from exceeding ticket limits which are arbitrarily set by Ticketmaster; and 6) contain a provision whereby the user agrees that any violation of the "terms of use" causes damage to Ticketmaster's goodwill, even though Ticketmaster's goodwill is unaffected by same.

27.     Counterclaim-Plaintiff is informed and believes and thereon alleges that the "terms of use" are monopolistic and do not serve any business purpose, other than to assist Ticketmaster in building a monopoly in the secondary market. The reason for this is that the "terms of use" do not have any effect whatsoever on the amount of remuneration generated by Ticketmaster for its ticket distribution services in the primary market.  In fact, the "terms of use" serve to reduce the amount which it earns for its ticket distribution services in the primary market for live events, as they only limit ticket resale brokers (and not the average ticket buyer) from purchasing tickets by severely reducing the amount of times that a broker can access Ticketmaster's website in order to purchase their inventory of tickets. Counterclaim-Plaintiff is informed and believes and thereon alleges that the "terms of use"  drive down Ticketmaster's earnings for its ticket distribution

1    services on the primary services, and the revenue generated by its clients through

2    the sale of tickets to live events, because ticket brokers often times purchase

3    tickets for events that otherwise would not have been sold, and which ticket

4    brokers later cannot distribute, or can only distribute at prices below face value.

5    Thus, the ticket brokers actually bear the risk of loss for events where the supply

6    exceeds the demand. Any damage claimed to be incurred by Ticketmaster from

7    brokers acquiring the retail ticket inventory of tickets for distribution services on

8    the secondary market is illusory, as Ticketmaster and its clients are paid for each

9    of those sales and distribution services regardless of whether a broker or a non-

10   broker purchases same, and Ticketmaster and its clients receive the benefit of

11   passing off of the risk of loss to the brokers.

12        28.    Upon information and belief, from February 2007 through April 17,

13   2007, Ticketmaster filed predatory lawsuits, including the instant lawsuit, in an

14   attempt to chill the purchasing activities of ticket resale brokers throughout the

15   country, to encourage select ticket brokers and ticketing software developers to

16   sell their businesses to Ticketmaster to avoid being sued, and to control

17   competition in the secondary market.  In the instant predatory lawsuit,

18   Ticketmaster alleged claims for Violation of the Computer Fraud and Abuse Act,

19   Violation of California Penal Code § 502, Violation of the RICO statutes, Breach

20   of Contract, Inducing Breach of Contract, Intentional Interference with

21   Contractual Relations, Fraud and Aiding and Abetting Fraud against RMG.  After

22   RMG filed its motion to dismiss the Complaint, Ticketmaster added claims of

23   Copyright Infringement and Violation of the Digital Millennium Copyright Act.

24   All of these claims asserted by Ticketmaster arise from what it alleges was RMG's

25   actual or contributory breach of the invalid and unenforceable "terms of use."

26        29.    The claims for Copyright Infringement and Violation of the Digital

27   Millennium Copyright Act arose out of allegations that the use of RMG's alleged

28   software in and of itself constitutes the copying of copyrighted pages and the

Second Amended Counterclaims          - 11 -

1 circumvention of technological measures, called a CAPTCHA system, to enter
2 Ticketmaster's website. However, these allegations are false. All of the material
3 on the Ticketmaster website contains information which is purely factual, such as
4 the name of an event, the dates that the event is scheduled, how to purchase
5 tickets, the number of tickets that may be purchased, seating maps of venues, etc.
6 None of that information is protected by the Copyright Act. Moreover, the layout
7 of the Ticketmaster.com website, whereby the factual information is arranged, is
8 not original, and therefore, is not protected by the Copyright Act. Finally, the
9 alleged software of RMG is not alleged by Ticketmaster to circumvent any
10 technological measures to protect copyright, but rather to permit its user entry onto
11 the Ticketmaster website through the CAPTCHA system- not around it.
12 Moreover, upon information and belief, said technological measures are not
13 intended to protect copyright, but to tell human users and computer programs apart
14 and slow purchasers in the purchase of tickets.

15    30.    This egregious and unfounded lawsuit by Ticketmaster constitutes
16 nothing more than a tactic to scare participants in the secondary market into
17 vacating the secondary market which Ticketmaster seeks to monopolize and to
18 unlawfully and illegally control competition.

