1   ROBERT H. PLATT (State Bar No. 108533)
    rplatt@manatt.com
2   MARK S. LEE (State Bar No. 094103)
    mlee@manatt.com
3   DONALD R. BROWN (State Bar No. 156548)
    dbrown@manatt.com
4   MANATT, PHELPS & PHILLIPS, LLP
    11355 West Olympic Boulevard
5   Los Angeles, California 90064-1614
    Telephone:  (310) 312-4000
6   Facsimile:   (310) 312-4224

7   Attorneys for *Plaintiff and Counter-Defendant*
    TICKETMASTER L.L.C. and *Counter-Defendant*
8   IAC/INTERACTIVECORP

9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  TICKETMASTER L.L.C., a Virginia          Case No. CV 07-2534-ABC (JCx)
    limited liability company,
13                                           Hon.  Audrey B. Collins
                     Plaintiff,
14                                           **NOTICE OF APPLICATION AND
          vs.                                APPLICATION BY
15                                           TICKETMASTER L.L.C. AND
    RMG TECHNOLOGIES, INC., a                IAC/INTERACTIVECORP FOR
16  Delaware corporation, and DOES 1         ENTRY OF DEFAULT JUDGMENT
    through 10, inclusive,                   AGAINST RMG TECHNOLOGIES,
17                                           INC.; MEMORANDUM OF POINTS
                     Defendants.             AND AUTHORITIES;
18                                           DECLARATIONS OF DONALD R.
                                             BROWN AND KEVIN McLAIN**
19  RMG TECHNOLOGIES, INC., a
    Delaware corporation,                    [[Proposed] Judgment and Permanent
20                                           Injunction submitted concurrently
                     Counterclaim-Plaintiff, herewith]
21
          vs.                                Complaint filed:  April 17, 2007
22
    TICKETMASTER L.L.C., a Virginia
23  limited liability company,
    IAC/INTERACTIVE CORP., a
24  Delaware corporation, and ROES 1
    through 10, inclusive,
25
                     Counterclaim-Defendants.
26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41283767.8

NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

TO DEFENDANT AND COUNTERCLAIMANT RMG TECHNOLOGIES, INC.:

PLEASE TAKE NOTICE THAT plaintiff and counterclaim-defendant Ticketmaster L.L.C. ("Ticketmaster") and counterclaim-defendant IAC/InterActiveCorp ("IAC," erroneously sued as "IAC/Interactive Corp.") hereby apply, pursuant to Rule 55 of the Federal Rules of Civil Procedure and Rule 55 of the Local Rules for the Central District of California, for entry of a default judgment and permanent injunction in their favor and against defendant and counterclaimant RMG Technologies, Inc. ("RMG"). This application is made on the grounds that the Court has entered a default against RMG, stricken RMG's Answer to Ticketmaster's First Amended Complaint, dismissed RMG's Second Amended Counterclaims with prejudice, and ordered Ticketmaster and IAC to submit a proposed default judgment to the Court no later than June 9, 2008.

As part of the proposed judgment, Ticketmaster seeks the entry of a permanent injunction to prohibit RMG and all persons acting for its benefit or on its behalf from (1) creating, trafficking in, facilitating the use of or using computer programs or other automatic devices to circumvent the technological copy protection systems in Ticketmaster's website; (2) using information gained from access of Ticketmaster's website to create computer programs to circumvent Ticketmaster's copy protection and website regulation systems; (3) copying or facilitating the copying of portions of Ticketmaster's website in excess of any license Ticketmaster has granted; (4) otherwise accessing and using Ticketmaster's website in excess of the license granted by the Terms of Use posted thereon; and (5) breaching or facilitating the breach by others of the Terms of Use posted on Ticketmaster's website, as they may be amended from time to time. Ticketmaster also seeks to require the impoundment and destruction of all copies of all bots, programs, or other automatic devices used by RMG and all persons acting for its benefit or on its behalf to violate Ticketmaster's rights.

Also as part of the proposed judgment, Ticketmaster seeks an award of damages in the amount of $18,237,200, comprised of $10,237,200 based on Ticketmaster's Eighth Claim for Relief for inducement to breach contract and Ninth Claim for Relief for intentional interference with contractual relations, and $8 million based on Ticketmaster's First Claim for Relief for copyright infringement and 17 U.S.C. Section 504.

Also as part of the proposed judgment, Ticketmaster seeks an award of attorneys' fees under 17 U.S.C. Sections 505 and 1203(a)(5) based on the First Claim for Relief for copyright infringement and the Second Claim for Relief for violation of the Digital Millennium Copyright Act, California Penal Code Section 502(e) based on the Fourth Claim for Relief for violation of the California Penal Code Section 502, and 18 U.S.C. Section 1964 based on the Fifth and Sixth Claims for Relief for violation of RICO, 18 U.S.C. Sections 1962(c) and 1962(d). This application seeks fees in an amount to be calculated by reference to the fee schedule in Local Rule 55-3, without waiver of any right by Ticketmaster or IAC to seek actual attorneys' fees upon entry of a default judgment. Based on damages of $18,237,200, the amount of attorneys' fees recoverable under the Rule 55 schedule would be $368,344.

Ticketmaster and IAC have provided notice of this application to RMG on June 3, 2008 by mailing a copy of the application to RMG's Chief Executive Officer, C.J. Garibay, at the address where RMG's former counsel served its motion to withdraw as counsel from the case.

This application is based on this Notice of Application and Application, the attached Memorandum of Points and Authorities, the attached declarations of Donald R. Brown and Kevin McLain, the May 29, 2008 Order entering default against RMG, the May 30, 2008 Order requiring Ticketmaster and IAC to submit a proposed judgment on or before June 9, 2008, the proposed Judgment and Permanent Injunction submitted concurrently herewith, all pleadings,

1   records and files herein, of which the Court is respectfully requested to take judicial

2   notice, and such other and further matters as may be presented in connection with

3   this application.

4   Dated:  June 3, 2008

                                             ROBERT H. PLATT

5                                                MARK S. LEE

6                                                DONALD R. BROWN
    MANATT, PHELPS & PHILLIPS, LLP

7

8   By: _____

9                         Donald R. Brown
                          Attorneys for *Plaintiff and Counter-*
    *Defendant* TICKETMASTER L.L.C. and

10                        *Counter-Defendant*
    IAC/INTERACTIVECORP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41283767.8

3

NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF FACTS........................................................................ 2

    A.    The Allegations of the First Amended Complaint Are Deemed True Because a Default Has Been Entered ............................................ 2

    B.    The Facts Which Supported Entry of a Preliminary Injunction Also Support Entry of a Permanent Injunction...................................... 3

        1.    Ticketmaster And Its Website .................................................. 3
        2.    Demand For Tickets .................................................................. 4
        3.    Ticketmaster's Technological Efforts To Maintain A Fair Website ...................................................................................... 5
        4.    Ticketmaster's Contractual Efforts To Maintain A Fair Website ...................................................................................... 5
        5.    Ticket Brokers .......................................................................... 7
        6.    RMG's Wrongful Conduct ........................................................ 7
        7.    The Harm Caused By RMG's Wrongful Conduct ................... 11

    C.    Additional Facts Relevant to Ticketmaster's Request for a Permanent Injunction and Damages ...................................................... 12

        1.    The Use of Automated Devices Has Continued....................... 12
        2.    Other Harm Resulting From RMG's Conduct ......................... 13
        3.    RMG Has Profited from its Misconduct .................................. 14

III.    TICKETMASTER IS ENTITLED TO A PERMANENT INJUNCTION ........................................................................................ 15

    A.    Ticketmaster Has Suffered Irreparable Injury ................................... 16
    B.    Money Damages Are Inadequate........................................................ 17
    C.    The Balance of Harms Favors an Injunction ..................................... 17
    D.    The Public Interest Favors a Permanent Injunction........................... 18
    E.    RMG Will Almost Certainly Continue Its Misconduct in the Absence of a Permanent Injunction ................................................... 19

IV.    TICKETMASTER IS ENTITLED TO DAMAGES ................................. 19

    A.    Ticketmaster is Entitled to Liquidated Damages from RMG's Inducement to Breach Contract and Intentional Interference with Contractual Relations ................................................................... 19

    B.    Ticketmaster is Also Entitled to Disgorgement of the Profits RMG Derived By Infringing Ticketmaster's Copyrights................... 21

**TABLE OF CONTENTS**
**(continued)**

                                                                    Page

V.    TICKETMASTER IS ENTITLED TO ATTORNEYS' FEES ................... 22

VI.   THERE IS NO NEED FOR AN EVIDENTIARY HEARING ................... 22

VII.  TICKETMASTER AND IAC HAVE PROVIDED NOTICE OF THIS
      APPLICATION ............................................................................ 23

VIII. CONCLUSION ............................................................................ 23

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41283767.8

ii

NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

# TABLE OF AUTHORITIES

**Page**

## CASES

*Corning Glass Works v. Jeannette Glass Co.*,
  308 F. Supp. 1321 (S.D.N.Y.), *aff'd* 432 F.2d 784 (2nd Cir. 1970) .................. 18

*Dundee Cement Co. v. Howard Pipe & Concrete Prod., Inc.*,
  722 F.2d 1319 (7th Cir. 1983) ........................................................................... 22

*eBay, Inc. v. MercExchange, LLC*,
  547 U.S. 388, 126 S. Ct 1837 (2006) ................................................................ 16

*Geddes v. United Financial Group*,
  559 F.2d 557 (9th Cir. 1977) ............................................................................... 3

*GHK Assoc. v. Mayer Group, Inc.*,
  224 Cal. App. 3d 856 (1990) ............................................................................. 20