**FIRST COUNTERCLAIM**

**(Attempted Monopolization of the Secondary Market**

**Violation of 15 U.S.C. § 2 by RMG Against All Counterclaim-Defendants)**

22    31.    RMG repeats and re-alleges all of the allegations set forth in
23 paragraphs 1 through 30 of its Counterclaims.

24    32.    Ticketmaster and IAC have illegally acted with the specific intent to
25 monopolize the secondary market.

26    33.    There was, and is, a dangerous probability that Ticketmaster and IAC
27 will succeed in their attempt to monopolize the ticket resale market because, upon
28 information and belief:

(1)  Ticketmaster competes with other participants to provide ticket distribution services on the secondary market through the TicketExchange, TeamExchange and Auction portions of its website;

(2)   Ticketmaster and IAC purchased TicketsNow.com and is now the second largest participant on the secondary market;.

(3) Ticketmaster and IAC are attempting to purchase some of the largest ticket brokers who are participants on the secondary market in order to monopolize same;

(4) Ticketmaster controls the distribution of tickets on the primary market which provides all of the inventory for the secondary market;

(5) Ticketmaster has specifically sought to exclude, and has excluded, participants on the secondary market from utilizing its primary ticket distribution services through blocking their access to Ticketmaster's website, and preventing said participants from acquiring sufficient inventory of tickets to compete with Ticketmaster on the secondary market;

(6) Ticketmaster has specifically sought to exclude, and has excluded participants in the secondary market from utilizing its primary ticket distribution services whom it alleges use "spiders, bots, robots or automated devices" which Ticketmaster alleges violates its "terms of use" by commencing predatory lawsuits against them in Federal Court for monetary damages and injunctive relief; and

(7) Ticketmaster has specifically sought to exclude, and has excluded ticket broker participants in the secondary market from utilizing its primary ticket distribution services, thereby preventing said participants from acquiring a sufficient inventory of tickets to distribute on the secondary market, by threatening to sue them in Federal Court and seeking monetary damages and injunctive relief.

Second Amended Counterclaims                - 13 -

1   Further success in excluding competitors in the secondary market from utilizing its

2   primary ticket distribution services, coupled with the expansion of Ticketmaster

3   and IAC's ticket distribution services as participants in the secondary market, will

4   allow Ticketmaster and IAC to obtain an illegal monopoly over the secondary

5   market.

6       34.   This conduct has harmed competition in the secondary market,

7   making the supply and selection of tickets on the secondary market to both brokers

8   and consumers lower than it would be in a competitive market.  Ticketmaster and

9   IAC's unlawful attempted monopolization has also reduced the number and

10  effectiveness of competitors in the secondary market which in turn has forced

11  consumers to turn to Ticketmaster for ticket distribution services on the secondary

12  market for higher prices and fees than they would have to pay in a competitive

13  market.  If Ticketmaster and IAC are permitted to continue with this conduct,

14  ticket distribution prices on the secondary market will continue to increase, and

15  only Ticketmaster and IAC will benefit.

16      35.   There is no appropriate or legitimate business justification for the

17  actions and conduct which has facilitated Ticketmaster and IAC's attempted

18  monopolization of the secondary market.

19      36.   The anticompetitive conduct described herein has caused antitrust

20  injury to RMG because: 1) a large percentage of RMG's customers have ceased

21  doing business with RMG for fears of being the target of a predatory lawsuit

22  instituted by Ticketmaster, causing it actual loss of revenue, profit and goodwill;

23  2) it is currently not permitted to sell or license legitimate software which can be

24  used to purchase tickets on ticketmaster.com to its customers who are participants

25  in the secondary market, causing it loss of revenue, profit and goodwill; 3) it is not

26  permitted to license the use of legitimate servers or IP addresses to its customers,

27  who are participants in the secondary market, for the purposes of making

28  purchases on Ticketmaster.com, which has caused it the loss of revenue, profits

1  and goodwill; 4) its customers, who are participants in the secondary market, have

2  had their access to ticketmaster.com blocked by Ticketmaster, which has resulted

3  in RMG's loss of customers, and in turn, loss of revenue, profits and goodwill.

4     37.    If these activities are not halted and abated, Ticketmaster and IAC

5  will continue to damage and further damage Counterclaim-Plaintiff.  These actions

6  constitute violations of Sherman Antitrust Act 15 U.S.C. § 2.  Thus, RMG requests

7  injunctive relief against Ticketmaster pursuant to the Clayton Act 15 U.S.C. § 26.