*MAI Sys. Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir. 1993) ............................................................................. 16

*Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ...................................................... 17, 18

*Register.com, Inc. v. Verio, Inc.*,
  126 F. Supp. 2d 238 (S.D.N.Y. 2000), *aff'd.*, 356 F.3d 393 (2d Cir.
  2004) ................................................................................................................... 17

*Seaboard Music Co. v. Germano*,
  24 Cal. App. 3d 618 (1972) ............................................................................... 20

*TeleVideo Sys., Inc. v. Heidenthal*,
  826 F.2d 915 (9th Cir. 1987) ............................................................................... 3

*Ticketmaster L.L.C. v. RMG Technologies, Inc.*,
  507 F. Supp. 2d 1096 (C.D. Cal. 2007) .............................................................. 3

*Triad Sys. Corp. v. SE. Exp. Co.*,
  64 F. 3d, 1330 (9th Cir. 1995) ........................................................................... 17

*Western Oil & Fuel Co. v. Kemp*,
  245 F.2d 633 (8th Cir. 1957) ............................................................................. 20

## STATUTES

17 U.S.C. § 1203 ..................................................................................................... 15

17 U.S.C. § 1203(a)(5) ........................................................................................... 22

17 U.S.C. § 502 ....................................................................................................... 15

17 U.S.C. § 504(a)(1) ............................................................................................. 21

17 U.S.C. § 504(b) ............................................................................................ 21, 22

17 U.S.C. § 505 ....................................................................................................... 22

18 U.S.C. § 1030(g) ................................................................................................ 15

18 U.S.C. § 1962(c) ................................................................................................ 15

18 U.S.C. § 1962(d) ................................................................................................ 15

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41283767.8

iii

NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

1
2

**TABLE OF AUTHORITIES**
**(continued)**

3

**Page**

18 U.S.C. § 1964.................................................................................15, 22

California Penal Code § 502.....................................................1, 2, 15, 22

California Penal Code § 502(e) ........................................................15, 22

4
5
6

**RULES**

F.R.C.P. 55(b)(2) .............................................................................22, 23

Local Rule 55-2 .......................................................................................23

Local Rule 55-3 ...................................................................................2, 22

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41283767.8

iv

NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This Court has already entered a default against RMG.  Ticketmaster and IAC now seek entry of a default judgment, including a permanent injunction and an award of damages and attorneys' fees, to end this action.

As alleged in Ticketmaster's First Amended Complaint, RMG designs, manufactures, distributes and supports automated devices that enable its customers to jump to the front of the line on Ticketmaster's website, thus denying legitimate consumers a fair opportunity to buy tickets.  Ticketmaster has asserted claims against RMG for copyright infringement, violation of the Digital Millennium Copyright Act, violation of the Computer Fraud and Abuse Act, violation of California Penal Code Section 502, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of contract, inducing breach of contract, intentional interference with contractual relations, fraud, and aiding and abetting fraud.  Ticketmaster's First Amended Complaint seeks a permanent injunction, compensatory damages, treble damages, punitive damages, disgorgement of RMG's ill-gotten gains, imposition of a constructive trust, and recovery of attorneys' fees and costs incurred by Ticketmaster to prosecute this lawsuit.

Entry of a permanent injunction at this time is necessary and appropriate.  Earlier in this case, the Court entered a preliminary injunction based on the irreparable harm RMG's automated devices were causing to Ticketmaster and the public.  The same factors that warranted entry of a preliminary injunction against RMG still apply.  A permanent injunction is needed to ensure that RMG does not recommence infringing activity after judgment is entered.

Ticketmaster also respectfully requests damages in the amount of $18,237,200, comprised of $10,237,200 based RMG's inducement to breach contract and interference with contractual relations, and $8 million based on profits

1    derived by RMG through its direct and contributory copyright infringement.  In
2    confining its request for damages to these claims and in these amounts in the
3    interest of judicial economy, Ticketmaster is not waiving any right or contention
4    regarding other damages as alleged in the First Amended Complaint.

5    　　　　　Ticketmaster further requests an award of attorneys' fees in
6    accordance with the schedule in Local Rule 55-3, based on Ticketmaster's claims
7    under copyright laws, the Digital Millennium Copyright Act, California Penal Code
8    Section 502, and civil RICO.  In seeking fees under the Local Rule 55-3 schedule,
9    neither Ticketmaster nor IAC is waiving any right to apply for actual fees upon
10   entry of the requested default judgment.

11   **II.    STATEMENT OF FACTS**

12   　　　　　There are three primary factual bases for the relief requested in this
13   application: (i) the allegations of the First Amended Complaint, (ii) evidence
14   previously submitted in support of Ticketmaster's motion for a preliminary
15   injunction, and (iii) additional evidence submitted with this application.

16   **A.    The Allegations of the First Amended Complaint Are Deemed**
17   **True Because a Default Has Been Entered.**

18   　　　　　On April 8, 2008, the Court granted the motion of RMG's counsel to
19   withdraw as counsel.  RMG is a corporation and thus can neither prosecute claims
20   nor defend against claims except through counsel.  After RMG failed to retain new
21   counsel within a reasonable time, Ticketmaster and IAC moved to enter default
22   against RMG, and that motion was granted on May 29, 2008.  The Court ordered
23   that a default be entered against RMG, that RMG's Answer to the First Amended
24   Complaint be stricken, and that RMG's Second Amended Counterclaims be
25   dismissed with prejudice.  On May 30, 2008, the Court ordered Ticketmaster and
26   IAC to file a proposed judgment "immediately" and in no event later than June 9,
27   2008.

28

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

41283767.8                2                NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

1    Because a default has been entered, the factual allegations in the First

2    Amended Complaint must be treated as true.  *TeleVideo Sys., Inc. v. Heidenthal*,

3    826 F.2d 915, 917-18 (9th Cir. 1987), *quoting Geddes v. United Financial Group*,

4    559 F.2d 557, 560 (9th Cir. 1977) ("The general rule of law is that upon default the

5    factual allegations of the complaint, except those relating to the amount of

6    damages, will be taken as true.").

7    **B.    <u>The Facts Which Supported Entry of a Preliminary Injunction</u>**

8    **<u>Also Support Entry of a Permanent Injunction.</u>**

9    This Court entered a preliminary injunction against RMG on October

10   16, 2007, and entered Findings of Fact and Conclusions of Law in support of its

11   preliminary injunction ruling on October 26, 2007.  *See Ticketmaster L.L.C. v.*

12   *RMG Technologies, Inc.*, 507 F. Supp. 2d 1096 (C.D. Cal. 2007).

13   All of the facts and supporting evidence discussed below were

14   previously submitted to the Court in support of Ticketmaster's preliminary

15   injunction motion, and thus have previously been considered by the Court in

16   substantial detail.  Rather than re-file this extensive evidence, Ticketmaster will

17   merely cite to it by reference to previous filings which contain the evidence and the

18   Courts' Findings of Fact and Conclusions of Law.  Ticketmaster will also cite to

19   now-admitted allegations in the First Amended Complaint that support these facts.

20   1.    Ticketmaster And Its Website

21   Ticketmaster distributes tickets for live entertainment events to the

22   general public on behalf of Ticketmaster's clients, which are venues, promoters,

23   entertainers and sports franchises.  Those clients contract with Ticketmaster to

24   distribute their tickets because of Ticketmaster's demonstrated ability to do so

25   quickly, efficiently and fairly.  (Declaration of Kevin McLain, dated August 24,

26   2007 and filed August 27, 2007 (Docket No. 28) in support of motion for

27   preliminary injunction ("*August 24, 2007 McLain Decl.*") ¶ 2; Findings of Fact and

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41283767.8                    3                    NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

1    Conclusions of Law (Docket No, 61) ("*Findings*"), Fact No, 1; First Amended

2    Complaint ("*FAC*") ¶ 11.) [1]

3            Ticketmaster sells tickets through various distribution channels,

4    including its website, viewable at "http://www.ticketmaster.com"

5    ("ticketmaster.com").  Ticketmaster created its website for consumers who want to

6    purchase event tickets for their own, personal use.  (*August 24, 2007 McLain Decl.*

7    *¶ 3; Findings*, Fact No. 1; *FAC* ¶ 11.)

8            Consumers generally must first visit ticketmaster.com's home page,

9    and then navigate through a series of web pages, to buy tickets.  Consumers

10    navigate through those pages by clicking on designated hypertext "links" located on

11    each of those pages, culminating in a ticket purchase page.  Viewing any

12    Ticketmaster web page causes electronic copies of each of those pages to be created

13    and to appear on a user's computer screen.  (*August 24, 2007 McLain Decl.* ¶ 4;

14    Declaration of Adam Lieb (Docket No. 28) in support of motion for preliminary

15    injunction ("*Lieb Decl.*") ¶ 8; *Findings*, Fact No. 3; *FAC* ¶ 20.)  Ticketmaster has

16    obtained copyright registrations for various versions of its website or portions

17    thereof, including registrations for its home page, event purchase pages, and access

18    control and copy protection systems.  (Declaration of Mark S. Lee (Docket No. 28)

19    in support of motion for preliminary injunction ("*Lee Decl.*") ¶ 2; *August 24, 2007*

20    *McLain Decl.* ¶ 5 and Exh. 2; *Findings*, Fact No. 11 and Concl. No. 3; *FAC* ¶ 15.)

21            2.    Demand For Tickets

22            The number of tickets available for purchase for any particular event is

23    determined by Ticketmaster's clients.    Demand for tickets sold through

24    ticketmaster.com often exceeds the supply of tickets available for purchase.  Such

25    high demand for entertainment events inspires intense competition to purchase

26

27    _____

     [1]    Ticketmaster submitted several declarations by Kevin McLain in connection
28    with the preliminary injunction.  Therefore, each McLain declaration discussed
     above will be identified by date.