8     38.    As proximate result of the wrongful acts herein alleged,

9  Counterclaim-Plaintiff has been damaged in an amount to be determined at trial,

10  and is also entitled to recover treble damages, costs of suit and attorneys' fees,

11  pursuant to the Clayton Act 15 U.S.C. § 15.

12     39.    RMG has standing to assert this claim as 15 U.S.C. 15 states "any

13  person who shall be injured in his business or property by reason of anything

14  forbidden in the antitrust laws may sue therefor in any district court of the United

15  States in the district in which the defendant resides or is found or has an agent,

16  without respect to the amount in controversy, and shall recover threefold the

17  damages by him sustained, and the cost of suit, including reasonable attorney's

18  fees."

19  **SECOND COUNTERCLAIM**

20  **(For Violation of California Unfair Competition Law, Bus. & Prof. Code §§**

21  **17200, *et. seq.* by RMG Against All Counterclaim-Defendants)**

22     40.    RMG repeats and re-alleges the allegations set forth in paragraphs 1

23  through 30, 32 through 39 of these Counterclaims.

24     41.    The conduct alleged in these Counterclaims constitute unlawful and

25  unfair business acts and practices within the meaning of the California Unfair

26  Competition Law, §§ 17200, *et seq.* of the California Business and Professions

27  Code.  Counterclaim-Plaintiff has suffered injury in fact and lost money and

28  property as a result of Ticketmaster and IAC's violations of law and wrongful

conduct.

42.    Ticketmaster and IAC's actions are unlawful and unfair because they have violated, *inter alia*, the Sherman Antitrust Act.

43.    Ticketmaster and IAC's actions are unfair because in their pursuit of a monopoly over the secondary market, they have attempted to eliminate their competition, and they have eliminated some of their competition, as well as those who provide goods and services to their competition to make them competitive. Moreover, there is no legitimate business justification for Ticketmaster and IAC's conduct, and any business justification is further outweighed by the harm Ticketmaster and IAC's conduct has caused to consumers and competitors, and participants in the secondary market, including Counterclaim-Plaintiff.

44.    Accordingly, Ticketmaster and IAC have violated the Unfair Competition Law proscription against engaging in unlawful and unfair business practices.

45.    As a result of this unlawful and unfair conduct, Ticketmaster and IAC have been unjustly enriched at the expense of Counterclaim-Plaintiff, its customers, the general public, competitors and participants in the secondary market.

46.    Ticketmaster and IAC's conduct is continuing and unless equitable relief is granted, they will drive participants in the secondary market out of business.

47.    As proximate result of the wrongful acts herein alleged, Counterclaim-Plaintiff has been damaged in an amount to be determined at trial, and therefore requests costs of suit and attorneys' fees.

## THIRD COUNTERCLAIM

### (Declaratory Relief by RMG Against Ticketmaster and Roes 1 through 10)

48.    RMG repeats and re-alleges the allegations set forth in paragraphs 1 through 30, 32 through 39, 31 through 46 of these Counterclaims.

49.     Actual controversies have arisen and now exist between RMG on the one hand and Ticketmaster on the other hand.  RMG claims that Ticketmaster's "terms of use" are a vehicle to promote its illegal and illegitimate attempt to monopolize the secondary market, and are therefore invalid and unenforceable.  Upon information and belief, Ticketmaster claims that its "terms of use" of its website are legitimate.

50.     A decree from this Court is necessary to resolve the above controversy and to declare the respective rights and duties of RMG on the one hand and Ticketmaster on the other hand.  Such declaration is necessary and appropriate at this time in order that the parties may resolve their disputes in connection with the First Amended Complaint in this matter and the Counterclaims.

51.     RMG seeks a Declaratory Judgment deeming the "terms of use" on Ticketmaster's website invalid and unenforceable and an injunction thereon.

52.     Without such injunction, RMG will be irreparably harmed.

53.     RMG has no adequate remedy at law.

54.     The injury RMG will receive absent an injunction is greater than any foreseeable harm to Ticketmaster or others.

## FOURTH COUNTERCLAIM

### (Violation of Computer Fraud and Abuse Act- 18 U.S.C. 1030 Against Ticketmaster and Roes 1 through 10)

55.     RMG repeats and re-alleges the allegations set forth in paragraphs 1 through 10, of these Counterclaims.

56.     RMG is informed and believes and based thereon alleges that Ticketmaster has used the information contained on the hard drive of Chris Kovach  to reverse engineer and decompile source code and other information which is proprietary to RMG, and has used that information to intentionally access RMG's computers and non-public websites without authorization, and, through

interstate or foreign communication, obtained information from those computers, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)©. Upon information and belief, Ticketmaster is using this information to monitor the computer access of RMG and some of its customers. RMG is informed and believes, and based thereon alleges, that as a result of this conduct, RMG sustained economic damages of at least $5,000.00 over a one year period.