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

41283767.8                                    4                                    NOTICE OF APPLICATION AND
                                                                                 APPLICATION FOR ENTRY OF DEFAULT
                                                                                 JUDGMENT

tickets, because many consumers seek to acquire the same tickets to the same event at the same time, *i.e.*, when they go "on sale" on ticketmaster.com.  Recognizing this competitive reality, Ticketmaster tries to make the ticket buying process as fair and equitable to consumers as possible.  (*August 24, 2007 McLain Decl.* ¶ 6; *FAC* ¶¶ 12-13.)

3.    Ticketmaster's Technological Efforts To Maintain A Fair Website

Ticketmaster has engaged in extensive technical efforts to make the ticket purchasing process on ticketmaster.com as fair and equitable to consumers as possible.  Among other things, it tries to prevent the use of computer programs, sometimes called "software robots" or "bots," that provide an unfair advantage over human consumers in the ticket purchasing process.  It also blocks people who use such programs to buy tickets when it discovers them.  (*August 24, 2007 McLain Decl.* ¶¶ 7-8, 22; *Findings*, Fact No. 16; *FAC* ¶¶ 13-14.)

One of the technical measures Ticketmaster has undertaken is a security computer program, commonly known as CAPTCHA ("Completely Automated Public Turing Test To Tell Computers And Humans Apart"), that is designed to distinguish between human users and computer programs.  With CAPTCHA, a box appears on a user's computer screen with stylized, partially obscured random characters whenever a user submits a ticket request.  The user must retype those characters to proceed to purchase tickets.  Most automated devices cannot decipher and retype these random characters, and thus cannot proceed past that screen to complete a ticket transaction.  (*August 24, 2007 McLain Decl.* ¶ 9 and Exh. 3; *Findings*, Fact Nos. 16-18 and Concl. No. 25; *FAC* ¶ 14.)

4.    Ticketmaster's Contractual Efforts To Maintain A Fair Website

Use of ticketmaster.com requires the acceptance of contractual provisions that restrict access to the website and give consumers the fairest

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41283767.8                                    5                        NOTICE OF APPLICATION AND
                                                                      APPLICATION FOR ENTRY OF DEFAULT
                                                                      JUDGMENT

opportunity to purchase tickets from ticketmaster.com at the "face" price. The ticketmaster.com home page prominently displays the following warning:

> "Use of this website is subject to express <u>Terms of Use</u> which prohibit commercial use of this site. By continuing past this page, you agree to abide by these terms."

The underlined phrase "Terms of Use" on the home page is a readily visible hypertext link that, when clicked, causes the full Terms of Use to appear on the user's screen. The same message and hyperlink appear on virtually every webpage on ticketmaster.com. (*August 24, 2007 McLain Decl.* ¶¶ 10-11 and Exhs. 4-5; *Findings*, Fact No. 3; *FAC* ¶¶ 16-17.)

Users of ticketmaster.com must affirmatively agree to the Terms of Use to purchase tickets. Since 2003, users of ticketmaster.com have had to affirmatively agree to Ticketmaster's Terms of Use as part of the account setup procedure. Since mid-2006, users have had to affirmatively agree to the Terms of Use every time they purchase tickets. (*August 24, 2007 McLain Decl.* ¶¶ 12-13 and Exhs. 6-7; *Findings*, Fact No. 3; *FAC* ¶¶ 18-19.)

Ticketmaster's Terms of Use act as a license agreement that describes, *inter alia*, when and under what conditions a user may permissibly access and copy pages from ticketmaster.com. Among other things, the Terms of Use permit access only for personal use, prohibit commercial use of Ticketmaster's website, prohibit the use of "bots" and other computer programs to access ticketmaster.com, and prohibit unauthorized use of the site. (*August 24, 2007 McLain Decl.* ¶ 14 and Exh. 8; *Findings*, Fact No. 2 and Concl. Nos. 7, 9; *FAC* ¶¶ 20-24.)

The Terms of Use also prohibit consumers from purchasing more than a specified number of tickets in a single transaction, pursuant to Ticketmaster's "ticket purchase policy." The Terms of Use contain a hyperlink to and expressly incorporate the ticket purchase policy. Ticket limits are meant to ensure that more individuals have fair access to event tickets. The ticket limit for a particular event

1   is included on the event page and ticket purchase page.  (*August 24, 2007 McLain*
2   *Decl.* ¶ 15 and Exh. 9; *FAC* ¶¶ 25-26.)

3        5.    Ticket Brokers

4       Certain individuals and entities have capitalized on the demand for
5   event tickets by circumventing Ticketmaster's technical measures, breaching its
6   Terms of Use, and using computer programs to improperly access and copy
7   portions of Ticketmaster's website.  They do this to robotically "cut in line" in front
8   of human customers so they can acquire and resell tickets at prices far above that
9   designated by the sponsors of the event (the "face" price shown on the ticket).
10  Such persons, sometimes called "ticket brokers," reduce the number of tickets
11  available for fans and customers at the "face" price.  Ticketmaster has undertaken
12  the technical and legal measures described above to try to prevent such actions.
13  (*August 24, 2007 McLain Decl.* ¶ 16; *Findings*, Fact No. 4; *FAC* ¶ 28.)[2]

14       6.    RMG's Wrongful Conduct

15      RMG has developed marketed and sold approximately 21 computer
16  programs that enable its ticket broker customers to access Ticketmaster's website,
17  block access to the best tickets, copy purchase pages, and quickly purchase large
18  quantities of tickets faster than human customers can.  (*Lee Decl.* ¶¶ 3-5 and
19  Exhs. 10-12; *August 24, 2007 McLain Decl.* ¶ 25 and Exh. 1; *Lieb Decl.* ¶ 8 and
20  Exhs. 13-16; Declaration of Chris Kovach (Docket No. 28) in support of motion for
21  preliminary injunction ("*Kovach Decl.*") ¶ 3; *Findings*, Fact No. 4 and Concl. Nos.
22  12-13; *see also FAC* ¶ 28.)  Those automated devices are designed to, and do, allow
23  RMG's customers to covertly circumvent Ticketmaster's access control and copy
24  protection systems, including CAPTCHA.  (*Kovach Decl.* ¶¶ 5-9; *August 24, 2007*

25  _____
[2]     This case is <u>not</u> about stopping ticket reselling.  Ticketmaster has no
26  objection to ticket reselling that complies with applicable laws and the Terms of
Use of its website.  Instead, this case is about fairness, and RMG's use of technical
27  measures to improperly access Ticketmaster's website, breach its Terms of Use,
and give its clients an unfair technological advantage over consumers in the ticket
28  purchasing process.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41283767.8        7        NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

*McLain Decl.* ¶ 25 and Exh. 1; *FAC* ¶ 30; *see also Findings*, Fact No. 10 and Concl. Nos. 12-13.)  RMG boasts that its programs "do the work of a dozen people at once[,]" and employ "stealth technology" so its customers "**never get blocked by Ticketmaster**."  (*August 24, 2007 McLain Decl.* ¶ 25 and Exh. 1, emphasis in original; *Findings*, Fact No. 6 and Concl. No. 13; *see also FAC* ¶ 30.)

RMG had to visit, and thereby copy pages from, Ticketmaster's website to develop its computer programs.  (*Lieb Decl.* ¶ 9; *Findings*, Fact Nos. 5, 13 and Concl. No. 8; *FAC* ¶ 33.)  RMG necessarily saw repeated reminders of the Terms of Use each time it viewed a ticketmaster.com webpage during that process.  (*August 24, 2007 McLain Decl.* ¶¶ 9-12, Exhs. 4-6; *Findings*, Fact No. 13 and Concl. Nos. 8, 27; *FAC* ¶ 33.)    RMG necessarily purchased tickets on Ticketmaster's website as part of the ongoing testing of its computer programs, and has affirmatively clicked on the "accept" button on the ticket purchase page with each purchase.  (*August 24, 2007 McLain Decl.* ¶¶ 12-13 and Exhs. 6-7; *Lieb Decl.* ¶ 9; *Findings*, Fact Nos. 5, 13; *FAC* ¶ 33.)  RMG's unauthorized invasions into and copying from Ticketmaster's website exceed the scope of the license created by and breach the Terms of Use.  (*August 24, 2007 McLain Decl.* ¶ 14 and Exh. 8; *Findings*, Concl. Nos. 17, 27; *FAC* ¶¶ 34 and 48.)

RMG also participates with its ticket broker customers in every unauthorized access of Ticketmaster's website and every breach of Ticketmaster's Terms of Use.  RMG's ticket broker customers do not acquire physical possession of or download RMG's software.  Instead, they log onto RMG's website at "www.ticketbrokertools.com" and use a suite of devices and products available there to improperly access Ticketmaster's website in excess of the authorization granted by Ticketmaster's Terms of Use.  (*Kovach Decl.* ¶ 4; *August 24, 2007 McLain Decl.*, Exh. 1; *Lieb Decl.* ¶ 8 and Exhs. 13-16; *FAC* ¶¶ 29-31; *see also Findings*, Fact No. 9 and Concl. Nos. 12-13.)