57.    Under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), RMG is entitled to an injunction, damages, and other legal and equitable relief as prayed for in these Counterclaims.

## FIFTH COUNTERCLAIM

### (Violation of California Penal Code § 502 Against Ticketmaster and Roes 1 through 10)

58.    RMG repeats and re-alleges the allegations set forth in paragraphs 1 through 10 and 56 of these Counterclaims.

59.    RMG is informed and believes, and based thereon alleges, that Ticketmaster has knowingly used and caused to be used RMG's computer services without permission, in violation of California Penal Code § 502(c)(3).

60.    RMG is informed and believes, and based thereon alleges, that Ticketmaster has knowingly and without permission accessed or caused to be accessed RMG's computers, computer system and computer network in violation of California Penal Code § 502(c)(7).

61.    As a result of said actions, RMG has sustained damage and loss in an amount which has yet to be ascertained, but is believed to be in excess of $5,000.00 over a one year period for such activities, among other things, as verifying that RMG's computer system, computer network, computer programs, or data was or was not altered, damaged, or deleted by the access.

62.    Pursuant to California Penal Section 502(e), RMG is entitled to an injunction, compensatory and punitive damages, attorney's fees and other legal

and equitable relief as prayed for in these Counterclaims.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court declare, adjudge and decree the following:

1.     That the conduct alleged herein constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Antitrust Act;

2.     That the conduct alleged herein is in violation of the California Unfair Competition Law and appropriate restitutionary and other injunctive relief be granted pursuant to this law;

3.     For an order permanently restraining and enjoining Ticketmaster from continuing their unfair and anticompetitive activities as alleged herein;

4.     That Counterclaim-Plaintiff be awarded damages, compensatory damages, penalties and other monetary relief as provided by applicable law, including treble damages;

5.     That Counterclaim-Plaintiff recover its costs of suit, including reasonable attorneys' fees and pre and post-judgment interest;

6.     For an order requiring full restitution of all funds acquired from Ticketmaster's unfair business practices, including disgorgement of revenues and profits;

7.     Declaratory judgment deeming Ticketmaster's "terms of use" of its website invalid and unenforceable.

8.     A permanent injunction enjoining Ticketmaster and anyone acting on its behalf or at its request from accessing RMG's computers, computer networks, computer systems or websites; and

9.     Whatever further and different relief as the nature of the case may require or may be determined to be just, equitable, and proper by this

Second Amended Counterclaims         - 19 -

1    Court.

2    DATED: April 9, 2008    Respectfully submitted,

3                            COGGAN & TARLOW

4

5                            By:    DAVID N. TARLOW
                             Attorneys for RMG Technologies, Inc.
6
7                            **JURY DEMAND**

8        RMG demands a jury trial in this action.

9    DATED: April 9, 2008        Respectfully submitted,

10                               COGGAN & TARLOW

11

12

13

14                           By:    DAVID N. TARLOW
                             Attorneys for RMG Technologies, Inc.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

     Second Amended Counterclaims        - 20 -

## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                                   ) ss:

COUNTY OF LOS ANGELES      )

      I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: **1925 Century Park East, #2320, Los Angeles, California 90067**

      On April 9, **2008,** I served the foregoing document described as: **DEFENDANT RMG TECHNOLOGIES, INC.'S SECOND AMENDED COUNTERCLAIMS** on all interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, and addressed as follows:

Robert Platt, Esq.
Mark Lee, Esq.
Donald Brown, Esq.
Manatt, Phelps & Phillips, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064

      **(X ) BY MAIL.** I caused such envelopes to be deposited in the mail. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on the same day with postage thereon, fully prepaid, at Los Angeles, California in the ordinary course of business.

      I declare under penalty of perjury that I am a member of the bar of this court and this service was made at my direction.

      Executed on this <u>9th</u> day of **April, 2008,** at Los Angeles, California.

David N. Tarlow