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41283767.8                    8                    NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

RMG provides a variety of online software schemes to maximize the effectiveness of its "stealth technology."  (*Kovach Decl.* ¶¶ 5-9; *McLain Decl.* ¶ 25, Exh. 1; *Lieb Decl.* ¶ 8; *FAC* ¶¶ 29-30; *see also Findings*, Fact Nos. 9-10 and Concl. Nos. 12-13.)  Among other things, RMG utilizes a computer program known as a "proxy server" to accomplish its goals and conceal its and its customers' identities.  (*Lieb Decl.* ¶ 8 and Exhs. 12, 14-16; *Findings*, Concl. Nos. 12-13.)  Through the proxy server, RMG rewrites ticketmaster.com's own domain names to help it overcome Ticketmaster's technical protections.  (*Lieb Decl.* ¶ 8.)  Depending on the level of service and features a customer purchases from RMG, it can use multiple bots—sometimes hundreds of them—to simultaneously flood the Ticketmaster website with requests for tickets.  (*Kovach Decl.* ¶ 5; *Findings*, Concl. No. 12; *FAC* ¶ 30.)

RMG and its customers purchase tickets on a massive scale, thereby denying the public access to tens of thousands of the best tickets to many events.  One RMG customer alone placed about 9,500 orders to purchase almost 24,000 tickets using RMG's technology; and while Ticketmaster does not know how many customers RMG has, two other known RMG customers have purchased a total of about 36,000 tickets, and RMG customers have purchased more than 65,800 tickets so far in 2007 alone.  Indeed, for one event, RMG's customers acquired about 40% of the tickets in one of the most desirable sections and 13% of all "floor" seats; they also acquired significant portions of tickets to other events.  (*August 24, 2007 McLain Decl.* ¶ 24; *see also Findings*, Fact Nos. 7-8, 24; *FAC* ¶¶ 39-40.)

Further, RMG and its customers make millions of ticket requests, and thus copy millions of copies of ticketmaster.com web pages, through their ticket purchases.  Ticketmaster tracked over 425,000 automated ticket requests from one individual who used RMG technology on one day, and about 600,000 automated ticket requests from another individual who used RMG technology on another day.  Ticketmaster estimates that RMG and the three identified RMG customers alone

copied millions of pages in this manner to purchase the 60,000 tickets they bought for resale.  Consistent with that estimate, Ticketmaster has confirmed that millions of automated ticket requests have been made to ticketmaster.com on many days, with automated requests constituting up to 80% of all ticket requests made to ticketmaster.com on some days.  Ticketmaster also estimates that on one day after this lawsuit was filed, RMG customers contacted ticketmaster.com at least once every .25 seconds.  (*August 24, 2007 McLain Decl.* ¶¶ 23-24, 27; Supplemental Reply Declaration of Kevin McLain dated and filed October 5, 2007 (Docket No. 54) in support of motion for preliminary injunction ("*October 5, 2007 McLain Decl.*"); *see also Findings*, Fact Nos. 7-8, 24 and Concl. No. 20; *FAC* ¶ 34.)

RMG conceals its actions from Ticketmaster in various ways.  It spreads its automated requests for tickets over multiple IP addresses to conceal the source of its requests, and helps customers obtain new IP addresses from their internet service providers.  (*Lieb Decl.* ¶ 8e; *Kovach Decl.* ¶ 11; *Findings*, Fact No. 10; *FAC* ¶¶ 36-37.)  RMG also screens potential customers to ensure that they have no affiliation with or loyalty to Ticketmaster and warns its customers not to publicize the existence of RMG's ticket buying services.  If an existing customer wishes to recommend RMG's services to another broker, he or she is instructed to provide the name of the potential customer to RMG, so that RMG may first screen the potential customer before deciding whether to initiate contact.  (*Kovach Decl.* ¶¶ 3, 12, and Exh. 18; *Findings*, Fact No. 10; *FAC* ¶ 32.)

If a customer encounters any obstacle in securing tickets or circumventing Ticketmaster's security measures, the customer may immediately consult with an RMG representative to receive advice concerning how to obtain improper access to the Ticketmaster website.  RMG also offers consulting services to enable its customers to set up hardware, telecommunications equipment and other tools to expand their invasion of Ticketmaster's website.  (*Kovach Decl.* ¶¶ 10-11; *Findings*, Fact No. 9; *FAC* ¶ 31.)

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

41283767.8                    10          NOTICE OF APPLICATION AND
APPLICATION FOR ENTRY OF DEFAULT
JUDGMENT

7.    The Harm Caused By RMG's Wrongful Conduct

As described below, the use of automated devices to access Ticketmaster's website for commercial purposes causes ongoing expenses of technical countermeasures, harm to Ticketmaster's goodwill, and continued harm to the public trying to obtain tickets. (*August 24, 2007 McLain Decl.* ¶¶ 8-9, 20-21, 30-35; *Findings*, Fact Nos. 19-22, 24-26 and Concl. No. 36; *FAC* ¶¶ 35-45.)

The massive volume of ticket requests strains Ticketmaster's technical systems, and forces Ticketmaster to incur significant expense to increase the scale of its infrastructure to insure that its computer systems will remain functional in the face of the overwhelming increase in traffic caused by automated ticket requests. (*August 24, 2007 McLain Decl.* ¶ 34; *FAC* ¶ 45.)  Ticketmaster has been forced to reassign its technical personnel from productive development tasks that would improve the functionality of its website to technical measures to mitigate the harm caused by these automated invasions, as well as discover who is invading its computer systems.  (*August 24, 2007 McLain Decl.* ¶¶ 20-21; *FAC* ¶ 45.)  It is impossible for Ticketmaster to precisely calculate the costs it has incurred through these efforts, but it easily amounts to more than hundreds of thousands of dollars per year. (*August 24, 2007 McLain Decl.* ¶ 21.)

Although Ticketmaster's technical countermeasures have had some success, automated intrusions continue, and Ticketmaster will continue to have to incur significant expenses to combat this problem, and to divert precious resources from important, more productive endeavors. (*August 24, 2007 McLain Decl.* ¶¶ 34-35.)  It is not realistic to believe that technical countermeasures, no matter how expensive or extensive, can ever fully stop this problem.

RMG's misconduct also injures Ticketmaster's goodwill in ways that are real but impossible to quantify, and in ways that are difficult if not impossible to repair.  Many consumers are unable to purchase event tickets from Ticketmaster at the face price because ticket brokers using RMG's programs have already blocked

their access to and purchased such tickets.  Such customers understandably become frustrated and tend to blame Ticketmaster for the unavailability of these tickets. (Declaration of Steven J. Obara (Docket No. 28) in support of motion for preliminary injunction ("*Obara Decl.*") ¶ 4 and Exh. 19; *Lee Decl.* ¶¶ 7-8 and Exhs. 20-21; *Findings*, Fact Nos. 19-22; *FAC* ¶¶ 39-40.)  Many complain to Ticketmaster, and accuse Ticketmaster of colluding with brokers to divert tickets.  (*Obara Decl.* ¶¶ 3-5 and Exh. 19.)  Others complain in public forums, exacerbating the goodwill problem.  RMG's actions also threaten to harm Ticketmaster's client relationships by impairing its ability to provide accurate ticket sales information and jeopardizing the fairness of its online ticket purchasing system.  (*August 24, 2007 McLain Decl.* ¶¶ 36-41; *Findings*, Fact No. 25; *FAC* ¶ 40.)

Ticketmaster will suffer such harm as long as RMG and its customers are permitted to use their computer programs to invade Ticketmaster's website. Further, the public will continue to be denied a chance to buy tickets at the "face" price, and will continue to pay RMG's customers' inflated prices to acquire those tickets, unless this Court permanently orders RMG to stop its misconduct.

**C.** **Additional Facts Relevant to Ticketmaster's Request for a Permanent Injunction and Damages.**

1. The Use of Automated Devices Has Continued.

In the time since the preliminary injunction was entered in October 2007, automated devices, including RMG's, have continued to access Ticketmaster's website.  (Declaration of Kevin McLain dated June 3, 2008, attached hereto ("*June 3, 2008 McLain Decl.*") ¶ 2.)  As described in the Declaration of Kevin McLain dated November 6, 2007 (Docket No. 66), two of RMG's customers, Thomas Prior and Gary Bonner, used RMG's automated devices to access Ticketmaster's website in the weeks after the preliminary injunction was entered.

Prior, a defendant in a related action, has continued to use RMG's devices even up to the present.  In verified discovery responses from the related action, Prior explained that he only uses automated devices from RMG. (Declaration of Donald R. Brown attached hereto ("*Brown Decl.*") ¶ 3 and Exh. 1.) As a recent example, on May 13, 2008, Prior made 917 requests to Ticketmaster's website in a single hour from one IP address.  That volume can only be achieved through the use of automated devices.  (*June 3, 2008 McLain Decl.* ¶ 2.)

2.    Other Harm Resulting From RMG's Conduct.

The First Amended Complaint describes harm to Ticketmaster's website and infrastructure that was only briefly argued in support of the motion for preliminary injunction but is relevant to the need for a permanent injunction.  Every ticket request to Ticketmaster's website causes tickets to be placed temporarily on reserve.  When a large number of requests is made through an automated device, not only is the inventory of tickets for legitimate consumers diminished, but Ticketmaster's ability to provide an important service to its clients is compromised.  Clients use the Ticketmaster system to monitor ticket sales activity to make a variety of decisions, including whether to open more seats or move the seats to other distribution channels.  The artificially high volume of seats revolving in and out of reserve status due to the use of automated devices makes it difficult to gauge how well tickets for the event are actually selling, which in turn interferes with the clients' ability to make the ongoing decisions that are based on sales activity.  (*FAC* ¶ 40.)

In addition, Ticketmaster's website allocates traffic to various servers through a load balancing program that is designed to ensure consumer requests are processed equitably and that no consumer receives slower service merely because his or her request was directed to one server rather than another.  However, users of automated devices bypass the load balancing program and target specific servers directly with thousands of requests, thus interfering with the website's traffic

allocation feature and putting some consumers whose requests were allocated to the same server that was targeted by the automated device at risk of slower service. (*FAC* ¶ 41.)

Further, Ticketmaster's website is part of a carefully crafted business model that integrates other services and features into the ticket purchasing process. The website is designed so that users will follow certain steps and will see certain pages in the process of requesting and purchasing tickets. Based on this expected flow of traffic, clients, advertisers and Ticketmaster itself offer particular services or opportunities on particular pages, ranging from parking at the event to signing up for client newsletters. However, automated devices, which do not use traditional browsers, bypass the HTML code for these features, so the users of those devices never even see these offers. These same offenders further exacerbate the problem by purchasing enormous quantities of tickets, which diminishes the ticket inventory for legitimate consumers and reduces the number of legitimate consumers who will reach the pages that provide these up-sell opportunities. (*FAC* ¶ 42.)

Automated devices also alter the security features of the website itself by accessing the Ticketmaster system at targeted points. Normally, users receive automatic and temporary permission—in effect, a token—to make requests on the system. That token is automatically revoked if the pace of requests exceeds a certain limit. However, by systematically deleting cookies on the user's system, automated devices enable the user to constantly assume a new identity and acquire new tokens even though that same user is far exceeding the request limit. (*FAC* ¶ 43.)

3.    RMG Has Profited from its Misconduct.

RMG has earned substantial revenue through its automated devices. According to a March 2008 article in TicketNews—which was based on an "exclusive interview" with RMG's President, C.J. Garibay—RMG was "generating more than $12 million in annual revenues." (*Brown Decl.* ¶ 4, Exh. 2.) Moreover,

1   during a videotaped May 13, 2008 interview on an ESPN news program, Garibay

2   said that gross sales from RMG's automated devices were $2 million in 2007.

3   (*Brown Decl.* ¶¶ 5-6, Exhs. 3-4.)  Even accepting the more conservative of these

4   two figures, RMG has earned annual revenues of $2 million through its

5   Ticketmaster-related automated devices.[3]

6   　　　Assuming, *arguendo*, that RMG started marketing and distributing

7   these devices at the beginning of 2004 (there is reason to believe RMG started

8   sooner) and that RMG's revenues from those devices ceased by the end of 2007,

9   RMG has derived at least $8 million in revenue through these devices.

10  ## III.    TICKETMASTER IS ENTITLED TO A PERMANENT INJUNCTION

11  　　　Ticketmaster is entitled to a permanent injunction under its breach of

12  contract claim as well as the various statutory claims.  The website's Terms of Use

13  expressly provide for injunctive relief in the event of a breach of the Terms of Use.

14  Moreover, the following statutes provide for injunctive relief: 17 U.S.C. § 502

15  (First Claim for Relief for copyright infringement); 17 U.S.C. § 1203 (Second

16  Claim for Relief for violation of the Digital Millennium Copyright Act); 18 U.S.C.

17  § 1030(g) (Third Claim for Relief for violation of the Computer Fraud and Abuse

18  Act); California Penal Code § 502(e) (Fourth Claim for Relief for violation of the

19  California Penal Code Sec 502); and 18 U.S.C. § 1964 (Fifth and Sixth Claims for

20  Relief for violation of RICO, 18 U.S.C. §§ 1962(c) and 1962(d)).

21  　　　To obtain a permanent injunction, Ticketmaster "must demonstrate: (1)

22  that it has suffered an irreparable injury; (2) that remedies available at law, such as

23  monetary damages, are inadequate to compensate for that injury; (3) that,

24  considering the balance of hardships between the plaintiff and defendant, a remedy

25  in equity is warranted; and (4) that the public interest would not be disserved by a

26  permanent injunction."  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct

27

28  [3]    Because RMG has defaulted, Ticketmaster has not had the opportunity to
    obtain revenue figures from RMG in discovery.  (*Brown Decl.* ¶ 7.)

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

41283767.8                15                NOTICE OF APPLICATION AND
                                            APPLICATION FOR ENTRY OF DEFAULT
                                            JUDGMENT

1837, 1839-40 (2006).   Such injunctions are routinely granted where copyright infringement is shown.  *See*, *e.g.*, *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) ("as a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations").  RMG should be permanently enjoined under these criteria.

## A.   Ticketmaster Has Suffered Irreparable Injury.

RMG's actions have significantly harmed Ticketmaster, and will continue to cause harm if RMG is permitted to distribute its infringing software products after termination of this case.  Should that occur, Ticketmaster would once again be faced with massive numbers of automated ticket requests that strain its technical systems. Ticketmaster would again have to reassign technical personnel from productive tasks that improve the functionality of its website to technical measures to mitigate the harm caused by automated intrusions.  (*August 24, 2007 McLain Decl.* ¶ 21.)  It would again be faced with frustrated consumers who are denied a fair opportunity to buy tickets.  (*Obara Decl.* and Exh. 20; *Findings*, Fact Nos. 19-22 and Concl. No. 36.)

Moreover, Ticketmaster could again be faced with nationwide negative publicity in which frustrated consumers mistakenly blame Ticketmaster for their inability to get tickets.  (*Lee Decl.*; *Obara Decl.* and Exhs. 19-20; *Findings*, Fact Nos. 20-22.)  Ticketmaster could again have to address governmental investigations that are driven by the misimpression that Ticketmaster is colluding with ticket brokers to deny the public a fair opportunity to buy tickets.  (Declaration of Mark S. Lee dated September 24, 2007 (Docket No. 49) in support of motion for preliminary injunction ("*Sept. 24, 2007 Lee Decl.*") and Exh. 24, pp. 46-47, and Exhs. 25-26; *Findings*, Fact No. 22.)  In addition, Ticketmaster would again risk losing clients if they are publicly criticized for using Ticketmaster to sell their tickets.  (*August 24, 2007 McLain Decl.* ¶¶ 35-41; *Findings*, Fact No. 25.)

Such losses are "irreparable" and support a permanent injunction. *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 252 (S.D.N.Y. 2000), *aff'd.*, 356 F.3d 393, 404 (2d Cir. 2004) (potential harm from loss of customers and uncertain but significant expense involved in insuring that computer system can withstand unauthorized automated attacks constitute "irreparable" harm that supports an injunction); *Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1215 (C.D. Cal. 2007) (hereinafter, "*MGM*") (damage to brand recognition and goodwill caused by infringement establishes permanent irreparable harm that supports a permanent injunction).

## B.    Money Damages Are Inadequate.

Money damages are inadequate here because the monetary value of harm caused by diversion of employee resources, and the harm to Ticketmaster's goodwill, while real and significant, cannot be computed with sufficient precision to fully compensate Ticketmaster.  Further, any future infringement by RMG and future RMG customers would harm Ticketmaster in amounts that cannot now be computed, and require future suits to obtain compensation.  "A legal remedy is inadequate if it would require a multiplicity of suits."  *MGM*, *supra*, 518 F. Supp. 2d at 1220 (internal quotations and citation omitted).

## C.    The Balance of Harms Favors an Injunction.

Ticketmaster will be significantly harmed if RMG is permitted to once again distribute its computer programs that deny the public a fair chance to buy tickets from the tickemaster.com website as described above.  In contrast, the only harm that RMG would suffer if a permanent injunction issues is that it would be prevented from engaging in illegal conduct.  Such "harm" is not cognizable under applicable law.  *Triad Sys. Corp. v. SE. Exp. Co.*, 64 F. 3d, 1330, 1338 (9th Cir. 1995) ("when the only harm that defendant will suffer is lost profits from an activity which has been shown . . . infringing, such an argument merits little equitable consideration") (internal citation omitted).

1    The balance of harms thus favors a permanent injunction here.  A

2  company that has built its business on infringing conduct has no equitable right to

3  continue the infringing conduct to survive.  Otherwise, anyone could justify

4  infringing activities by claiming he or she needed to "avoid going out of business,"

5  and no permanent injunction could be obtained against a professional infringer.

6          **D.    The Public Interest Favors a Permanent Injunction.**

7    "[T]he public interest is . . . served when the rights of copyright

8  holders are protected against acts constituting infringement."  *MGM*, *supra,* 518 F.

9  Supp. 2d at 1222.  "An injunction is thus in the public interest; only if the

10  distribution of [RMG's infringing software] is stopped can further fraud be

11  avoided."  *Corning Glass Works v. Jeannette Glass Co.*, 308 F. Supp. 1321, 1328

12  (S.D.N.Y.), *aff'd* on the opinion below, 432 F.2d 784 (2nd Cir. 1970).

13    The public interest obviously favors a permanent injunction here.

14  RMG's misconduct denied consumers the opportunity to purchase many event

15  tickets from Ticketmaster at the face price and instead forced them to purchase

16  tickets from RMG's ticket broker clients at inflated prices.  Such actions enrich

17  RMG and its clients at the public's expense.

18    The public interest in an injunction is underscored by actions of the

19  Kansas City Council and Attorneys General of Missouri and Arkansas, as described

20  in connection with Ticketmaster's motion for preliminary injunction.  The Kansas

21  City Council held a televised hearing on September 20, 2007 to investigate whether

22  Ticketmaster was improperly withholding tickets from the public, and the

23  Attorneys General of Missouri and Arkansas launched investigations into

24  Ticketmaster's distribution of tickets for the Hannah Montana concerts.  (*Sept. 24,*

25  *2007 Lee Decl.* and Exh. 24, pp. 46-47, and Exhs. 25-26; *Findings*, Fact No. 22.)[4]

26  _____

[4]    In the time since Ticketmaster moved for a preliminary injunction, other
27  states have also been in contact with Ticketmaster regarding possible investigations
    into ticket distribution issues created by the use of automated devices.  (*June 3,*
28  *2008 McLain Decl.* ¶ 5.)

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41283767.8                18                NOTICE OF APPLICATION AND
                                            APPLICATION FOR ENTRY OF DEFAULT
                                            JUDGMENT

The public obviously is very interested in this issue, and the public interest favors giving the public a fair chance to acquire as many tickets as possible at the face price from ticketmaster.com's website, as Ticketmaster and its clients intend. A permanent injunction will help give the public that chance.

**E.    RMG Will Almost Certainly Continue Its Misconduct in the Absence of a Permanent Injunction.**

The volume of assaults decreased after a preliminary injunction was entered in this case. (*June 3, 2008 McLain Decl.* ¶ 2.) Nonetheless, the use of automated devices has not disappeared, and there is evidence, discussed above, that RMG's automated devices continue to access Ticketmaster's website. Without a permanent injunction, there is a significant risk that the volume of automated devices assaulting Ticketmaster's website will only increase.

Therefore, Ticketmaster seeks a permanent injunction in the form incorporated in the proposed judgment filed concurrently with this application.

**IV.    TICKETMASTER IS ENTITLED TO DAMAGES**

The First Amended Complaint asserts a variety of claims for relief for damages. In the interest of judicial economy, and without waiver of any rights or contentions regarding other damages, Ticketmaster is only requesting damages for its inducement/interference and copyright infringement claims.

**A.    Ticketmaster is Entitled to Liquidated Damages from RMG's Inducement to Breach Contract and Intentional Interference with Contractual Relations.**

The Terms of Use for Ticketmaster's website include a provision for liquidated damages in the amount of $10 for every page request that exceeds 1000 page requests in a 24-hour period. (*FAC* ¶ 90.)[5] As alleged in the Seventh, Eighth

---

[5]    The full provision reads as follows:

> You agree that Abusive Use of the Site, as defined above, causes damage and harm to Ticketmaster in the form of, among other things, impaired goodwill, lost sales, and increased expenses associated with responding to Abusive Use of the Site. You further agree that monetary damages

1  and Ninth Claims for Relief (breach of contract, inducement to breach contract, and

2  intentional interference with contractual relations), RMG was aware of this

3  provision in the Terms of Use and agreed to it when accessing Ticketmaster's

4  website and requesting and purchasing tickets. (*FAC* ¶¶ 86, 95-96, 106.)

5        RMG breached the Terms of Use. (*FAC* ¶ 89.) RMG also induced its

6  customers to breach the Terms of Use by using RMG's automated devices to access

7  Ticketmaster's website and purchase tickets. (*FAC* ¶¶ 99-101.) In addition, RMG

8  intentionally interfered with the contractual relationships between Ticketmaster and

9  RMG's customers who accessed Ticketmaster's website through RMG's automated

10  devices. (*FAC* ¶¶ 109-111.)

11        RMG is liable to Ticketmaster for damages resulting from this conduct.

12  Because the Terms of Use contain a liquidated damages clause, RMG is liable for

13  the liquidated damages resulting from its inducement to breach contract and its

14  interference with contractual relations. *See GHK Assoc. v. Mayer Group, Inc*., 224

15  Cal. App. 3d 856, 877 (1990) (measure of damages for inducement to breach

16  contract is the measure of damages applicable to the breach of contract); *Seaboard*

17  *Music Co. v. Germano*, 24 Cal. App. 3d 618, 622 (1972) (same); *see also Western*

18  *Oil & Fuel Co. v. Kemp,* 245 F.2d 633, 644-45 (8th Cir. 1957) (damages for

19  inducement to breach contract measured by liquidated damages clause in contract).

20

21

---

22        for Abusive Use of the Site are difficult to ascertain and

23  that proof of monetary damages for Abusive Use would be costly and inconvenient to calculate. Accordingly you agree that liquidated damages are warranted for Abusive

24  Use. Therefore, you agree that if you, or others acting in concert with you, alone or collectively request more than

25  1000 pages of the Site in any twenty-four hour period, you, and those acting in concert with you, will be jointly

26  and severally liable for liquidated damages in the amount of ten dollars ($10.00) per page request each time that a

27  page request is made after that first 1000 during that twenty-four hour period.

28  (*FAC* ¶ 90.)

The liquidated damages clause at issue here provides for damages to the full extent of each customer's request for web pages in excess of the 1000-page limit for each 24-hour period.  (*FAC* ¶¶ 102-03, 112-13.)    Without waiving any right to recover damages for all of the times that RMG induced its customers to breach the Terms of Use or interfered with that contract, Ticketmaster is only seeking damages for two such instances.

As described above and in Ticketmaster's motion for preliminary injunction, Thomas Prior used RMG's automated devices on May 26, 2007 to make approximately 600,000 requests on Ticketmaster's website.  (*August 24, 2007 McLain Decl.* ¶ 24; *October 5, 2007 McLain Decl.*)  As further clarified in the attached McLain Declaration, the precise number of page requests on that day was 600,569. (*June 3, 2008 McLain Decl.* ¶ 3.)

Similarly, Gary Bonner used RMG's automated devices on May 21, 2007 to make approximately 425,000 requests on Ticketmaster's website.  (*August 24, 2007 McLain Decl.* ¶ 24; *October 5, 2007 McLain Decl.*)  As further clarified in the attached McLain Declaration, the precise number of page requests on that day was 425,451. (*June 3, 2008 McLain Decl.* ¶ 4.)

At $10 per page request after the first 1000 requests, the total damage figure for these two incidents alone is $10,237,200.

**B.    Ticketmaster is Also Entitled to Disgorgement of the Profits RMG Derived By Infringing Ticketmaster's Copyrights.**

RMG is liable for direct and contributory copyright infringement under Ticketmaster's First Claim for Relief.  This infringement was integral both to RMG's development of the automated devices and the use of those devices by RMG's customers.  Whenever one of RMG's automated devices copied a webpage from Ticketmaster's website, a copyright infringement occurred.

Under 17 U.S.C. Sections 504(a)(1) and (b), Ticketmaster can recover the profits that RMG obtained through its direct and contributory infringement of

1   Ticketmaster's copyrights.  RMG's revenues from its infringing activity are at least

2   $8 million, as discussed above.  Ticketmaster is entitled to damages in that amount,

3   except insofar as RMG can establish any offsetting costs.  *See* 17 U.S.C. § 504(b).

4   ## V.    TICKETMASTER IS ENTITLED TO ATTORNEYS' FEES

5           Ticketmaster seeks an award of attorneys' fees pursuant to 17 U.S.C.

6   Section 505 based on its First Claim for Relief for copyright infringement, 17

7   U.S.C. Section 1203(a)(5) based on its Second Claim for Relief for violation of the

8   Digital Millennium Copyright Act, California Penal Code Section 502(e) based on

9   its Fourth Claim for Relief for violation of the California Penal Code Section 502;

10  and 18 U.S.C. Section 1964 based on its Fifth and Sixth Claims for Relief for

11  violation of RICO.

12          In this application, Ticketmaster only seeks fees in accordance with the

13  fee schedule in Local Rule 55-3, which first requires a determination of

14  Ticketmaster's compensatory damages.   Based on the compensatory damages

15  requested by Ticketmaster, the award of fees under the fee schedule would be

16  $368,344.[6]

17  ## VI.   THERE IS NO NEED FOR AN EVIDENTIARY HEARING.

18          The Court need not conduct an evidentiary hearing to enter a default

19  judgment.  "If, in order to enable the court to enter judgment or to carry it into

20  effect, it is necessary . . . to establish the truth of any averment by evidence . . . the

21  court <u>may</u> conduct such hearings or other such references as it deems necessary."

22  F.R.C.P. 55(b)(2) (emphasis added); *see also Dundee Cement Co. v. Howard Pipe*

23  *& Concrete Prod., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983) ("district court did not

24  abuse its discretion in determining that a hearing on the truth of any allegation

25  relating to liability was unnecessary").

26

27  ---
    [6]    Ticketmaster respectfully reserves its right under Local Rule 55-3 to seek actual attorneys' fees upon entry of a default judgment (which, depending on the

28  amount of compensatory damages awarded, may turn out to be unnecessary).

In light of the detailed pleadings and substantial evidence relating to this motion for default judgment, there is ample evidence—and certainty—to enter the requested default judgment without an evidentiary hearing.

## VII.    TICKETMASTER AND IAC HAVE PROVIDED NOTICE OF THIS APPLICATION.

Pursuant to F.R.C.P. Rule 55(b)(2) and Local Rule 55-2, Ticketmaster and IAC have given notice of this application to RMG by mailing a copy of this Notice and Application to the address for RMG that was set forth in the Proof of Service attached to the motion of RMG's former counsel to withdraw as counsel. (*Brown Decl.* ¶ 2.)

## VIII.    CONCLUSION

Ticketmaster and IAC respectfully request that the Court enter a default judgment in their favor and against RMG on Ticketmaster's First Amended Complaint and RMG's Second Amended Counterclaims.  As part of that judgment, Ticketmaster respectfully requests that the Court enter a permanent injunction in the form incorporated into the proposed judgment, and that the Court award Ticketmaster damages in the amount of $18,237,200, attorneys' fees in the amount of $368,344, and allowable costs.

Dated:  June 3, 2008

ROBERT H. PLATT
MARK S. LEE
DONALD R. BROWN
MANATT, PHELPS & PHILLIPS, LLP


By: _____
    Donald R. Brown
    Attorneys for *Plaintiff and Counter-Defendant* TICKETMASTER L.L.C. and *Counter-Defendant* IAC/INTERACTIVECORP

**DECLARATION**

## <u>DECLARATION OF DONALD R. BROWN</u>

I, Donald R. Brown, declare:

1.    I am an attorney admitted to practice before this Court and am a member of the firm of Manatt, Phelps & Phillips, LLP, counsel for plaintiff and counterclaim-defendant Ticketmaster L.L.C. ("Ticketmaster") and counterclaim-defendant IAC/InterActiveCorp ("IAC") in this action.

2.    Notice of the application by Ticketmaster and IAC for entry of a default judgment and permanent injunction was sent under my direction by regular mail on June 3, 2008 to the address for RMG Technologies, Inc. ("RMG") that was set forth in the Proof of Service attached to the motion of RMG's former counsel to withdraw as counsel.  This is the same address for RMG that our firm has used for other transmissions to RMG in the time since RMG's counsel withdrew from the case.

3.    Thomas Prior is a defendant in a related action before this Court, Case No. CV07-2535 ABC (JCx).  A copy of Mr. Prior's interrogatory responses from that action, dated January 16, 2008, is attached hereto as Exhibit 1.  In his responses to Interrogatory Nos. 12 and 13, Mr. Prior stated that he only uses automated devices from RMG.  These responses have not been changed by any supplemental responses by Mr. Prior.

4.    Attached hereto as Exhibit 2 is a copy of an article dated March 26, 2008, in a ticketing industry periodical called TicketNews.  The article is entitled "RMG Technologies claims they are not the bad guys."  In the article, the author explains that he had conducted an "exclusive interview" with "C.J. Garibay, President of RMG Technologies."  The article states that RMG was "generating more than $12 million in annual revenues."

5.    Attached hereto as Exhibit 3 is a transcript prepared by my firm's word processing department of portions of a videotaped interview of C.J. Garibay that was broadcasted on May 13, 2008 on an ESPN news program.

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

41284592.1

During this interview, Mr. Garibay said that RMG's gross sales from ticketing automated devices for the previous year (2007) were $2 million.

6.    Attached hereto as Exhibit 4—but not in the electronically filed copy of this Declaration—is a disc with a copy of the actual footage from the videotaped interview described above in paragraph 5.  The disc contains the same portions that are transcribed in Exhibit 3 hereto.

7.    Because RMG has defaulted in this action, we have not had the opportunity to obtain revenue figures from RMG in discovery.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.  Executed on June 3, 2008 in Los Angeles, California.

DONALD R. BROWN

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41284592.1                                        2

DECLARATION OF DONALD R. BROWN

**EXHIBIT 1**

*[handwritten: 06 2307-156 / A Clip / TM | Prior]*

1  Caryn Brottman Sanders, SBN 175378
   LAW OFFICES OF CARYN SANDERS
2  27240 Turnberry Lane, Suite 200
   Valencia, California 91355
3  (661) 362-0788
   Fax (661) 362-0789
4
   Attorney for Defendant Thomas Prior dba
5  USA Entertainment

6

7

8                    UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  TICKETMASTER L.L.C., Virginia        )  CASE NO.: CV07-2535ABC (JCx)
    limited liability company,           )  Honorable Audrey B. Collins
12                                       )
                                         )
13            Plaintiff,                 )  RESPONSE TO
                                         )  INTERROGATORIES
14       vs.                             )
                                         )
15                                       )
    THOMAS   PRIOR   and   USA           )
16  ENTERTAINMENT,                       )
                                         )
17                                       )
            Defendants.                  )
18  _____    )                ♦

19

20  PROPOUNDING PARTY:        PLAINTIFF TICKETMASTER

21  RESPONDING PARTY:         DEFENDANT THOMAS PRIOR dba USA

22                            ENTERTAINMENT

23  SET NO:                   ONE

24

25       It should be noted that these responding parties have not fully completed the

26  investigation of the facts relating to this case, have not fully completed discovery

27  in this action and have not completed preparation for the trial.  All of the

28  responses contained herein are based only upon such information and documents

1   which are presently available to and specifically known to these responding parties

2   and disclose only those contentions which presently occur to such responding

3   parties.  It is anticipated that further discovery, independent investigation, legal

4   research and analysis will supply additional facts, add meaning to the known facts,

5   as well as establish entirely new factual conclusions and legal contentions, and

6   may discover new or additional documents, all of which may lead to substantial

7   additions to or changes in these responses.

8        The following responses are given without prejudice to responding parties'

9   right to produce evidence of any subsequently discovered fact or facts which this

10  responding parties may later recall, or to produce any subsequently discovered

11  documents.  Responding parties accordingly reserve the right to change any and

12  all responses herein as additional facts and documents are ascertained or

13  discovered, analyses are made, legal research is completed and contentions are

14  made.

15       The responses contained herein are made in a good faith effort to supply as

16  much factual information and documents as are presently known, but should in no

17  way be to the prejudice of these responding parties in relation to further discovery,

18  research, or analysis.

19  **<u>RESPONSES TO INTERROGATORIES</u>**

20  Interrogatory 1:  Identify all persons who acted at your direction or on your behalf

21  in the purchase of any tickets.

22  Response:  None

23

24  Interrogatory 2:  Identify all persons who acted at your direction or on your behalf

25  in the sale or transfer of any tickets.

26  Response:  None

27

28  Interrogatory 3:  Identify every person, including but not limited to brokers or

- 2 -

1  resellers, with whom you communicated regarding Ticketmaster or Tickets

2  Response:  See document production.  No such list is maintained.

3

4  Interrogatory 4:  Describe how you decided which events to purchase tickets for.

5  Response:  Defendant buys what he thinks will sell.

6

7  Interrogatory 5:  Describe how you decided how many tickets to purchase for a

8  particular event.

9  Response:  If an event is selling out all over the country I buy as many as I can, if

10  an event is only selling out half the venue I buy a select few.

11

12  Interrogatory 6:  Identify every occasion on which you purchased tickets, and for

13  each such occasion state the date of purchase, the number of tickets purchased, the

14  purchase price and the name of the event.

15  Response:  Records are not kept in this manner.  See Production responses for

16  related information.

17

18  Interrogatory 7:  Identify every occasion on which you sold tickets to third parties,

19  and for each occasion state the date of sale, the number of tickets sold, the sale

20  price, and the name of the person.

21  Response:  Records are not kept in this manner.  See Production responses for

22  related information.

23

24  Interrogatory 8:  Describe what you did with the monies received from tickets you

25  sold to third parties, including identifying bank accounts to which such funds have

26  been deposited.

27  Response:  All credit cards, cash and checks get deposited in the Citizens Bank-

28  Massachuttes.

1    Interrogatory 9:  Describe your method for accessing Ticketmaster's website and
2    purchasing tickets.
3    Response: Purchase methods are only:  Usually manual purchasing, tbat on certain
4    occasions.
5
6    Interrogatory 10:  Describe all software and/or automated devices you, or anyone
7    acting on your behalf, use or have used to purchase tickets.
8    Response:  Tbat.
9
10   Interrogatory 11:  Identify all persons from whom you, or anyone acting on your
11   behalf, obtained automated devices or software for the purpose of purchasing
12   tickets from Ticketmaster.
13   Response:  RMG
14
15   Interrogatory 12:  Identify the manufacturer of all automated devices and/or
16   software you, or anyone acting on your behalf have used or considered using that
17   can be used to purchase tickets from Ticketmaster.
18   Response:  RMG
19
20   Interrogatory 13:  Identify all persons to whom you transferred automated devices
21   and/or software which can be used to purchase tickets from Ticketmaster or other
22   websites.
23   Response:  None
24
25   Interrogatory 14:  Identify the make model and serial number of all computers and
26   other hardware used to purchase tickets.
27   Response: HP ZE4500, Serial CNF3451Y54
28

-4-

Interrogatory 15: Identify all IP addresses used by you and on your behalf to purchase tickets.

Response: Current IP address - 24.34.108.243

Interrogatory 16: Identify all email addresses used by you or on your behalf to purchase tickets.

Response:   TPRIOR@COMCAST.NET;  PRIORC@COMCAST.NET;
PRIORTJ@COMCAST.NET;  PRIORRT@COMCAST.NET;  PRIORKA@COMCAST.NET
TOMPRIOR@COMCAST.NET

Interrogatory 17: Identify all credit cards that have been used by you or on your behalf to purchase tickets.

Response:   See attached.

Interrogatory 18: Identify all persons who are employed by you or who work on your behalf.

Response: None

Interrogatory 19: Identify and describe your source of funds to buy tickets.

Response: Credit cards

DATED: March 3, 2008                    LAW OFFICES OF CARYN SANDERS

                                        BY: _____
                                        Caryn Brottman Sanders    Attorney
                                        for Thomas Prior dba USA Entertainment

## VERIFICATION

**STATE OF MASSACHUSETTS,**

I have read the foregoing ____Responses to Special Interrogatories____and know its contents.

### Check Applicable Lines

__X____        I am a party to this action. The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, an as to those matters, I believe them to be true.

_____        I am ____ an Officer ____ a Partner____ a _____ of _____ _____ a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ____ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ____ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on ____2/27____, 2008, at Reading, MA.

I declare under penalty of perjury under the laws of the State of MA that the foregoing is true and correct.

_____
Tom Prior

## PROOF OF SERVICE

**STATE OF CALIFORNIA**      )
                             ) ss:
**COUNTY OF LOS ANGELES**    )

 I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is: **27240 Turnberry Lane, Suite 200, Valencia, California  91355**

 On **March 4, 2008,** I served the foregoing document described as **Response to Interrogatories** on all interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, and addressed as follows:

Alison Sultan, Esq.
Manatt Phelps & Phillips LLP
11355 West Olympic Blvd.
Los Angeles, California  90064

 **(X) BY MAIL.**  I caused such envelopes to be deposited in the mail.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on the same day with postage thereon, fully prepaid, at Los Angeles, California in the ordinary course of business.

 I declare that I am a member of the bar of this court.

 Executed on this **4th** day of **March, 2008** at Valencia, California.

Caryn Brottman Sanders

**EXHIBIT 2**

Case 2:07-cv-02534-ABC-JC    Document 124    Filed 06/03/08    Page 44 of 51    Page ID #:661

Get in the know with **TICKET** *news*

| Home | Rankings | Industry Resources | About Us |

Home

# RMG Technologies claims they are not the bad guys

Wed, Mar 26th 2008 10:32 am EST
By Brian Thompson



In the wake of the **Hannah Montana ticket fiasco**, fingers have been pointed in various directions as people look for answers. But, one company has emerged as the villain, Pittsburgh-based **RMG Technologies**, whose software gives ticket brokers the ability to quickly navigate the **Ticketmaster** website and snatch up blocks of tickets as they go on sale.

And, therein lies the problem for some, the ability of brokers to buy lots of tickets at a clip, making it difficult, if not impossible in some cases, for the general public to get a crack at those same tickets. Numerous state politicians and attorneys general are **considering legislative action** in the wake of the Hannah Montana concert tour to ban the use of RMG's software.

In an exclusive interview with TicketNews, C.J. Garibay, President of RMG Technologies, said that his company is being made a scapegoat for the practices of Ticketmaster and other companies, and that nothing RMG has done has violated the Digital Millennium Copyright Act (DMCA).

"We expected Ticketmaster to adapt their software to lock us out any day after we rolled out our program. But few days turned into a few months, which turned into a years," Garibay said. The two sides are locked in a legal battle, and in October, Ticketmaster **won an injunction against RMG** to prevent them from using and distributing their software.

Garibay is confident that RMG will be triumphant in court, if not in the mind of the public. "Once all of the facts are known, I have no doubt that we will win our lawsuit." To him there was no question, to the best of Garibay's knowledge, RMG has at no point broken any laws.

In the beginning, like a lot of other companies, RMG started on a whim. About six years ago, Garibay was turning in his rent to his landlord, and noticed that the landlord's office was also being used to run a ticket brokerage. Sensing an opportunity, he developed software to enable ticket brokers to more easily navigate Ticketmaster's website. This simple idea would lead to RMG growing, at its peak, to become a 12 person team generating more than $12 million in annual revenues.

Garibay created a unique web browser to circumvent the cookies on Ticketmaster's website, cookies that prevented a broker from monitoring multiple events in multiple browsers. When Ticketmaster countered this solution with captchas which forced individuals browsing the website to enter in letters from an image to browse a page, RMG found a new solution.

Rather than create software "bots" which could enter the required captchas, RMG outsourced the captcha typing to workers in India. Thus, a single broker using RMG's software could not purchase an infinite number of tickets, but could realistically "browse the website as fast as perhaps 15-20 users. This is fair because plenty of people ask their friends to log on to Ticketmaster to help them make sure they are able to buy tickets to an event."

Garibay expected Ticketmaster to realize what RMG was doing and adapt their code to keep the company's software from working, but they didn't. RMG provided its services to brokers for $1,000 per month. They did not go into business as ticket brokers themselves, Garibay said, because RMG was a technology company, not a ticket brokerage. Its software is not the instant cash machine that Ticketmaster alleges.

In fact, Garibay feels that Ticketmaster is using them as a scapegoat to cover for their own activities in the secondary ticket market. Front row seats to the Hannah Montana concert went directly to Ticketmaster's resale service, and as prices soared for Hannah Montana tickets, Ticketmaster actually put a halt to one of its own auctions.

While the current injunction blocks RMG only from working on Ticketmaster's website, Garibay said the company is continuing to move forward; RMG is already developing software for the efficient navigation of other ticketing websites besides Ticketmaster.

When asked about the future of ticketing, Garibay sees the role of technology will continue to expand. "Technology will be the most important driving force in the ticket industry. Tickets on cell phones, more efficient ticket selling websites technology will continue to get better in the industry."

The "fat, dumb, and lazy" companies of the world like Ticketmaster will be put under pressure to step up their efforts to create technological innovation, as RMG is developing its own ticketing software with which to beat Ticketmaster at its own game.

However, waiting for that to happen could be for quite some time. RMG has filed an appeal against Ticketmaster's primary injunction, and the two sides will have their full trial in October. RMG is confident that it did not violate the DMCA, nor does it have an army of ticket grabbing bots, Garibay claimed. Lacking RMG's solution, Garibay believes that his clients will still browse the website through more than one person; cheap outsourcing options remain in India and Mexico.

SHARE

♀ Add new comment    ✉ Email this page    ◆ ◘   Rate this story!

**EXHIBIT 3**


**E: 60-Ticketmaster**
**(6.2.08)**

| | |
|---|---|
| Announcer: | This is the hottest ticket in Cleveland. And these are the best seats. And you are not in them. But outside this venue and others across the country this is where you have always been able to buy tickets to sold-out games – for a price. |
| Scalper 1: | Who needs tickets? Anyone need tickets? Need tickets? Anyone got extra tickets? |
| Announcer: | It's scalping. The free market at its finest, some say. Now perfectly legal in 40 states. |
| Scalper 2: | $350 a piece for 'em. |
| Announcer: | This 3 billion dollar industry has taken a 21st century turn: from the street to the computer. Where scalpers are now called ticket brokers. |
| Scalper 3: | Who needs tickets? |
| CJ Garabay | It's, you know, somebody who buys and resells tickets. You know, it's a kind of a speculator. |
| Announcer: | 34-year old CJ Garabay, a software engineer and owner of RMG Technologies in Pittsburgh, is a ticket broker's dream. |
| CJ Garabay | Have you been putting this, uh, data in here? |
| Announcer: | All because four years ago he discovered his landlord was running a scalping operation and he saw an opportunity. |
| CJ Garabay | [...] Major League Baseball, through Tickets.com. |
| | They were a bit behind the times. They were a bit antiquated. They were still using older technologies and they weren't quite up to the 20th century, so to speak. |
| Announcer: | Like people standing in line, or like what were the methods they were using? |
| CJ Garabay | That's, that's one method. But having people stand in line or people call in on the phone to get tickets, that's kind of antiquated. |
| Announcer: | Garabay created software that allowed brokers to make up 600,000 ticket requests a day. Ticketmaster, the nation's largest primary seller of tickets, says Garabay's software inundated their computers and prevented ordinary customers from accessing their website, while brokers were buying hundreds of tickets almost immediately after they went on sale. Ticketmaster thought the brokers were cheating, so it found a way to stop automation. It's an on screen code called CAPTCHA. |
| Announcer: | In ballpark figure, how much money you've made from this software? |
| CJ Garabay | It wasn't that much. I mean, I think in 2007 we broke the two million mark in gross sales. |

41284650.1

**EXHIBIT  4**

# CD MANUALLY FILED IN ACCORDANCE WITH GENERAL ORDER 08-02 AND LOCAL RULE 5-4

**DECLARATION**

# DECLARATION OF KEVIN McLAIN

I, Kevin McLain, declare:

1.     I am the Vice President of Applications Support for Ticketmaster L.L.C. ("Ticketmaster"), and I have worked for Ticketmaster for approximately eleven years. As Vice President, I am responsible for the day-to-day uptime, maintenance, performance and availability of Ticketmaster's website, www.ticketmaster.com. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify to the facts contained in this declaration.

2.     In the time since the preliminary injunction in this case was entered in October 2007, the volume of automated devices accessing Ticketmaster's website has declined, but there nonetheless continues to be regular and frequent use of automated devices on the website. In fact, recently, on May 13, 2008, Thomas Prior, who is known to be a customer of RMG Technologies, Inc. ("RMG"), made 917 requests on Ticketmaster's website from a single IP address in one hour. From my knowledge of the Ticketmaster website and user interface, I am confident that this number of requests could only have been achieved through the use of an automated device.

3.     In my previous declarations dated August 24, 2007 and October 5, 2007, I described how I reached the conclusion that, on May 26, 2007, Thomas Prior had used RMG's automated devices to make approximately 600,000 requests on Ticketmaster's website. Ticketmaster's records for that day show that the precise number of page requests made by Mr. Prior on that day was 600,569.

4.     Similarly, in my previous declarations dated August 24, 2007 and October 5, 2007, I described how I reached the conclusion that, on May 21, 2007, Gary Charles Bonner had used RMG's automated devices to make approximately 425,000 requests on Ticketmaster's website. Ticketmaster's records

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41284570.3

1    for that day show that the precise number of page requests made by Mr. Bonner on

2    that day was 425,451.

3        5.     At the time Ticketmaster moved for a preliminary injunction in

4    2007, and as described in support of Ticketmaster's motion for preliminary

5    injunction, Attorneys General in Missouri and Arkansas had launched

6    investigations into Ticketmaster's distribution of tickets for the Hannah Montana

7    concerts. I am aware that, since that time, other states have also been in contact

8    with Ticketmaster regarding possible investigations into ticket distribution issues

9    created by the use of automated devices.

10

11        I declare under penalty of perjury under the laws of the United States

12    of America that the forgoing is true and correct. Executed on June 3, 2008 in West

13    Hollywood, California.

14

15

16                                KEVIN McLAIN

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41284570.3                        2

DECLARATION OF KEVIN McLAIN